**Court of Appeal No. 23-55726**

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ELECTION INTEGRITY PROJECT CALIFORNIA, INC., *et al.*,

*Plaintiffs-Appellants*,

*vs.*

SHIRLEY WEBER, *et al.*,

*Defendants-Appellees*

_____

*Appeal from the Order of the United States District Court for the Central District of California,*

*Case No. 2:21-cv-00032-AB-MAA
The Honorable André Birotte Jr., District Judge*

_____

**APPELLANTS' OPENING BRIEF**

_____

ADVOCATES FOR FAITH &
FREEDOM
Mariah Gondeiro, Ca Bar No. 323683
mgondeiro@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Tel: (951) 600-2733

*Counsel for Appellants Election Integrity
Project California, Inc. et al.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant, Election Integrity Project California, Inc., certifies that it is not publicly held and has no corporate parents, subsidiaries, or affiliates that are publicly held and own 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................... ii

I.     INTRODUCTION .............................................................................. 1

II.    JURISDICTIONAL STATEMENT ......................................................... 3

III.   ISSUES PRESENTED ......................................................................... 3

IV.   STATEMENT OF THE CASE ............................................................... 3

     A.    BACKGROUND ......................................................................... 3

          1.    The Integrity Of California's Elections Has Been Systemically Undermined Through Decades Of Laws And Regulations ...................... 3

          2.    California's Voting Laws, Regulations, And Procedures Lead To Pervasive Irregularities ............................................................. 7

     B.    PROCEDURAL HISTORY ........................................................... 10

V. SUMMARY OF THE ARGUMENT ..................................................... 11

VI. STANDARD OF REVIEW ............................................................... 12

VII. ARGUMENT ............................................................................... 13

     A.    APPELLANTS HAVE ALLEGED THAT APPELLEES' LAW, REGULATIONS, AND PROCEDURES BURDEN APPELLANTS' RIGHT TO VOTE ......................................... 13

     B.    APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE EQUAL PROTECTION CLAUSE ............................................................... 17

          1.    Vote dilution can occur through vote aggregation or vote cancellation or negation. ........................................................ 18

          2.    Appellants have alleged that California lacks uniform and secure voting laws, diluting the votes of citizens in certain counties, including Appellants. ............................................................ 20

          3.    Appellants have alleged that Appellees' voting laws, regulations, and practices disadvantage in-person and minority voters. .................. 22

     C.    APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE DUE PROCESS CLAUSE .... 25

     D.    THE LOWER COURT IMPROPERLY DISMISSED THE CASE WITHOUT LEAVE TO AMEND. .............................................................................. 29

VIII. CONCLUSION ........................................................................... 30

STATEMENT OF RELATED CASES ...................................................... 31

CERTIFICATE OF COMPLIANCE ........................................................ 32

CERTIFICATE OF SERVICE ............................................................... 33

i

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ........................................................................................13

*Anderson v. United States,*
    417 U.S. 211 (1974) ..........................................................................................1

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................12

*Black v. McGuffage,*
    209 F. Supp. 2d 889 (N.D. Ill. 2002) ..............................................................19

*Burdick v. Takushi*
    504 U.S. 428 (1992) ........................................................................................13

*Bush v. Gore,*
    531 U.S. 98 (2000) .................................................................................. passim

*Carrington v. Rash,*
    380 U.S. 89 (1965) ............................................................................................1

*Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones,*
    213 F. Supp. 2d 1106 (C.D. Cal. 2001) ..........................................................20

*Curry v. Baker,*
    802 F.2d 1302 (11th Cir. 1986) ......................................................................27

*Dougherty v. City of Covina,*
    654 F.3d 892 (9th Cir. 2011) ..........................................................................29

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) ........................................................................................25

*Election Integrity Project California, Inc. v. Weber,*
    No. 21-56061, 2022 WL 16647768 (9th Cir. Nov. 3, 2022) ...........................10

*Gamza v. Aguirre,*
    619 F.2d 449 (5th Cir. 1980) .................................................................... 27, 29

*Gray v. Sanders,*
    372 U.S. 368 (1963) .................................................................................. 18, 25

*Harper v. Virginia Bd. of Elections,*
    383 U.S. 663 (1966) ........................................................................................25

*League of Women Voters of Kansas v. Schwab,*
    525 P.3d 803 (2023) ....................................................................................1, 20

*League of Women Voters of N.C. v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) .......................................................... 2, 11, 12, 24

*Miller v. Rykoff-Sexton, Inc.,*
    845 F.2d 209 (9th Cir. 1988) ..........................................................................30

