No. 23-55726

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

_____

ELECTION INTEGRITY PROJECT CALIFORNIA, INC., et al.,

*Plaintiffs-Appellants*,

v.

SHIRLEY WEBER, et al.

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Central District of California
Case No. 2:21-cv-00032-AB-MAA
The Honorable André Birotte Jr., District Judge

_____

### COUNTY DEFENDANTS-APPELLEES' ANSWERING BRIEF
_____

TONY LOPRESTI
DOUGLAS M. PRESS
KIM H. HARA
*MARY E. HANNA-WEIR
NICHOLAS DEFIESTA
OFFICE OF THE COUNTY COUNSEL
70 West Hedding Street, East Wing, 9th Fl.
San José, California 95110
(408) 299-5900
mary.hanna-weir@cco.sccgov.org

Attorneys for Defendant-Appellee
Shannon Bushey, Registrar of Voters
County of Santa Clara

(Additional Counsel for Appellees on Signature Page)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .......................................................3

ISSUES PRESENTED.............................................................................3

STATEMENT OF THE CASE ................................................................3

    A.    BACKGROUND ........................................................3

    B.    PROCEDURAL HISTORY .........................................9

SUMMARY OF THE ARGUMENT ....................................................14

STANDARD OF REVIEW ...................................................................16

ARGUMENT..........................................................................................18

    A.    APPELLANTS FAILED TO STATE A CLAIM
           UNDER THE EQUAL PROTECTION CLAUSE. ..........................18

    B.    APPELLANTS FAILED TO STATE A CLAIM
           UNDER THE DUE PROCESS CLAUSE......................................31

    C.    THE DISTRICT COURT PROPERLY DISMISSED
           THE SAC WITHOUT LEAVE TO AMEND. ................................37

CONCLUSION ......................................................................................39

ATTESTATION .....................................................................................44

CERTIFICATE OF COMPLIANCE ....................................................45

CERTIFICATE OF SERVICE...............................................................46

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................... 17, 33, 35

*Baker v. Carr,*
  369 U.S. 168 (1962) ..................................................................................18

*Bennett v. Yoshina,*
  140 F.3d 1218 (9th Cir. 1998) ..................................................................34

*Black v. McGuffage,*
  209 F. Supp. 2d 889 (N.D. Ill. 2002) .................................................22, 23, 33

*Bodine v. Elkhart Cty. Election Bd.,*
  788 F.2d 1270 (7th Cir. 1986) ............................................................32, 34

*Bush v. Gore,*
  531 U.S. 98 (2000) .................................................................................*passim*

*Common Cause S. Christian Leadership Conference of Greater
Los Angeles v. Jones,*
  213 F. Supp. 2d 1106 (C.D. Cal. 2001) .............................................23, 24

*Curry v. Baker,*
  802 F.2d 1302 (11th Cir. 1986) ........................................................31, 32

*Democratic Cong. Campaign Comm. v. Kosinski,*
  2022 WL 2712882 (S.D.N.Y. July 13, 2022).........................................30

*Election Integrity Project California, Inc. v. Weber,*
  No. 21-56061, 2022 WL 16647768 (9th Cir. Nov. 3, 2022) .............11

*Gold v. Feinberg,*
  101 F.3d 796 (2d Cir. 1996) ....................................................................31

*Gray v. Sanders,*
  372 U.S. 368 (1963) ..................................................................................22

*Harlan v. Scholz,*
  866 F.3d 754 (7th Cir. 2017) ....................................................................28

*Hendon v. N.C. State Bd. of Elections,*
  710 F.2d 177 (4th Cir. 1983) ...................................................................32

*Hennings v. Grafton*,
    523 F.2d 861 (7th Cir. 1975) .............................................................31

*Johnson v. Hood*,
    430 F.2d 610 (5th Cir. 1970) .............................................................32

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...........................................................17

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .............................................................18

*League of Women Voters of Ohio v. Brunner*,
    548 F.3d 463, 475 (6th Cir. 2008) .....................................................15

*Lemons v. Bradbury*,
    538 F.3d 1098 (9th Cir. 2008) ......................................24, 25, 26, 27

*Mays v. LaRose*,
    951 F.3d 775 (6th Cir. 2020) .............................................................28

*Moore v. Ogilvie*,
    394 U.S. 814 (1969) ...........................................................................22

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
    15 F.4th 885 (9th Cir. 2021) ........................................................16, 17

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) .............................................................38

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) .....................................................17, 38

*Pirani v. Slack Techs., Inc.*,
    13 F.4th 940 (9th Cir. 2021) ..............................................................17

*Powell v. Power*,
    436 F.2d 84 (2d Cir. 1970) ................................................................32

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .....................................................................18, 22

*Rodriguez v. Newsom*,
    974 F.3d 998 (9th Cir. 2020) .............................................................24

*Roman v. Sincock*,
    377 U.S. 695 (1964) ...........................................................................22

*Short v. Brown*,
    893 F.3d 671 (9th Cir. 2018) ........................................................22, 30

*Soules v. Kauaians for Nukolii Campaign Comm.*,
   849 F.2d 1176 (9th Cir. 1988) ............................................................15

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ....................................................17, 20

*Sw. Voter Registration Educ. Project v. Shelley*,
   344 F.3d 914 (9th Cir. 2003) ............................................................24

*Trump for President, Inc. v. Boockvar*,
   493 F. Supp. 3d 331 (W.D. Pa. 2020)................................................33

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ..........................................................20

*WMCA, Inc. v. Lomenzo*,
   377 U.S. 633 (1964) ..........................................................................22

*Wood v. Raffensberger*,
   501 F. Supp. 3d 1310 (W.D. Pa. 2020)..............................................21

## STATUTES, REGULATIONS, AND RULES

United States Code

3 U.S.C. § 7........................................................................................ 8
42 U.S.C. § 1983 ...............................................................................15
52 U.S.C. § 20507 .............................................................................14
52 U.S.C. § 20510(b) ...................................................................14, 36

California Elections Code

Cal. Elec. Code §  3000.5 .............................................................4, 19
Cal. Elec. Code §  3003 ...................................................................... 4
Cal. Elec. Code §  3011 ...................................................................... 5
Cal. Elec. Code §  3015 ...................................................................4, 6
Cal. Elec. Code §  3017 ...................................................................... 4
Cal. Elec. Code §  3019 ...............................................................*passim*
Cal. Elec. Code §  3020 ...............................................................4, 5, 13
Cal. Elec. Code §§ 6904–06 ............................................................. 8
Cal. Elec. Code §  14212 .................................................................. 6
Cal. Elec. Code §  14401 .................................................................. 7
Cal. Elec. Code §  15101 .................................................................. 6
Cal. Elec. Code §  15105 .................................................................. 6
Cal. Elec. Code §  15109 .................................................................. 6
Cal. Elec. Code §  15152 .................................................................. 6

iv

Cal. Elec. Code §§ 15200–90 ................................................................ 6
Cal. Elec. Code §   15208 .................................................................... 7
Cal. Elec. Code §   15210 .................................................................... 7
Cal. Elec. Code §   15342 .................................................................... 7
Cal. Elec. Code §   15342.5 ................................................................. 7
Cal. Elec. Code §   15360 .................................................................... 8
Cal. Elec. Code §§ 15365–67 ............................................................. 8
Cal. Elec. Code §   15372 .................................................................... 8
Cal. Elec. Code §   15400 .................................................................... 8
Cal. Elec. Code §   15503 .................................................................... 8
Cal. Elec. Code §   15505 .................................................................... 8
Cal. Elec. Code §   15620(a) ............................................................8, 9
Cal. Elec. Code §   16003 .................................................................... 9
Cal. Elec. Code §   16401(c), (d) ......................................................... 9