*Moore v. Ogilvie*,
   394 U.S. 814 (1969) ................................................................. 1, 18, 19
*Reynolds v. Sims*,
   377 U.S. 533 (1964) ................................................................. 1, 17, 25
*Roman v. Sincock*,
   377 U.S. 695 (1964) ................................................................. 17
*Short v. Brown*,
   893 F.3d 671 (9th Cir. 2018) ................................................... 15, 16
*Soules v. Kauaians for Nukolii Campaign Comm.*,
   849 F.2d 1176 (9th Cir. 1988) ................................................. 25, 26
*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*,
   368 F.3d 1053 (9th Cir. 2004) ................................................. 30
*Thompson v. Paul*,
   547 F.3d 1055 (9th Cir. 2008) ................................................. 12
*United States v. Classic*,
   313 U.S. 299 (1941) ................................................................. 25
*United States v. Corinthian Colleges*,
   655 F.3d 984 (9th Cir. 2011) ................................................... 29
*Wesberry v. Sanders*,
   376 U.S. 7 (1964) ..................................................................... 25
*WMCA, Inc. v. Lomenzo*,
   377 U.S. 633 (1964) ................................................................. 17
*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
   135 F.3d 658 (9th Cir. 1998) ................................................... 12, 13, 14, 24
*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ................................................................. 25

**Statutes**

28 U.S.C. § 1291 ........................................................................ 3, 4, 5
28 U.S.C. § 1331 ........................................................................ 3
28 U.S.C. § 1343 ........................................................................ 3
42 U.S.C. § 1983 ........................................................................ 3
California Elections Code section 3019 ..................................... 5, 14
California Elections Code section 3020 ..................................... passim

**Regulations**

2 California Code of Regulations

    Section 20960....................................................................... 5, 6, 28

    Section 20962...............................................................................14

    Section 20991.................................................................................6

    Sections 20980-20985.............................................................. 14, 28

# I. INTRODUCTION

No right is more sacred than the right to vote, as it involves "matters close to the core of our constitutional system." *Carrington v. Rash*, 380 U.S. 89, 96 (1965). "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974). "[T]he State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Even without a suspect classification or invidious discrimination, the right to vote "can be denied by debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

Voting rights cases often involve actual classifications by the government to treat groups of people differently than others. *See, e.g., Moore v. Ogilvie*, 394 U.S. 814 (1969). Courts have found equal protection and due process violations when state law authorizes uneven and precarious vote counting procedures. *See, e.g., Bush*, 531 U.S.; *League of Women Voters of Kansas v. Schwab*, 525 P.3d 803 (2023), review granted (June 23, 2023).

1

Appellants Election Integrity Project California, Inc. ("EIPCa"), James Bradley, Mark Reed, Buzz Paterson, Michael Cargile, and Ronda Kennedy allege that California lacks uniform vote counting procedures, inherently disadvantaging voters in certain counties. Appellees'[1] laws, regulations, and practices also dilute the votes of in-person voters, including Appellants who reside in specific counties and minority voters who historically prefer to vote in person. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 245-46 (4th Cir. 2014).

Appellants' allegations do not amount to garden variety irregularities but represent a pattern of practice. For years, California's laws have enabled uneven practices regarding signature verification, ballot remaking, and the maintenance of voter rolls. Appellants allege these practices led to the counting of ineligible ballots in the counties that Appellee County Registrars oversee.

Appellants have alleged sufficient facts demonstrating that the challenged state-authorized system does not afford the "equal dignity owed to each voter." *Bush*, 531 U.S. at 104. This Court should therefore reverse or vacate the lower court's decision to dismiss Appellants' lawsuit for failure to state a claim and remand for further proceedings.

---

[1] Appellees include California Secretary of State Shirley Weber, California Attorney General Rob Bonta, and fifteen county registrars in California (collectively, "Appellee County Registrars").

2

## II.   JURISDICTIONAL STATEMENT

The lower court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Appellants' claims arise under the United States Constitution, and pursuant to 28 U.S.C. § 1343 because relief is sought under 42 U.S.C. § 1983. On August 17, 2023, Appellants filed a timely Notice of Appeal (ER 222-24) of the lower court's August 15, 2023 Judgment (ER 3) and July 18, 2023 Order Granting Defendants' Motions to Dismiss. ER 4-38. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## III.   ISSUES PRESENTED

1.      Whether Appellants have alleged sufficient facts demonstrating that Appellees' election laws, regulations, and procedures violate the Equal Protection Clause?

2.      Whether Appellants have alleged sufficient facts demonstrating that Appellees' election laws, regulations, and procedures violate the Due Process Clause?

## IV.   STATEMENT OF THE CASE

### A.   BACKGROUND

### 1.   The Integrity Of California's Elections Has Been Systemically Undermined Through Decades Of Laws And Regulations

For the past three decades, California has passed a series of laws and regulations that have the cumulative effect of undermining election integrity. ER 48.

3

In 1998, California eliminated absentee ballots, which is more secure than universal VBM because it requires voters to present identification and apply for a ballot. ER 49. Then, in 2002, after Congress passed the Help America Vote Act to require statewide voter databases, California was one of the last states to come in compliance in 2016, and, even then, Appellant EIPCa reported serious and potentially disqualifying defects in the database. ER 49-50.