## California Code of Regulations

Cal. Code Reg. tit. 2, §   20136(e) .................................................... 6, 7
Cal. Code Reg. tit. 2, §   20137........................................................... 4
Cal. Code Reg. tit. 2, §   20143........................................................... 4
Cal. Code Reg. tit. 2, §   20960................................................ 5, 6, 26, 27
Cal. Code Reg. tit. 2, §   20982........................................................... 7

## Federal Rules of Civil Procdure

Federal Rule 12(b)(1) ........................................................... 11, 12, 20
Federal Rule 12(b)(6) ........................................................... 10, 12, 16, 17

## **OTHER AUTHORITIES**

Certificate of the Secretary of State, Alex Padilla (Dec. 11, 2020),
https://elections.cdn.sos.ca.gov/sov/2020-general/sov/17-cert.pdf ........................ 8

Secretary of State, Advisories to County Elections Officials,
https://www.sos.ca.gov/elections/advisories-county-elections-officials. ...............20

# INTRODUCTION

The integrity and security of California elections are the highest priority and responsibility of County elections officials—including, but not limited to, County Appellees[1]—along with the California Secretary of State and the California Attorney General.  California has developed an elections system designed to ensure every eligible voter has ready access to a ballot, including several options for casting a secure ballot, and to ensure that ballots are securely processed and that results are accurately tallied.  Appellees employ, train, and supervise thousands of election workers, all of whom are committed to carrying out their duties to ensure that each and every lawful vote is counted in every election.

///

---

[1] "County Appellees" refers collectively to Tim Dupuis, Registrar of Voters for the County of Alameda; Kristin Connelly, Registrar of Voters for Contra Costa County; James A. Kus, County Clerk/Registrar of Voters for the County of Fresno; Aimee Espinoza, Auditor-Controller/County Clerk/Registrar of Voters for Kern County; Dean C. Logan, Los Angeles County Registrar-Recorder/County Clerk; Gina Martinez, Registrar of Voters for the County of Monterey; Bob Page, Registrar of Voters for the County of Orange; Art Tinoco, Riverside County Interim Registrar of Voters; Hang Nguyen, Sacramento County Registrar of Voters; Francisco Diaz, San Benito County Clerk-Recorder-Registrar of Voters; Stephenie Shea, Registrar of Voters for San Bernardino County; Elaina Cano, Clerk-Recorder-Registrar of Voters for San Luis Obispo County; Shannon Bushey, Registrar of Voters for the County of Santa Clara; Tricia Webber, Santa Cruz County Registrar of Voters; and Michelle Ascencion, Ventura County Registrar of Voters.  "State Appellees" refers collectively to the California Secretary of State Dr. Shirley Weber and Attorney General Rob Bonta.

The Election Integrity Project California, Inc. ("EIPCa"), along with individual voters James Bradley, Mark Reed, Buzz Paterson, Michael Cargile, and Ronda Kennedy (together, "Appellants") seek to cast doubt upon the integrity and security of California's elections because they have been recently unsuccessful in legislatively defeating efforts to enable all voters to cast ballots in the safe, simple, and secure method of their choosing. Nevertheless, Appellants seek an extreme measure, absent any showing, to put California's fair and accurate election system into permanent receivership overseen by a special master, and to strike down many of the statutes and regulations that guide efficient and effective election administration, all because they fundamentally mistrust California's civil servants and the public.

At base, Appellants' conclusory allegations reflect a misunderstanding of how elections operate and fail to state a claim under the Equal Protection or Due Process Clauses. They speculate, and ask the Court to speculate, that ordinary operational differences and layperson observations of limited aspects of the election process demonstrate enough certainty of election fraud to fundamentally undermine the entire electoral system. But Appellants' allegations do not give rise to a reasonable inference of vote dilution, much less constitutional injury. Appellants' legal theories of constitutional injury have been rejected by courts time

and time again, including by this Court's binding precedent. Therefore, their complaint is legally baseless, and thus, the district court's order dismissing the case with prejudice should be affirmed.

## JURISDICTIONAL STATEMENT

County Appellees agree with Appellants' jurisdictional statement. *See* ECF 16 at 3.

## ISSUES PRESENTED

1.      Whether Appellants sufficiently pled a claim for relief under the Equal Protection Clause.

2.      Whether Appellants sufficiently pled a claim for relief under the Due Process Clause.

3.      Whether the district court properly dismissed without leave to amend.

## STATEMENT OF THE CASE

**A.      BACKGROUND**

Since 1978, all California voters have had the choice to vote in person at a polling location or by mail. Regardless of voting method, California requires county elections officials, including County Appellees, to follow precise procedures to protect the chain of custody and securely process ballots. Since the November 2020 election, a vote-by-mail (VBM) ballot has been mailed to every

registered active voter. Elec. Code § 3000.5.[2] When voting by mail, voters may drop their ballot in official VBM drop boxes or the U.S. mail, designate another person to mail or return their ballot, or return the ballot directly to the county elections official. *Id.* §§ 3003, 3015, 3017. Ballots from each VBM drop box are collected by at least two designated, sworn elections workers who fill out a retrieval form—cataloguing the location, drop box identification number, and date and time of retrieval—before placing the collected ballots in a secure ballot transfer device. 2 Cal. Code Reg. §§ 20137, 20143. Upon arrival at the office of the county elections official, that official notes the time of arrival on the retrieval form, inspects the secure ballot container for evidence of tampering, and signs the retrieval form; once elections officials open the secure container, the number of ballots inside is noted on the retrieval form. *Id.*

Mailed ballots, meanwhile, are delivered directly to the county elections official by the U.S. Postal Service or other bona fide delivery companies. Elec. Code § 3020. Mailed ballots are counted as timely if they are postmarked on or before Election Day and received by the county elections official no later than seven days after Election Day. *Id.* If no information on a VBM ballot indicates

---

[2] All references to the Elections Code in this brief are to the California Elections Code.

the date on which the ballot was mailed (e.g., the ballot's postmark is missing or illegible and elections officials cannot retrieve tracking information from the Postal Service's Intelligent Mail barcode system), the ballot is date-stamped by the county elections official and shall be considered timely cast only if the ballot is then signed and dated by the voter on or before Election Day. *Id.* §§ 3011, 3020.