In 2012, California passed Senate Bill ("SB") 397 (Stats. 2011, Chap. 561), "allowing online voter registration without effective controls against ineligible registrations." ER 50. Within a month, 6,080 duplicate registrations were recorded in just nine counties. *Id.* Over one-hundred individuals voted twice in the November 2012 election. *Id.*

In 2016, California passed the Voter's Choice Act, which eliminated neighborhood precinct voting, sent VBM ballots to every registered voter, and eliminated the requirement that in-person voters who received a VBM ballot surrender the ballot and clearly mark it as surrendered. *Id*. That same year, California passed Assembly Bill ("AB") 1921, "allowing an unlimited number of VBM ballots to be turned in by anyone, regardless of relationship to the voter." *Id.* This bill also eliminated chain of custody and legalized wholesale ballot harvesting/ballot trafficking. *Id.* Ballot harvesting was further enabled by AB 306, which prohibits

disqualification of a ballot even if the person returning it does not identify their name, relationship to the voter, or signature. ER 51.

On June 18, 2020, California passed AB 860, which directed counties to send a VBM ballot to every active-status voter. ER 52. Millions of ballots were sent to every active voter for the 2020 election with no chain of custody. *Id.* "EIPCa data research shows that hundreds of thousands of ballots were sent to the last known address of individuals showing no electoral activity for 12-40 years." *Id.*

On September 28, 2020, former Secretary of State Alex Padilla adopted new emergency regulations which gutted the signature verification process. *Id.* California readopted the regulations in 2021 and 2022. *Id.* In 2021, California codified the emergency regulations into law, as reflected in California Elections Code section 3019 and SB 503. ER 53.

The regulations lack uniform and robust vote counting procedures. ER 52. For instance, the regulations allow the comparison of signatures to begin with the presumption that the signature on the petition or ballot envelope is the voter's signature. ER 52-53. Section 3019 does not require election officials to find an exact match either. ER 53. Neither section 3019 nor 2 California Code of Regulations ("CCR") section 20960 requires election workers to satisfy a specific number of points of comparison when evaluating signatures. *Id.* Examples of points of comparison include: "the slant of the signature, whether the signature is cursive; the

size, proportions, or scale of the signature; individual characteristics such as how the t's are crossed or how the i's are dotted; line direction; spacing between letters; and letter formations." *Id.*

Subsection (g) of section 20960 justifies the finding of a favorable comparison (i.e. match) of two signatures that clearly do not match under the theory that the "voter's signature style may have changed over time." *Id.* When combined with the "beyond the reasonable doubt standard" in subsection (j) of section 20960, election officials can justify "the acceptance of virtually any signature on a VBM ballot return envelope, again, without subjecting clearly mis-matching signatures to the safeguard of the curing process." ER 53-54. The adopted regulations also nullify rejections based on signature recognition technology, "requiring the election workers evaluate any rejection manually under the virtually nonexistent standards of 2 CCR § 20960." ER 54.

The regulations also require election officials to accept VBM envelopes with no indication that the ballot was cast on or before election day, as reflected in subsection (b)(8) of 2 CCR section 20991. ER 55. California Elections Code section 3020 also requires election officials to count ballots up to seven days after election day, even if the officials cannot reliably determine that the VBM ballot was cast on or before election day. *Id.*

Neither California's laws nor regulations require counties to apply the same standard when determining the intent of a voter during the ballot remaking process. ER 64. For instance, "[s]ome counties use machine technology while other counties use arbitrary manual standards or a hybrid model." *Id.*

### 2. California's Voting Laws, Regulations, And Procedures Lead To Pervasive Irregularities

Over the past few years, EIPCa received thousands of incident reports signed under penalty of perjury demonstrating that EIPCa observers were obstructed from observing the processing of votes. ER 59. Some observers were relegated to remote video access which precluded their ability to determine whether election officials were following verification procedures. *Id.*

Despite the obstacles imposed by Appellee County Registrars on EIPCa-trained observers, EIPCa has collected thousands of incident reports signed under penalty of perjury, revealing, among other things, that county election officials did not apply uniform and secure ballot processing procedures. *Id.*

Counties like Solano County apply robust signature verification procedures. *Id.* County officials conduct an initial review of all signatures with a machine, and then they look for more than three points of comparison. *Id.* "Any rejected signature gets at least three reviews, including by a machine, line staff, and supervisor." *Id.* Placer County applies at least three points of comparison, and "[t]he signature

verification process is slow, in-depth, and methodical." *Id.* Thus, "citizens in these counties did not report incidents of election workers approving ballots that did not match the signatures on file." *Id.*

Appellee County Registrars implemented inadequate procedures. *Id.* "As massive numbers of VBM ballots flooded vote counting centers, their signatures were visually checked at the rate of one signature pair every one to four seconds." *Id.* In some instances, "four signature comparisons were conducted simultaneously using images projected on computer monitors, at the rate of one to four seconds per screen." *Id.*

Because California does not require county officials to calibrate their machines to a specific error rate, some counties, like Los Angeles County, use a higher error rate, resulting in more mis-matched signatures. ER 64, 66-67. Overall, Appellee County Registrars' inadequate procedures resulted in election officials approving mis-matched signatures and even ballots with no signatures. ER 64.

In Contra Costa County, a voter had his ballot envelope signed by another person with a different name and the county accepted the signature without conducting signature matching during the 2020 election. ER 65. Similarly, in 2021, election workers accepted ballots even though the signature on the ballot did not match the signature on file. *Id.* The same pattern transpired during the 2020 and 2021 elections in Los Angeles County. ER 66-67. In Sacramento County, an observer saw

an "x" marked for both candidates, but the adjudicators concluded, without evidence, the voter had just changed his or her mind. ER 68-69.