When timely VBM ballots are received, the VBM envelope signature is verified using human review or signature verification technology to compare the signature on the envelope with the voter's signature on their voter registration affidavit or in their voter registration record. Elec. Code § 3019. Elections officials are to presume that the signature is the voter's signature, and the fact that the VBM envelope signature shares similar characteristics with the comparator signature is sufficient to determine the VBM envelope signature is valid. *Id.* Elections statutes and regulations specify the factors elections officials may use to determine a signature's validity, including the signature's slant, size, spacing, connecting strokes, and characteristics such as how "t's" are crossed, "i's" are dotted, or loops are made on letters like g, j, and y. Elec. Code § 3019; 2 Cal. Code Reg. § 20960. The regulations also require elections officials to consider reasonable explanations for signature discrepancies, such as evidence of shaking that could be health- or aging-related, a change in the voter's signature style over

time, or use of a different writing surface. 2 Cal. Code Reg. § 20960. If a signature possesses "multiple, significant, and obvious differing characteristics," or is flagged as not matching by the signature verification technology, it proceeds to further review, where it shall be rejected only if two different elections officials unanimously find beyond a reasonable doubt that the signature differs in such "multiple, significant, and obvious" manners. Elec. Code § 3019; 2 Cal. Code Reg. § 20960. Voters whose signatures are rejected under this process, as well as those who fail to sign the VBM envelope, are notified and given an opportunity to cure until two days before the canvass is complete. Elec. Code § 3019. Finally, verified VBM envelopes are then opened, and the ballots are counted. *Id.* §§ 15101, 15109.

Alternatively, any voter may choose to vote in person. *Id.* § 3015. They may do so if they first surrender their VBM ballot, or if the county elections official verifies that the voter has not returned their VBM ballot and notates their voter record to ensure their VBM ballots are not cast or tabulated after voting at the polls. *Id.* Ballots cast in person are scanned at the voting location, a precinct office, or the county's central counting location. *Id.* §§ 15105, 15152, 15200–90. All polls, including VBM drop boxes, close at 8:00 p.m. on Election Day, *id.* § 14212; 2 Cal. Code Regs. § 20136(e), although voters still in line at a polling

6

location or at a VBM drop box when polls close may stay in line and cast their ballot after 8:00 p.m., Elec. Code § 14401; 2 Cal. Code Regs. § 20136(e).

If the voting system flags any ballot as being unclear regarding voter intent for any contest, the ballot is adjudicated by trained elections officials according to uniform vote counting standards. *See* 2 Cal. Code Reg. § 20982.[3] In adjudication, a vote for a candidate or measure is considered void if it is impossible to determine a voter's choice. *Id.* A voting mark is considered valid when it clearly represents the voter's choice and is consistent with the technique used by the voter to indicate their ballot selections. *Id.* If a ballot is marked with more choices than required for a specific contest (an "overvote"), the vote shall not be counted for that contest but shall be counted for all other validly voted contests. *Id.* If a contest is marked with fewer choices than required for a specific contest (an "undervote"), the vote choice for all properly marked candidates or measures shall be counted.[4] *Id.* Finally, after all eligible ballots are counted over the 30 days of the official canvass, counties audit the results with a manual tally of at least one percent of the

---

[3] If any ballot—VBM or cast in person—is damaged or otherwise unreadable by the tabulator, it is carefully duplicated so that it can be counted. Elec. Code § 15208, 15210.

[4] California law provides similar requirements for the processing of write-in votes. *See* Elec. Code §§ 15342, 15342.5.

precincts or through a risk-limiting audit.  Elec. Code §§ 15360, 15365–67.  Then, results are certified and announced.

The above-described process was followed in the November 3, 2020 Presidential Election, in which over 17 million Californians cast their votes.  By December 3, 2020, county registrars of voters across the state certified their election results.  Elec. Code § 15372.  On December 11, 2020, the Secretary of State certified the statewide results.[5]  Elec. Code §§ 15503, 15505.  California's presidential electors then met and cast their electoral votes on December 14, 2020, as did electors in states across the nation.  3 U.S.C. § 7; Elec. Code §§ 6904–06.  Meanwhile, governing boards across the state declared the election results, and new local and state officeholders took their oaths of office.  Elec. Code § 15400.

Under California law, recount requests by voters must be made within five days after certification—for the 2020 Election, by December 8, 2020.  Elec. Code § 15620(a).  No Appellant requested a recount.  Election contests involving presidential electors must be filed within 10 days of the results being certified and resolved "at least six days before the first Monday after the second Wednesday in

---

[5] Certificate of the Secretary of State, Alex Padilla (Dec. 11, 2020), https://elections.cdn.sos.ca.gov/sov/2020-general/sov/17-cert.pdf (last accessed Oct. 23, 2023).

December." *Id.* §§ 16003, 16401(c).  For the 2020 Election, that meant that election contests involving presidential electors had to be resolved by December 8, 2020.  No Appellant filed an election contest.

Later, in the 2021 Gubernatorial Recall Election, 12.9 million Californians voted. 2-SER-104.  Recount requests were due by October 19, 2021, and election contests, including constitutional challenges, by November 13, 2021.  Elec. Code §§ 15620(a), 16401(d).  Appellants filed neither.  In the 2022 General Election, 11.1 million Californians voted.  Recount requests were due by December 13, 2022, and election contests by January 7, 2023.  *Id.*  Again, Appellants filed neither.

## B.   PROCEDURAL HISTORY

On January 4, 2021—many weeks after votes in the November 2020 Election were certified, and after many newly elected officers took office—EIPCa and thirteen congressional candidates in California who lost their general elections by multiple percentage points filed this action.[6]  They sought a temporary restraining order and a private audit of highly sensitive election infrastructure,

---

[6] Although the parties who filed the original action differ somewhat from those that filed the present appeal, this brief will refer to both sets of parties as "Appellants" for ease of reading.

records, security materials, and related items, which the district court denied. After Appellees filed motions to dismiss, Appellants filed a First Amended Complaint (FAC), adding candidate plaintiffs and factual assertions, expanding upon legal claims, and amending their prayer for relief.

Appellants alleged in their FAC that California's "unconstitutional statutes, regulations, executive orders, and voting practices . . . create an environment in which elections could be manipulated and eligible voters of all political viewpoints disenfranchised." 4-SER-611. They pled injuries under the Elections, Equal Protection, Due Process, and Guarantee Clauses of the U.S. Constitution. 4-SER-652–57.

Appellees moved to dismiss the FAC, and the district court dismissed without leave to amend in June 2021. Dist. Ct. Dkt. No. 111. The court held that the individual Appellants lacked standing because they alleged only a generalized vote dilution injury; that the candidate plaintiffs failed to allege they would have won their elections absent the irregularities; and that EIPCa had not shown organizational standing. *Id.* at 10. Further, the district court dismissed Appellants' Guarantee Clause claims as nonjusticiable political questions. *Id.* at 13. The district court declined to address mootness, laches, or Appellees' argument that the FAC failed to state a claim for relief under Rule 12(b)(6). *Id*. at 13 n.1.

Appellants appealed. On November 3, 2022, this Court affirmed the dismissal of the Guarantee Clause claim but held that EIPCa had sufficiently alleged organizational standing. *Election Integrity Project California, Inc. v. Weber*, No. 21-56061, 2022 WL 16647768, at *2 (9th Cir. Nov. 3, 2022). This Court expressly did not address individual standing for the remaining Appellants. *Id.*

On remand, Appellants filed a Second Amended Complaint (SAC), adding and removing several parties, removing the Elections and Guarantee Clause claims, and narrowing their Equal Protection and Due Process Clause claims to rely solely on the theories that (1) state and county "laws, regulations, and procedures . . . diminish the value of in-person voters" and that (2) nonuniform voting regulations and procedures treat voters in some counties differently than those in other counties. ER-74–77. Appellees moved to dismiss the SAC for lack of subject matter jurisdiction and failure to state a claim under Rules 12(b)(1) and (6).