The irregularities are the result of universal VBM and the current regulatory scheme governing signature verification and ballot remaking. ER 71. "[T]he same issues that transpired in 2020 continued in 2021 and 2022 with roughly the same rate of incident reports." *Id.*

In addition to irregularities across counties, in-person voters were subject to unequal treatment compared to VBM voters. ER 71-72. California Elections Code section 3020 requires counties to accept VBM ballots up to seven days after election day, even if election workers cannot reliably determine when the ballot was cast, disproportionately affecting in-person voters. *Id.*

In 2020, EPICa identified hundreds of thousands of ineligible registrants on the voter rolls and even warned former Secretary of State Padilla of these discrepancies. ER 56-57. After the election, EIPCa collected information revealing that around 596 Nevadans voted in the counties managed by Appellee County Registrars. ER 72. EIPCa's research also revealed that 180 individuals voted in both Nevada and California, and 72 deceased individuals voted in California. *Id.* "Almost 124,000 more votes were counted in the 2020 election than registrants with voting histories for that election." *Id.* Appellee County Registrars in "Kern County, Riverside County, Orange County, and Los Angeles County recorded higher

discrepancies by percentage between VBM votes counted and VBM registrants with voting histories than non-defendant counties like Butte County and Glenn County." *Id.*

The irregularities are the result of universal VBM and Appellee County Registrars not maintaining adequate voter rolls. *Id.* "[T]hese patterns and practices have continued through 2021 and 2022." *Id.* Indeed, in 2018, EIPCa entered into a settlement with Los Angeles County Registrar and former Secretary of State Padilla, which required the removal of 1.5 million inactive registrants from the voter rolls. ER 49.

## B.  PROCEDURAL HISTORY

On September 23, 2022, this Court heard Appellants' appeal of the lower court's order granting Appellees' motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Election Integrity Project California, Inc. v. Weber*, No. 21-56061, 2022 WL 16647768 (9th Cir. Nov. 3, 2022). This Court found that Appellant EIPCa had organizational standing and remanded the case back to the lower court for further proceedings. *Id.*

On February 21, 2023, Appellants filed a second amended complaint ("SAC"). ER 39-78. Appellees filed motions to dismiss the SAC under both Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. ER 79-156. The lower court refused to readdress Appellees' motions under 12(b)(1), but granted

Appellees' motions under 12(b)(6), finding Appellants did not state a claim for relief under either the Equal Protection Clause or the Due Process Clause. ER 4-38.

## V. SUMMARY OF THE ARGUMENT

Appellants' claims are supported by Supreme Court precedent. Indeed, if this Court were to find Appellants' equal protection or due process claims were not viable, it would render *Bush* a dead letter. *Bush* clearly establishes that vote dilution is not limited to malapportionment or state reapportionment cases but occurs any time a state-sanctioned system increases the chances that a portion of the electorate will have their votes diluted. 531 U.S. at 109, 125.

Appellants state a claim for relief under the Equal Protection Clause because they allege that Appellee County Registrars' disparate practices regarding signature verification, ballot remaking, and the maintenance of voter rolls inherently leads to uneven results across counties. Appellants also allege that Appellees' laws, regulations, and procedures disadvantage in-person voters. California law grants VBM voters more time to cast their ballot, and Appellee County Registrars do not consistently remove ineligible registrants, which has enabled the counting of ineligible VBM ballots. The dilution of in-person voters disproportionately burdens minority voters who have historically preferred to vote in person. *See League of Women Voters of N.C.*, 769 F.3d at 245-46.

Appellants state a claim for relief under the Due Process Clause because the alleged irregularities that have transpired over the years represent a pattern of practice, not a temporary or accidental machine malfunction. Since California gutted signature verification requirements and solidified VBM, EIPCa has received more incident reports demonstrating that election officials do not adequately vet VBM ballots. ER 71. The irregularities that transpired in 2020 continued with the same frequency in 2021 and 2022. *Id.* Appellee County Registrars have also failed to remove ineligible voters from the voter rolls for at least a decade. ER 50, 52, 57, 72.

For these reasons, the lower court's decision is erroneous, and this Court should remand the case back for further proceedings.

## VI.  STANDARD OF REVIEW

A dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed de novo. *Thompson v. Paul*, 547 F.3d 1055, 1058 (9th Cir. 2008). In considering a motion to dismiss under Rule 12(b)(6), "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). If a complaint alleges enough facts to state a claim for relief that is plausible on its face, a complaint may not be dismissed for failing to allege additional facts that the plaintiff would need to prevail at trial. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Federal Rule of Civil Procedure 8(a)(2) requires a

complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

## VII.   ARGUMENT

### A.   APPELLANTS HAVE ALLEGED THAT APPELLEES' LAW, REGULATIONS, AND PROCEDURES BURDEN APPELLANTS' RIGHT TO VOTE

In *Burdick v. Takushi*, the Supreme Court established that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." 504 U.S. 428, 434 (1992). "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). However, strict scrutiny applies when state election laws "are subjected to 'severe' restrictions." *Id.* (citation omitted).