The district court granted the motion to dismiss on July 18, 2023. ER-4–38. It granted County Appellees' request—unopposed by Appellants—for judicial notice of certain court documents and state documents from the Secretary of State and California Legislature. ER-6–7. The court declined to address Appellees'

11

remaining Rule 12(b)(1) arguments because this Court already determined EIPCa had organizational standing, and instead the court turned to the substance of the Rule 12(b)(6) merits. ER-12.

As an initial matter, the district court found that Appellants failed to address many of Appellees' arguments. The court found that Appellants did not respond to Appellees' argument that the challenged laws do not severely burden the right to vote and therefore strict scrutiny did not apply. ER-13 The court further found that the laws and regulations did not burden the right to vote (instead, finding that they work to *expand* the right to vote) and that they are generally applicable. ER-12–19. Thus, the court held that the state interests in increasing voter turnout, modernizing the election process, protecting public confidence in the integrity of elections, and setting a window for timely receipt of VBM ballots were sufficient to justify the laws and regulations under the *Anderson-Burdick* framework. ER-19–20.

The court then turned to Appellants' vote dilution claims, finding the claims noncognizable because "[t]he weighing or diluting of votes under the Supreme Court's one-person, one vote cases focuses on the systems that provide voters representation, not on allegedly fraudulently cast votes." ER-20–24. It then discussed how this case is not controlled by *Bush v. Gore*, 531 U.S. 98 (2000), or

its progeny, both because *Bush* involved a standardless recount process and was expressly limited by the Supreme Court to its facts, and subsequent cases were clearly distinguishable. ER-24–27.

Next, the court found that Appellants' allegations failed to demonstrate differential treatment to support their equal protection claim. First, the court rejected Appellants' allegation about purported Secretary of State guidance suggesting VBM ballots may be mailed after the close of polls because judicially noticeable facts demonstrated that such guidance did not exist; the court also rejected the allegation that Elections Code section 3020 permits late voting by mail because that allegation contradicts the plain text of the statute; and the court rejected allegations that in-person voters were treated differently than VBM voters because none of the allegations demonstrated favorable treatment to VBM voters. The court reasoned that to the extent that any invalid or fraudulent VBM ballots were counted, such votes would harm all voters similarly. ER-27–30.

Finally, the court rejected Appellants' allegations related to election irregularities and due process concerns.[7] It explained that Appellants must show

---

[7] The district court also rejected Appellants' allegations related to election observers, concluding that Appellants had waived the issue of whether a logical inference exists between observation obstruction and vote dilution and determining that the "speculative" allegations do not affect voting rights. ER-30.

"pervasive error" undermining election processes to establish a constitutional violation based on election irregularities. ER-32. The court relied upon reasonable inferences from judicially noticeable facts that county variations in signature verification practices reflected county size, and rejected Appellants' argument that California gives election workers "wide discretion" to determine voter intent when reviewing signatures as unsupported by the relevant regulations. ER-33–34. And the court concluded that Appellants' allegations of ballots being counted with missing or mismatched signatures or from ineligible voters were nothing more than "garden variety irregularities." ER-35–36. Finally, Appellants' voter registration allegations, the court explained, were more appropriate for claims brought under the National Voter Registration Act, not those brought under the SAC.[8] ER-37.

The court dismissed the SAC with prejudice, finding that any amendment to the SAC would be futile. ER-37. Appellants appealed to this Court on August 18, 2023. ER-222.

## SUMMARY OF THE ARGUMENT

Appellants fail to state a violation of either the Equal Protection Clause or

---

[8] The National Voter Registration Act (NVRA) creates a private right of action aggrieved by a violation of the NVRA, 52 U.S.C. 20510(b), which requires states to maintain voter lists by updating voter registrations and removing certain ineligible voters from the voter rolls, *see* 52 U.S.C. 20507.

the Due Process Clause because their concerns about California's election system and County Appellees' administration of it constitute policy disagreements rather than constitutional injuries. To state a claim under section 1983, a plaintiff must allege that they were deprived of a right secured by the U.S. Constitution or the laws of the United States by someone acting under the color of state law. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008). But "[i]t is hornbook law that Section 1983 does not provide a right of action for 'garden variety election irregularities.' . . . Only a pervasive error which undermines the 'organic processes' of the ballot is sufficient to trigger constitutional scrutiny." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1183 (9th Cir. 1988) (citations omitted). None of Appellants' allegations rise anywhere close to the level of such a "pervasive error" that prior case law has found to merit concern.

Appellants' first equal protection claim—that VBM and in-person voters are treated differently—fails because *all* voters can choose how to vote and can thus belong to either group. Moreover, Appellants' allegations that VBM voters receive additional time to vote are contradicted by the text of the laws and regulations they cite, and Appellants do not explain how the alleged possibility that elections officials accepted a small number of invalid VBM ballots disproportionately harms in-person voters—because they cannot. Appellants' second equal protection claim,

15

that varying county election procedures harm voters in certain counties, similarly fails, as the differing procedures Appellants decry merely represent the ordinary, practical variation among differently sized counties, not a pervasive error undermining California's elections. Appellants' reliance on *Bush v. Gore*, 531 U.S. 98 (2000), and its progeny, is mistaken, as those cases are all distinguishable and *Bush*'s precedential value was expressly limited by the Supreme Court.

Appellants' due process claim is a complete nonstarter, based entirely on speculation and insinuations. They do not explain how their allegations rise beyond the "garden variety" election irregularities that federal courts have repeatedly determined do not violate due process.

For these reasons, the lower court's decision is correct, and it properly dismissed the SAC without leave to amend because Appellants have not explained, in the two years since the commencement of this case, what additional allegations they could include in their fourth iteration of the complaint that would save their legally deficient claims.

## STANDARD OF REVIEW

A district court's decision to grant or deny a motion to dismiss under Rule 12(b)(6) for failure to state a claim is reviewed de novo. *See Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021). All allegations

16

of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Id*. But conclusory allegations and unwarranted inferences are insufficient for a non-movant to defeat a motion to dismiss. *See Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 946 (9th Cir. 2021) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted). When ruling on a motion to dismiss under Rule 12(b)(6), a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Nor does it "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Dismissal without leave to amend is reviewed de novo to determine whether the complaint could be saved by any amendment. *See Parents for Priv. v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020). Dismissing without leave to amend is proper "if is it clear that the complaint could not be saved by amendment." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) (noting that plaintiffs failed to state how they would amend the complaint if given leave).

///

///

17

A district court's decision whether to take judicial notice is reviewed for an abuse of discretion. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

## ARGUMENT

### A.     APPELLANTS FAILED TO STATE A CLAIM UNDER THE EQUAL PROTECTION CLAUSE.

Appellants argue that they have adequately pled a violation by County Appellees of the Equal Protection Clause based on two theories: (1) that Appellees treat in-person voters, including minority voters, differently than VBM voters; and (2) that individual County Appellees use procedures that sufficiently differ so as to treat residents of those counties differently.  In both instances, however, Appellants have failed to plead a legal theory sufficient to state a claim.  In order to plead an equal protection violation, Appellants must plead allegations that an identifiable class of voters to which Appellants belong or represent—such as groups based on "race, sex, economic status, or place of residence within a State," *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)—is disfavored, where the "favored group has full voting strength and the groups not in favor have their votes discounted," *id.* at 555 n.29; s*ee also Baker v. Carr*, 369 U.S. 168, 206 (1962).  The allegations in the SAC are insufficient to support Appellants' theory of relief.