The lower court incorrectly found that the challenged laws, regulations, and procedures were generally applicable. ER 19-20. In doing so, it failed to comprehend the nature of Appellants' claims and improperly gave greater weight to Appellees' arguments than Appellants' allegations, which must be accepted as true on a motion to dismiss. *See Wyler Summit P'ship*, 135 F.3d at 661.

13

The lower court concluded that universal VBM does not burden Appellants' right to vote because it expands "the methods by which people may vote as well as to ensure that all ballots or signatures are not rejected for arbitrary reasons." ER 19. The lower court also found that the regulations provided sufficient standards for the processing of ballots without addressing Appellants' concerns with the current regulatory scheme. *Id.*

Appellants do they challenge Appellees' motives. Thus, Appellees' reasons for expanding universal VBM are immaterial. ER 19-20. Appellants challenge a combination of laws, regulations, and procedures which, taken together, create a system that disproportionately impacts voters in specific counties. ER 63-72.

As to ballot processing, Appellants allege that there are no consistent means of assessing signatures and the intent of a voter. ER 63-64. Neither California Elections Code section 3019, 2 CCR sections 20960-20962, nor sections 20980-20985 require election officials run ballots through a machine, calibrate their signature verification rate to a specific error rate, or apply a specific number of points of comparison. ER 63-64, 71. California also gives election workers wide discretion when determining the intent of the voter during the duplication process. *See* 2 CCR §§ 20980-20985. The lower court improperly ignores these facts and fails to apply them to its decision.

The lower court also overlooks Appellants' allegations regarding the disparate treatment of in-person voters. For instance, California Elections Code section 3020 allows counties to accept VBM ballots after election day if they cannot reliably determine that they were cast on or before election day. ER 71-72. Appellants also allege that universal VBM and Appellees' inadequate maintenance of the voter rolls disproportionately impacts in-person voters. ER 72. Past elections have shown that counties like Los Angeles County and Orange County counted ineligible VBM ballots because they did not maintain accurate voter rolls. *Id.*

For these reasons, this Court's decision in *Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) is not analogous, contrary to the lower court holding otherwise. ER 19. In *Short*, the plaintiffs challenged California's Voter Choice Act passed in 2018 because it permitted voters in some counties to receive an automatic VBM ballot, while requiring voters in other counties to register before receiving a VBM ballot. *Id.* at 677. The Ninth Circuit found that having to register to receive a ballot was an "extremely small" burden and chose not to preliminary enjoin the Act. *Id.* at 677-80.

*Short* is distinguishable because, among other reasons, it involved a motion to preliminary enjoin a bill while this case involves a motion to dismiss. This distinction is critical because unlike the standard on a motion for preliminary injunction, this Court can only consider the allegations in Appellants' complaint. Whether the challenged laws, regulations, and procedures burden Appellants is an

issue of fact not suitable for resolution on a motion to dismiss. Appellants' allegations easily survive Rule 8 of the Federal Rules of Civil Procedure's minimal pleading standard.

Appellants allege that several counties like Santa Clara County, Orange County, and Riverside County did not compare signatures using multiple points of comparison or rushed through the signature verification process. ER 63-66. In some cases, election workers counted ballots when the signatures did not match. *Id.* Los Angeles County calibrated their machine to such a rapid speed that it flagged few ballots, "despite observers noting clear discrepancies in the signatures." ER 66-67. In 2020, EIPCa reported that Kern County, Riverside County, Orange County, and Los Angeles County reported higher discrepancies by percentage "between VBM votes counted and VBM registrants with voting histories than non-defendant counties like Butte County and Glenn County." ER 72. Appellants allege that these irregularities are the result of universal VBM, the California regulations, and the inadequate maintenance of voter rolls. ER 71-72. Thus, the election laws and procedures were not uniform and generally applicable but rather enabled uneven practices across counties, diluting the votes of specific voters based upon where they reside and how they vote.

**B.** **APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE EQUAL PROTECTION CLAUSE**

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote…." *Reynolds*, 377 U.S. at 554. "The conception of political equality … can mean only one thing – one person, one vote…." – "[t]he idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions." *Id.* at 558 (internal citations omitted).

The law does not require the actual curtailment of the right to vote to trigger strict scrutiny. "[T]he right to suffrage can be denied by the debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. The Equal Protection Clause prohibits government officials from implementing an electoral system that gives the votes of similarly situated voters different effect based on the happenstance of the county or district in which those voters live. *See, e.g., Roman v. Sincock*, 377 U.S. 695, 707-12 (1964); *WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 653 (1964) (state apportionment scheme "cannot, consistent with the Equal Protection Clause, result in a significant undervaluation of the weight of the votes of certain of a State's citizens merely because of where they happen to reside").

17

Appellants allege multiple vote dilution theories giving rise to an equal protection violation. First, Appellants allege Appellee County Registrars implemented different election rules and practices, thereby disadvantaging voters in certain counties. Second, and as a corollary to the first argument, Appellants allege that in-person voters were subject to unequal treatment compared to VBM voters.