Appellants allege that in-person and VBM voters are treated differently because VBM voters have more time to vote and VBM ballots are allegedly less scrutinized, ER-71–73, a claim that fails in three respects. First, those two "groups" of voters are not distinct groups because all registered, active voters in California are mailed a VBM ballot and all registered voters can cast a ballot in person at a polling place, and so any voter can, of their own volition, be an in-person or VBM voter. Elec. Code § 3000.5. Second, as the district court found, ER-27, 29, Appellants' allegations regarding additional time for VBM voters to vote misstates the law and should be disregarded. Appellants allege that the Secretary of State offered guidance suggesting that ballots could be lawfully deposited in drop boxes after the close of voting at 8 p.m. on Election Day. ER-71. But this misstates the legal requirements for accepting ballots arriving by mail, which require that VBM ballots be mailed on or before Election Day or placed in a drop box before the close of voting on Election Day. Despite Appellees challenging this allegation in prior briefing and presenting judicially noticeable facts that conflict with the allegation, Appellants have not cited to any such

///

///

///

19

guidance.[9]  Appellants fail to identify when or where this guidance was allegedly offered or can be found; without this, the mere assertion that it exists is not a well-pled allegation.  *Sprewell*, 266 F.3d at 988 (the court need not accept as true allegations that are conclusory or "that contradict matters properly subject to judicial notice").  And a conclusory allegation that EIPCa has recorded late voting and pickups of ballots from mailboxes, ER-71, only supports an inference that county elections officials took custody of those late ballots.  Those allegations do not support the inference that those late ballots were, in fact, *counted* in violation of the law.  Third, to the extent that Appellants have any allegations that a small number of invalid or fraudulent VBM ballots were counted, the harm of those allegedly invalid votes does not tend to propound to lawful in-person voters as compared to lawful VBM voters—both types of voters are harmed by these alleged

---

[9] An unsupported allegation that such guidance was issued, when it would have been plainly contrary to law, need not be taken as true when publicly available, judicially noticeable, facts suggest no such guidance exists.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (The "court may look beyond the complaint to matters of public record" when ruling on a Rule 12(b)(1) motion).  It is proper for this Court to take judicial notice of the same publicly available facts presented to the district court.  *See* 1-SER; 2-SER.  All available guidance from the Secretary of State includes the 8 p.m. deadline and reiterates that ballot drop boxes should be locked and secured.  *See, e.g.*, 2-SER-302–29.  An archive of the Secretary's guidance to county elections officials is available at https://www.sos.ca.gov/elections/advisories-county-elections-officials.

invalid votes, and so there is no disparate adverse impact to in-person voters. *See*
*Wood v. Raffensberger*, 501 F. Supp. 3d 1310, 1322–23 (W.D. Pa. 2020)
(collecting cases holding that the injury from fraudulent votes propounds to all
lawful voters absent particularized showing). Appellants simply fail to plead any
meaningful differential treatment between these alleged two groups of voters.

Appellants rely primarily on *Bush v. Gore*, 531 U.S. 98 (2000), to support
their second theory of a violation of the Equal Protection Clause based on county-
by-county variation, but their arguments are unavailing. First, the Supreme Court
made clear that the case was confined to its facts and should not be relied upon as
precedent. *Bush,* 531 U.S. at 109 ("Our consideration is limited to the present
circumstances, for the problem of equal protection in election processes generally
presents many complexities."). Second, the cases cited by Appellants that rely
upon *Bush* to suggest that there could be an equal protection claim when different
counting procedures are used address a scale of disparity that is of a wholly
different magnitude than the allegations in Appellants' complaint. Appellants do
not plead allegations that votes were counted differently, but rather that through a
smattering of allegations, there may have been opportunities for invalid votes to be
cast or for vote tallies to be changed. ER-59–71.

///

Appellants also rely on several apportionment cases including *Gray v. Sanders*, 372 U.S. 368 (1963) (county unit system granting each county one vote devalued votes of residents in large counties), *Reynolds v. Sims*, 377 U.S. 533 (1964) (Alabama state apportionment must be based on population), *Roman v. Sincock*, 377 U.S. 695, 707–12 (1964) (same as *Reynolds*, regarding Delaware), *WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 653 (1964) (same as *Reynolds,* regarding New York), and *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) (party formation laws must not discriminate against populous counties), to support their county-by-county vote dilution claims.  But Appellants' reliance on these apportionment cases to plead a theory of county-by-county vote dilution based on the alleged increased risk of invalid ballots being counted has been rejected by this Court. *Short v. Brown*, 893 F.3d 671, 678 (9th Cir. 2018) ("[A]ppellants cite *Gray v. Sanders* and *Reynolds v. Sims* to argue that treating citizens differently based on their county of residence constitutes "vote dilution," a severe burden triggering strict scrutiny.  But those cases stand for something narrower: that a state may not *allocate representation differently* based on a voter's county of residence.") (citations omitted).

While it is an out-of-circuit district court case whose application is limited, the facts in *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002), are

22

illustrative of the scale at which there may be a constitutional injury in violation of the Equal Protection Clause, unlike in this case. In that case, the plaintiffs alleged in their complaint that the punch card voting machines in certain localities were 22 times more likely to undercount a vote than voting machines used in other localities. *Id.* at 895. At that level of statistical disparity, voters in precincts that used the allegedly faulty machines were significantly more likely to have their votes *not counted at all*, whereas in this instance, Appellants fail to allege any detail concerning the number of votes that were in fact counted that should not have been. Rather, Appellants plead only a *possibility* that ineligible voters were able to cast a ballot that was unlawfully counted. Despite deploying hundreds of election observers, ER-58–59, some of whom were able to allegedly witness numerous irregularities, ER-63, Appellants do not provide any allegations to suggest that voters in some counties were statistically more likely to have enough ineligible votes counted such that those ineligible votes would effectively dilute their votes, for instance, by changing the outcome of the election.

Appellants also incorrectly cast *Common Cause S. Christian Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1106 (C.D. Cal. 2001), as a case about different voting *procedures*, when in fact like *Black*, it was a case about statistically less reliable punch card voting machines being used in

counties with higher racial minority populations that increased the likelihood that their votes would *not be counted.  Id.* at 1107–08.  Similar to *Black*, the court found that allegations of a statistical likelihood that votes would not be counted as compared to other counties was sufficient to state a claim under the Equal Protection Clause.  *Id.* at 1108–09.  Appellants' complaint, however, does not allege that a statistically significant disparity in the treatment of votes between counties exists.