### 1.    Vote dilution can occur through vote aggregation or vote cancellation or negation.

As a threshold matter, the lower court's suggestion that vote dilution only applies in state reapportionment cases is myopic. ER 21-24. Although vote dilution originated through state reapportionment cases in the civil rights era, vote dilution occurs whenever voters are treated differently based upon where they live and/or how they vote.

In *Gray v. Sanders*, the Supreme Court found that Georgia's county unit system weighted rural votes more heavily than urban votes and weighted some rural counties more heavily than other larger rural counties. 372 U.S. 368, 379 (1963). The disparate treatment of voters in various counties violated the Equal Protection Clause. *Id.* at 381.

Similarly, in *Moore*, the Supreme Court found that Illinois's county-based procedure for nominating presidential candidates diluted the votes of citizens in larger counties, leading to due process and equal protection violations. 394 U.S. at

819. The Court observed that "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Id.*

The Supreme Court relied on the principles outlined in *Gray* and *Moore* when determining Florida's recount system for the 2000 presidential election did not pass constitutional muster. *Bush*, 531 U.S. at 107. In *Bush*, the record revealed that the counties applied different standards in defining a legal vote. *Id.* at 106. Even though the dissent noted that the Supreme Court had not addressed the constitutionality of disparate vote counting procedures, the majority found that this distinction did not preclude a finding of an equal protection violation. *Id.* at 109, 125 (Stevens, J., dissenting) ("[W]e have never before called into question the substantive standard by which a State determines that a vote has been legally cast.")

*Short* does not conflict with *Bush*. ER 23-24. There, plaintiffs simply argued that California voters were treated differently based on their county of residence. *Short*, F.3d at 678. There was no evidence that the counties implemented substandard or disparate vote counting procedures disproportionately harming voters in specific counties. *Id.*

Courts have applied the holding in *Bush* to uneven and substandard election systems. *See, e.g., Black v. McGuffage*, 209 F. Supp. 2d 889, 898-99 (N.D. Ill. 2002) (holding that plaintiffs had stated an equal protection claim where they alleged that

19

votes in some counties were statistically less likely to be counted than votes in other counties); *Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones*, 213 F. Supp. 2d 1106, 1108–10 (C.D. Cal. 2001) (holding plaintiffs stated an equal protection claim because some counties adopted more reliable voting procedures than others); *League of Women Voters of Kansas*, 525 P.3d at 828 (holding plaintiffs stated an equal protection claim because the signature verification statute contains no uniform standards to determine what constitutes a signature match).

In sum, *Bush* is not an outlier in vote dilution jurisprudence. *Bush* and its progeny demonstrate that votes can carry less weight and give rise to an equal protection violation whether they are marred by fraud, gerrymandering, or malapportionment.

**2.** **Appellants have alleged that California lacks uniform and secure voting laws, diluting the votes of citizens in certain counties, including Appellants.**

Appellants' equal protection claim finds support in *Bush*. The lower court incorrectly held that *Bush* is distinguishable because it "dealt with an election *recount* process ordered by the Florida Supreme Court *without any standards on how to proceed*." ER 24 (emphasis in original). The lower court further concludes that because "the State of California has laws governing signature verification and ballot counting, *Bush* is distinguishable and not applicable." ER 25.

20

It is irrelevant that *Bush* involved a recount. Nowhere in the opinion did the Court suggest that *Bush*'s holding was limited to a recount election. The relevant holding is that an uneven vote counting procedure gives rise to an equal protection claim when it disproportionately impacts voters in certain counties. *Bush*, 531 U.S. at 106-07. It is also immaterial that California has laws and regulations governing signature verification and ballot counting. Appellants challenge California's laws and regulations, together with Appellee County Registrars' practices, because they are *inadequate* and do not pass constitutional muster.

Specifically, here, as in *Bush*, Appellants have alleged that California gives Appellee County Registrars wide discretion when determining the intent of a voter. For instance, California does not require election workers to use a machine when verifying signatures, nor does it require election workers to look for a specific number of points of comparison when comparing signatures. ER 64. Similarly, California does not require counties apply the same process during the ballot remaking process. ER 65.

Consequently, certain voters, including the individual Appellants, have a greater likelihood of having their votes diluted because they live in counties that implement precarious voting practices. ER 45, 63-64. Indeed, this case is not at the summary judgment stage, and the parties have not engaged in discovery. Yet, Appellants have still demonstrated that in past elections, unlawful votes were

counted. ER 63-72. Appellee County Registrars applied procedures that enabled election officials to count ballots without signatures, mis-matching signatures, or ineligible ballots. *Id.* Accordingly, at the pleading stage, Appellants have pled more than enough facts to state a claim under the Equal Protection Clause.

3. **Appellants have alleged that Appellees' voting laws, regulations, and practices disadvantage in-person and minority voters.**

Appellants allege several theories of vote dilution regarding the disparate treatment of in-person voters.

*First*, Appellants allege that Appellees' uneven and precarious practices treat VBM voters differently than in-person voters, devaluing the votes of in-person voters, including Appellants. ER 71-74. The lower court rejected this theory, holding that "invalid VBM votes would harm both voters regardless of whether they voted by mail or in person." ER 30. This holding misapprehends Appellants' claims.