More importantly, Appellants' arguments relying upon *Bush v. Gore* are foreclosed by binding Ninth Circuit precedent, which also casts doubt upon the *Common Cause* case upon which Appellants rely.  This Court has unequivocally held that *Bush v. Gore* is limited in its scope and that similar claims related to disparate signature verification practices and voting technologies are not sufficient to state an equal protection claim.  *See Rodriguez v. Newsom*, 974 F.3d 998, 1006 (9th Cir. 2020) ("First, the precedential value of Bush is limited."); *Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) (noting that *Bush v. Gore* is likely not "applicable to more than the one election to which the Court appears to have limited it" and finding Oregon's signature verification standards do not violate the Equal Protection Clause); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (rejecting the same factual circumstances and legal

theory of an equal protection violation as *Common Cause* related to different voting technologies and noting that *Bush v. Gore* specifically did not address "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.") (quoting *Bush*, 531 U.S. at 109).

   *Lemons* is particularly instructive, as in that case this Court examined whether Oregon's signature verification standards permitted too much county discretion to survive scrutiny under the Equal Protection Clause. The plaintiffs alleged that the statewide standard directing elections officials to compare the signature on a referendum petition to the signature on the voter registration card was insufficient to ensure uniformity as required by *Bush v. Gore*. *Lemons*, 538 F.3d at 1105. This Court held that even if *Bush* were to apply beyond the Supreme Court's limitation to that specific election, Oregon's signature verification standards were "sufficiently uniform and specific to satisfy equal treatment of voters." *Id.* at 1106. This Court determined that the statewide standard "uniformly instructs" officials to compare referendum signatures to signatures on voter registration cards, citing as an example the instruction to "[c]ompare the signature on the petition and the signature on the voter registration card to identify whether the signature is genuine and must be counted." *Id.* It also quoted direction instructing voting officials to "[c]heck the registration of the names indicated by

comparing the signature on the petition to the signature on the registration card," and noted that one option for rejecting signatures was if the "[s]ignatures do not match." *Id.* This relatively barebones standard, this Court concluded, "ensures equal treatment because it uniformly requires all counties to compare two existing signature specimens when determining the validity of each sampled signature." *Id.*

California's signature verification standards are far more detailed and instructive than Oregon's simple instruction. The regulations state that elections officials "must compare the signature on a voted vote-by-mail envelope and a voted provisional ballot envelope to the voter's signature(s) in the voter's registration record prior to counting a ballot." 2 Cal. Code Reg. § 20960(a); *see also* Elec. Code § 3019. Then the regulations go on to require the basic presumption that the signature is that of the voter, find that similar characteristics are sufficient to verify the signature, and provide a list of permissive characteristics that may be considered in the mandatory signature comparison. *Id.* at (c)–(f); *see also* Elec. Code § 3019. There are additional regulatory standards for layers of review to reject a signature and other factors for elections officials to consider, and to not consider, in evaluating a signature comparison. *Id.* at (b), (g)–(k); *see also* Elec. Code § 3019.

///

26

Unlike Florida's infirm recount standards in *Bush v. Gore* that provided no guidance, California has robust signature verification standards in both Elections Code section 3019 and Title 2, section 20960 of the California Code of Regulations. Under these standards, the signature on a VBM envelope is presumed to be that of the voter and should only be rejected if, on a second review, two election officials find "beyond a reasonable doubt" that the signature does not match. Elec. Code § 3019(a)(2)(A), (c)(2). These standards reflect the Legislature's well-reasoned judgment, despite Appellants' view to the contrary, that returned VBM ballots generally bear sufficient indicia of reliability to presume that the voter is the one who signed and returned the ballot. *See, e.g.*, *Lemons*, 538 F.3d at 1104 ("Moreover, fraudulent signatures are less likely in vote-by-mail elections, in which the ballots are sent directly by the elections official to the voter, and returned directly by the voter to the elections official.") Appellants' policy disagreement[10] with California's standards for signature verification does not give rise to a constitutional claim when this Court has found less specific, less directive standards to withstand a challenge under the Equal Protection Clause.

---

[10] *See, e.g.*, 1-SER-2–64 (collecting several instances of Appellant EIPCa engaging in legislative advocacy to oppose statutes challenged in this litigation including SB 503, which enacted the signature verification standards at issue).

Moreover, different jurisdictions may vary in the complexity of their elections and the resources available for managing election observers. For instance, they may adopt different practices that serve those jurisdictions' "interests in efficiently allocating [their] election resources and administering elections in an orderly manner," changes that do not impose a burden on Appellants' rights. *Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020); *see also Harlan v. Scholz*, 866 F.3d 754, 755–56 (7th Cir. 2017). Nothing about these variations in County Appellees' practices or policies make the County Appellees' practices or policies unlawful. These differences reflect the discretion afforded to counties as subdivisions of the state to operate effective and fair elections within the framework of state and federal election law. Far from showing—or even inferring—wrongdoing, Appellants highlight differences (e.g., different numbers of reviewers, or number of signatures per screen) that merely represent the ordinary, practical variation among counties of different sizes, a reasonable inference the district court also made based upon judicially noticeable facts. *See* 2-SER-137–63; ECF 16 at 28–29. And contrary to Appellants' assertion on appeal, *see* ECF 16 at 29, the SAC does allege that larger counties are verifying signatures at a faster rate than smaller counties. *Compare* ER-63 at ¶ 107 (Placer County signature verification review is "slow, in-depth, and methodical") *with id.* at ¶ 108

28

(alleging that Appellees reviewed at "a rate of one signature pair every one to four seconds") *and* ER-67 at ¶ 120 (Orange County signature verification included display of signatures "four at a time on computer screens and remained on the screen for only a few seconds").

Moreover, Appellants fail to show that any of the alleged county variations have harmed Appellants or will do so in the future. They allege that "election workers even counted ballots with no signatures or signatures that did not match the identity of the voter," ER-64, but fail to allege when or where this happened, or how many such ballots were allegedly counted among the *tens of millions* of ballots cast in 2020, 2021, and 2022. Appellants allege that review was too fast, ER-66–70, but these conclusory statements by untrained laypeople cannot support a reasonable inference that review was inadequate or likely to allow for the counting of invalid ballots. Instead, Appellants rely on speculation and unpled assumptions about the likelihood of election fraud.

At most, the SAC alleges that perhaps a handful of ballots without properly verified signatures were mistakenly counted across the state without permitting those voters to cure the missing or mismatched signatures as required by state

///

///

law.[11]  Statewide standards, like California's, cannot guard against all mistakes, and as *Bush v. Gore* and its progeny make clear, allegations of a handful of mistakes are not sufficient to find the standards unconstitutional.  *See Bush v. Gore*, 531 U.S. at 109 (holding that minimal statewide procedural safeguards are required in vote tabulation but recognizing variation within those standards is permissible); *Democratic Cong. Campaign Comm. v. Kosinski*, 2022 WL 2712882, at \*20 (S.D.N.Y. July 13, 2022) ("[State standards] simply cannot guarantee against arbitrary mistakes, as no standard can do.").  Nothing in the SAC suggests systematic errors on the part of *any* County Appellee.