Appellants allege that in 2020, around 596 Nevadans voted, and counties included in this lawsuit reported more irregularities. ER 72. Appellants also allege that nearly 124,000 ineligible VBM votes were counted in the 2020 election, and "Kern County, Riverside County, Orange County, and Los Angeles County recorded higher discrepancies by percentage between VBM votes and VBM registrants with voting histories than non-defendant counties like Butte County and Glenn County." *Id.* The Appellee County Registrars also implemented weak vote counting

procedures that enabled the counting of improper VBM ballots. ER 63-72. Again, the discrepancies were due to universal VBM, the regulations, and Appellee County Registrars failing to update and maintain voter rolls. ER 71-72. The invalid VBM votes did not harm all California voters equally but rather the voters in specific counties, including counties where Appellants reside. *Id.*

*Second*, Appellants allege that California Elections Code section 3020 "allows counties to accept VBM ballots after election day that cannot reliably be determined to have been cast on or before election day." *Id.* The lower court held that this allegation misstates section 3020(b)(2), which states that VBM ballots will be timely if they are received no later than seven days after election day and "the ballot is postmarked on or before election day…." ER 29. The code also states that a VBM ballot will be timely if it has "no postmark, a postmark with no date, or an illegible postmark" but is "date stamped by the elections official upon receipt of the [VBM] ballot from the United States Postal Service or a bona fide private mail delivery company and is signed and dated pursuant to Section 3011 on or before election day." Cal. Elec. Code § 3020 (b)(2).

Appellants' allegation does not contradict section 3020(b)(2). ER 29. Because the code allows election workers to collect ballots with no postmark or illegible postmarks, a voter can simply backdate the date next to his signature and still have his ballot counted. Considering Appellants' allegations and the reasonable

inferences in Appellants' favor, the lower court improperly dismissed this claim at the pleading stage. *See Wyler Summit P'ship*, 135 F.3d at 661.

*Third*, California's election laws and regulations disproportionately burden minority voters because they have historically preferred to vote in person. *See League of Women Voters of N.C.*, 769 F.3d at 245-46. The lower court dismissed this theory because "[Appellants] do not represent African American or Latino Voters." ER 26.

Whether Appellants represent one minority voter or a coalition is a distinction without a difference. Appellant Ronda Kennedy's claim is not viable because she did not bring the case with a coalition of minority voters. *Id.* In any event, Appellant EIPCa also alleges the procedures disadvantage their observers, and EIPCa allows all voters to join its organization. ER 43-44, 74-75.

The lower court also improperly concludes that Appellants' claim is not viable "because they do not claim that their votes have not or will not be counted…." ER 27. This requirement is not supported by case law. Indeed, in *Bush*, the Supreme Court did not hold that former President George Bush's claim was not viable because he did not allege facts showing the recount system would dilute the votes cast for him. 531 U.S. at 105-07. Instead, the Court held that the election system violated the Equal Protection Clause because it disadvantaged voters in certain counties. *Id.* Similarly, here, Appellants allege that Appellees' election laws, regulations, and

practices disadvantage in-person voters in specific counties, including where Appellant Ronda Kennedy votes and resides in. ER 45, 71-72, 74-76.

## C. APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE DUE PROCESS CLAUSE

In terms of due process, the right to vote is a fundamental right, "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 670 (1966). The right to vote includes the right to have one's vote counted on equal terms with others. *Bush*, 531 U.S. at 104 ("[T]he right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter."); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Reynolds*, 377 U.S. at 567–68; *Wesberry v. Sanders*, 376 U.S. 7, 84 (1964); *Gray*, 372 U.S. at 380 ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions."); *United States v. Classic*, 313 U.S. 299, 315 (1941).

The lower court held that Appellants did not allege a due process violation because the irregularities amounted to "garden variety irregularities." ER 32. The lower court relied on this Court's decision in *Soules v. Kauaians for Nukolii*

*Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) and a slew of distinguishable sister circuit cases. *Id.* The lower court also held that the alleged irregularities are not due to California's laws and regulations but variations in the size of the counties. ER 33-34.

*First*, in *Soules*, appellants challenged a special election and Hawaii's absentee voting law, claiming the law failed to prohibit the delivery of absentee ballots to persons other than voters. *Id.* at 1183. This Court concluded that in light of the extensive regulations preventing the tampering of ballots, the delivery of 60 absentee ballots to persons other than the voter did not render the election unfair. *Id.* This Court, therefore, affirmed the summary judgment order rejecting appellants' constitutional claims. *Id.* at 1184.

In *Bodine v. Elkhart County Elec. Bd.*, Democratic candidates sought to set aside an election involving a computerized voting system and punch card ballots, claiming the election officials undermined the accuracy of the votes and thereby infringed on their constitutional right to vote. 788 F.2d 1270, 1270-71 (7th Cir. 1986). At the summary judgment stage, the Seventh Circuit found that the malfunctioning of electronic voting devices did not give rise to a section 1983 claim because there was no evidence of willful conduct. *Id.* at 1272.