Appellants' facial challenges to a bevy of statutes and regulations based on alleged violation of the Equal Protection Clause are properly analyzed under the *Anderson-Burdick* framework.  *See Short v. Brown*, 893 F.3d at 677 (explaining *Anderson-Burdick* framework).  County Appellees join in full the State Appellees' arguments regarding the application of the *Anderson-Burdick* framework.  To the

---

[11] Appellants repeatedly imply that the Court should draw the inference that the ballots inside envelopes with mismatched or missing signatures are necessarily invalid or fraudulent, when in fact those envelopes should have been set aside for the signature cure process.  Elec. Code. § 3019.  Some portion of those envelopes would have been cured and the ballots properly included in the canvass.  Therefore, the small number of allegedly mishandled ballot *envelopes* are not one-to-one miscounted or invalid *votes counted*.

extent that any of the statutes or regulations at issue burden the right to vote of any eligible voters, the burden is minimal and therefore subject to less scrutiny. The important governmental interests of expanding access to the ballot, ensuring integrity and security of the election, and promoting uniform standards for signature verification and vote counting while permitting necessary discretion of county elections officials due to the wide variation in size and complexity of counties across California certainly justifies the theoretical, albeit minimal, burden alleged by Appellants.

## B.   APPELLANTS FAILED TO STATE A CLAIM UNDER THE DUE PROCESS CLAUSE.

Appellants' allegations under the Due Process Clause are nothing more than an amalgamation of speculative and conclusory allegations that, taken together, suggest that County Appellees' procedures allow for the *possibility* of an indeterminate number of invalid or fraudulent ballots being counted. However, federal courts have uniformly found that election irregularities greater in degree to those alleged by Appellants do not rise to the level of due process violations. *See Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975) (malfunctioning of voting machines); *Gold v. Feinberg*, 101 F.3d 796, 801–02 (2d Cir. 1996) (human error resulting in miscounting of votes and delay in arrival of voting machines); *Curry v.*

*Baker*, 802 F.2d 1302, 1316 (11th Cir. 1986) (allegedly inadequate state response to illegal cross-over voting); *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986) (mechanical and human error in counting votes); *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (technical deficiencies in printing ballots); *Powell v. Power*, 436 F.2d 84, 85–86 (2d Cir. 1970) (mistaken allowance of non-party member votes in congressional primary); *Johnson v. Hood*, 430 F.2d 610, 612–13 (5th Cir. 1970) (arbitrary rejection of ten ballots).

Even the few allegations that allegedly invalid ballots were counted are clearly conclusory and based on speculation or assumptions. For example, Appellants allege that Los Angeles County observers witnessed "two different women drop off multiple ballots without voter signatures. Nevertheless, the ballots were counted by election officials for the 2020 general election." ER-66–67. It is inconceivable that these observers were able to track those specific ballots from drop off through the entire process and *know* they were counted as is, rather than being properly routed to the missing or mismatched signature cure process. In other instances, the number of ballots at issue is entirely unclear, such as with broad allegations that "ballots" were mishandled or counted that should not have been counted, leaving Appellees and the Court without any guide as to the scope of

harm. ER-64, 67–68. Allegations about supposedly insecure situations such as bags and big purses in locations where ballots "could easily have been taken," ER-66–67, or unexplained unlocked doors, ER-70, invite the Court to conclude that bad actors, including potentially actors *other than Appellees*, took steps to undermine the security of the election without pleading those specific allegations necessary for drawing the inference. Such allegations are insufficient to support a plausible inference that Appellants have stated a claim that they are entitled to relief. *See Iqbal*, 556 U.S. at 678; *see also Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 418 (W.D. Pa. 2020) ("While vote dilution is a recognized burden on the right to vote in certain contexts, such as when laws are crafted that structurally devalue one community's or group of people's votes over another's, there is no authority to support a finding of burden based solely on a speculative, future possibility that election irregularities might occur.") (collecting cases).

For a due process violation based on a theory of vote dilution, Appellants must allege that voters in different counties were subject to statistically significant inaccuracies in vote tabulation without a rational basis. *See, e.g.*, *Black*, 209 F. Supp. 2d at 901 ("The crux of the matter . . . [is] that a law that allows significantly inaccurate systems of vote counting to be imposed upon some portions of the electorate and not others without any rational basis runs afoul of the due process

clause of the U.S. Constitution.").  But after several rounds of litigation and two amendments to the complaint, Appellants do not plead such allegations because their theory of the case is that allegations of even a single mishandled ballot or insufficiently vetted signature would be sufficient to allege a constitutional violation.  That is simply not how courts have interpreted the constitutional limits on variation and errors in elections.  Instead, courts have held that the "Constitution is not an election fraud statute."  *Bodine*, 788 F.2d at 1271.  "It is not every election irregularity . . . which will give rise to a constitutional claim."  *Id.* Rather, "garden variety election irregularities that could have been adequately dealt with through the procedures set forth in [state] law" do not support constitutional due process claims.  *Id.*; *see also Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) ("[G]arden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.").

To the contrary, Appellants plead nothing more than scattershot instances where observers were dissatisfied with the level of access allegedly provided to them and to alleged election security deficiencies, without making *any* assertions that those irregularities rose to the level of a constitutional violation that impeded the right to vote.  ER-58–63.  Although Appellants allege to have additional incident reports, their actual allegations fail to give rise to a reasonable inference

that the 2020, 2021, or 2022 Elections were inherently flawed or that vote dilution occurred or will occur in the future. Similarly, Appellants' allegations of deficient signature verification are often conclusory and speculate that invalid ballots may have been (or may one day be) counted. Appellants invite the Court to *assume* that all missing or mismatched signatures necessarily contain invalid or fraudulent ballots, rather than recognizing that some or even most of those ballot envelopes would have been verified through the signature cure process laid out in Elections Code section 3019. Some portion of the ballots contained in those allegedly insufficiently vetted envelopes were from eligible voters who failed to sign the envelope or whose signature was hastily affixed without matching the signature on their voter registration. Therefore, the SAC's continued reliance on the alleged increased "possibility" for invalid votes to be counted, especially without sufficient allegations that such ballots *were* actually counted on a scale that calls into question the integrity of any election, fundamentally undermines the claim that County Appellees' conduct infringed upon Appellants' constitutional rights. *See* ER-50–51, 54, 56, 73; *see also Iqbal*, 556 U.S. at 678.

Significant portions of Appellants' arguments rely upon allegations of improper voter registration list maintenance, but Appellants did not bring a cause of action under the NVRA. The NVRA creates a private right of action,

35

subsequent to certain notice requirements, to challenge the adequacy of voter registration list maintenance programs. *See* 52 U.S.C. 20510(b). Instead of bringing such a cause of action, Appellants' allegations regarding voter registration list maintenance, including references to out of state voters or other ineligible voters on the rolls, primarily seek to create an atmospheric sense that County Appellees are somehow diluting votes of lawful voters by failing to ensure voter registration lists are updated to attempt to bolster Appellants' due process claim. Importantly, Appellants' allegation that some County Appellees had a higher discrepancy of "VBM votes counted and VBM registrants with voting histories" is vague and unclear. ER-72. First, *all* voters receive a vote-by-mail ballot—any previous registration as a permanent VBM voter is no longer relevant to whether a voter may choose to vote by mail. Second, voting history is updated throughout the canvass, and individuals can register to vote at the same time as casting their ballots, meaning that the completeness of any voter's voting history depends on the point in time. But the allegation is vague as to whether Appellants are comparing data from the same point in time. And most importantly, "higher discrepancies by percentage" is not sufficient detail about the *scope* of difference to allege harm that rises to the level of constitutional injury. *Id.*

///

36

**C.    THE DISTRICT COURT PROPERLY DISMISSED THE SAC WITHOUT LEAVE TO AMEND.**

Appellants have not shown in their briefing before this Court or the district court how they could amend their complaint for a third time to remedy the many legal deficiencies in their claim.  Instead, they simply argue that the "lower court does not explain how no amendment to the pleading could establish that Appellants' claims transcended garden variety irregularities."  ECF 16 at 30.