In *Gamza v. Aguirre*, the Fifth Circuit emphasized that courts must "recognize a distinction between state laws and patterns of state action that systematically deny

26

equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote." 619 F.2d 449, 454 (5th Cir. 1980). The court concluded that because there was no evidence that Texas's electoral laws operated in a discriminatory manner, and the complaint alleged only an "inadvertent error", there was no constitutional deprivation. *Id.*; *see also Curry v. Baker*, 802 F.2d 1302, 1316 (11th Cir. 1986) (finding no constitutional violation because the alleged irregularities were the "incidental result of the Democratic Committee's attempt to determine the lawful primary winner in circumstances where plaintiffs had created the situated making absolute accuracy impossible").

Unlike *Soules* and the sister circuit cases, this case does not involve an accidental malfunction in counting or isolated events of irregularities. The irregularities are the result of a state-sanctioned vote counting procedure which allows election officials to impose flawed systems on portions of the voters. For instance, some counties, as authorized by state law, have not maintained accurate voter rolls and have applied signature verification systems that fail to adequately vet invalid signatures. ER 63-72. These irregularities have transpired for years and are the result of Appellees' election laws, regulations, and procedures. ER 71-72. Indeed, Appellant EIPCa has collected data showing that Appellee County Registrars have failed to remove ineligible voters from the voter rolls for at least a

27

decade, and in some cases, counted ineligible ballots. ER 50, 52, 57, 72. Thus, Appellants also raise a viable claim under the Due Process Clause.

*Second*, Appellants have alleged that there are no consistent means of assessing signatures and the intent of a voter. ER 63-64. Instead of addressing Appellants' allegations, the lower court simply reiterates the current guidelines under state law and suggests those are sufficient. ER 34-35. Even though the regulations do not "use the word discretion", 2 CCR section 20960(f) says election officials "*may* consider the following characteristics when visually comparing a signature to determine whether the signatures are from the same signer." ER 34 (emphasis added). Again, the regulations do not require election officials to apply a specific number of points of comparison when comparing signatures. ER 53. 2 CCR sections 20980-20985 do not require counties to apply the same standard when determining the intent of a voter. "Some counties use machine technology while other counties use arbitrary manual standards or a hybrid model." ER 64. Counties like Siskiyou County have more accurate procedures than Appellee County Registrars because they provide additional oversight and accountability. *Id.*

The lower court's suggestion that the uneven signature verification procedures reflect the sizes of the counties is untenable.[2] ER 33. Whether the counties apply

---

[2] The lower court also incorrectly claims that Appellants waived this issue. ER 33. Appellants clearly explain in their briefing filed in the lower court that the

different points of comparison or use a signature verification technology has no bearing on the size of the counties. ER 63. It is also improper for the lower court to rely on Appellees' judicially noticed facts, which conflict with Appellants' allegations. ER 33; *see also United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) ("More specifically, we may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed.") Nowhere did Appellants allege that the bigger counties applied a faster signature verification process than the smaller counties. ER 63-71.

In sum, Appellants state a claim for relief under the Due Process Clause because they allege that the irregularities are not isolated events but represent a pattern of practice that has "systemically den[ied] equality in voting." *Gamza*, 619 F.2d at 454.

## D. THE LOWER COURT IMPROPERLY DISMISSED THE CASE WITHOUT LEAVE TO AMEND

Although the lower court's decision is erroneous, the court also failed to provide leave to amend, which is another reason this Court must reverse the decision. "Denial of leave to amend is reviewed for an abuse of discretion." *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011). "Dismissal without leave to amend is

---

irregularities are the result of California's election laws, regulations, and procedures. ER 174-79.

improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004). A "district court does not err in denying leave to amend where the amendment would be futile." *Id.* (internal quotation marks omitted). An amendment is futile when "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

Although the Appellants have satisfied Rule 8's liberal pleading standard, none of the impediments to stating a claim for relief are incurable. For instance, the lower court does not explain how no amendment to the pleading could establish that Appellants' claims transcended garden variety irregularities. On this basis alone, the Court should reverse the lower court's dismissal.

## VIII. CONCLUSION

This Court should reverse or vacate the lower court's dismissal and remand for further proceedings.

Date: September 29, 2023      Respectfully submitted,

/s/ Mariah Gondeiro
Mariah Gondeiro

*Counsel for Appellants Election Integrity Project California, Inc. et al.*

30

## STATEMENT OF RELATED CASES

Appellants certify that, pursuant to Ninth Circuit Rule 28-2.6, they are not aware of any related cases pending in this Court.

Date:  September 29, 2023                Respectfully submitted,

/s/ Mariah Gondeiro
Mariah Gondeiro

*Counsel for Appellants Election Integrity Project California, Inc. et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by the Ninth Circuit Rule 32-1. The brief is 6,687 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Date: September 29, 2023          Respectfully submitted,

                                  /s/ Mariah Gondeiro
                                  Mariah Gondeiro

## CERTIFICATE OF SERVICE

I certify that on September 29, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Ninth Circuit. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Mariah Gondeiro
Mariah Gondeiro