But the gravamen of Appellants' allegations and complaint has been the same throughout this years-long litigation, *compare* 4-SER-787–818 (allegations and claims in complaint), 4-SER-622–57 (FAC), *and* ER-48-77 (SAC), and they have not provided any additional allegations that would support their causes of action nor suggest what those might be.  Similarly, Appellees have identified the same legal deficiencies in the pleadings throughout the litigation.  *Compare* 4-SER-736–42 (State Appellees' motion to dismiss complaint), 4-SER-698–703 (County Appellees), 3-SER-448–55 (State Appellees' motion to dismiss FAC), 4-SER-595–60 (County Appellees), ER-110–18 (State Appellees' motion to dismiss SAC) *and* ER-144–55 (County Appellees).  And the district court's discretion to deny leave to amend is particularly broad where a plaintiff has previously been

///

37

afforded such opportunity. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020).

Fundamentally, the underlying theory of the case is without legal merit; additional facts would be irrelevant if Appellants have not pled a legally plausible claim. *See Parents for Priv. v. Barr*, 949 F.3d at 1239 ("The problem with Plaintiffs' complaint, however, is not the sufficiency of their factual allegations. Rather, as we have explained above, Plaintiffs' legal theories fail. Amending the complaint will not change, for example, the extent of the rights that are protected by the Fourteenth Amendment's Due Process Clause."). Because any amendment would be futile, the district court properly dismissed the SAC without leave to amend.

///

///

///

///

///

///

///

///

38

**CONCLUSION**

For the foregoing reasons, the district court's order dismissing this case with prejudice should be affirmed.

Respectfully submitted,

Dated: October 30, 2023

TONY LOPRESTI
COUNTY COUNSEL

By: */s/ Mary E. Hanna-Weir*

MARY E. HANNA-WEIR
Deputy County Counsel

Attorneys for Defendant-Appellee
Shannon Bushey, Registrar of Voters
for the County of Santa Clara

Dated: October 30, 2023

DONNA ZIEGLER
County Counsel

By: */s/ Raymond Lara*

RAYMOND LARA
Senior Deputy County Counsel

Attorneys for Defendant-Appellee
Tim Dupuis, Registrar of Voters
for the County of Alameda

Dated: October 30, 2023

THOMAS L. GEIGER
County Counsel

By: */s/ Rebecca Hooley*

REBECCA HOOLEY
Assistant County Counsel

Attorneys for Defendant-Appellee
Kristin Connelly, Registrar of Voters
for the County of Contra Costa

39

Dated: October 30, 2023     DANIEL C. CEDERBORG
            County Counsel

          By: */s/ Kyle R. Roberson*
            KYLE R. ROBERSON
            Senior Deputy County Counsel

            Attorneys for Defendant-Appellee
            James A. Kus, County Clerk/Registrar
            of Voters for the County of Fresno

Dated: October 30, 2023     MARGO A. RAISON
            County Counsel

          By: */s/ Marshall Scott Fontes*
            MARSHALL SCOTT FONTES
            Chief Deputy County Counsel

            Attorneys for Defendant-Appellee
            Aimee Espinoza, Auditor-Controller/
            County Clerk/Registrar of Voters
            for the County of Kern

Dated: October 30, 2023     DAWYN R. HARRISON
            County Counsel

          By: */s/ Eva W. Chu*
            EVA W. CHU
            Senior Deputy County Counsel

            Attorneys for Defendant-Appellee
            Dean C. Logan, Registrar-Recorder/
            County Clerk for the County of Los
            Angeles

Dated:  October 30, 2023

LESLIE J. GIRARD
County Counsel


By: */s/ Marina S. Pantchenko*
MARINA S. PANTCHENKO
Deputy County Counsel

Attorneys for Defendant-Appellee
Gina Martinez, Registrar of Voters
for the County of Monterey


Dated:  October 30, 2023

LEON J. PAGE
County Counsel


By: */s/ Rebecca S. Leeds*
REBECCA S. LEEDS
Senior Deputy County Counsel

Attorneys for Defendant-Appellee
Bob Page, Registrar of Voters
for the County of Orange


Dated:  October 30, 2023

MINH TRAN
County Counsel


By: */s/ Stephanie K. Nelson*
STEPHANIE K. NELSON
Deputy County Counsel

Attorneys for Defendant-Appellee
Art Tinoco, Interim Registrar of Voters
for the County of Riverside

Dated:  October 30, 2023               LISA A. TRAVIS
County Counsel

By: */s/ Janice M. Snyder*
JANICE M. SNYDER
Assistant County Counsel

Attorneys for Defendant-Appellee
Hang Nguyen, Sacramento County
Registrar of Voters

Dated:  October 30, 2023               TOM BUNTON
County Counsel

By: */s/ Laura L. Feingold*
LAURA L. FEINGOLD
Principal Assistant County Counsel

Attorneys for Defendant-Appellee
Stephenie Shea, Registrar of Voters
for the County of San Bernardino

Dated:  October 30, 2023               BARBARA THOMPSON
County Counsel

By: */s/ Amanda Uhrhammer*
AMANDA UHRHAMMER
Deputy County Counsel
Prentice Long PC

Attorneys for Defendant-Appellee
Francisco Diaz, Clerk-Recorder-Registrar
of Voters for the County of San Benito

Dated: October 30, 2023

RITA L. NEAL
County Counsel


By: */s/ Ann Duggan*
ANN DUGGAN
Deputy County Counsel

Attorneys for Defendant-Appellee
Elaina Cano, Clerk-Recorder-
Registrar of Voters
for the County of San Luis Obispo


Dated: October 30, 2023

JASON M. HEATH
County Counsel


By: */s/ Melissa C. Shaw*
MELISSA C. SHAW
Assistant County Counsel

Attorneys for Defendant-Appellee
Tricia Webber, Registrar of Voters
for the County of Santa Cruz


Dated: October 30, 2023

TIFFANY N. NORTH
County Counsel


By: */s/ Matthew A. Smith*
MATTHEW A. SMITH
Assistant County Counsel

Attorneys for Defendant-Appellee
Michelle Ascencion, Registrar of Voters
for the County of Ventura

## ATTESTATION IN COMPLIANCE WITH CIR. R. 25-5(e)

I attest that all other signatories listed, and on whose behalf this document is filed, concur in the filing's content and have authorized the filing.

*/s/ Mary E. Hanna Weir*
MARY E. HANNA-WEIR

44

## CERTIFICATE OF COMPLIANCE

I am the attorney.

**This brief contains 8,406 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

*/s/ Mary E. Hanna Weir*
MARY E. HANNA-WEIR

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing COUNTY

DEFENDANTS-APPELLEES' ANSWERING BRIEF with the Clerk of the Court

for the United States Court of Appeals for the Ninth Circuit using the appellate

CM/ECF system on October 30, 2023.

Participants in the case who are registered CM/ECF users will be served by

the appellate CM/ECF system.

*/s/ Mary E. Hanna-Weir*
MARY E. HANNA-WEIR