No. 23-55726

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

ELECTION INTEGRITY PROJECT CALIFORNIA, INC., ET AL.,
*Plaintiffs-Appellants*,

v.

SHIRLEY WEBER, CALIFORNIA SECRETARY OF STATE, ET AL.,
*Defendants-Appellees*.
_____

### On Appeal from the United States District Court
### for the Central District of California
No. 2:21-cv-00032-AB-MAA
The Honorable Andre Birotte, Jr., Judge
_____

### STATE DEFENDANTS' ANSWERING BRIEF
_____

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANTHONY R. HAKL
Supervising Deputy Attorney General

JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3479
  Fax: (415) 703-1234
  Email: John.Echeverria@doj.ca.gov
*Attorneys for Defendants-Appellees*
*Shirley N. Weber, in her official capacity*
*as California Secretary of State, and Rob*
*Bonta, in his official capacity as*
*California Attorney General*

October 30, 2023

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Jurisdictional Statement ..............................................................................4

Statement of Issues ......................................................................................5

Addendum of Statutory Provisions ............................................................5

Statement of the Case..................................................................................5

      A.    California's All-Mailed Ballot Election System ......................5

      B.    Plaintiffs' Second Amended Complaint ..................................10

      C.    Procedural History .................................................................12

            1.    Pre-Remand Proceedings and the Prior Appeal ............12

            2.    Post-Remand Dismissal and the Current Appeal ..........14

Summary of Argument ...............................................................................16

Standard of Review....................................................................................19

Argument....................................................................................................20

    I.    Plaintiffs Fail to State a Claim under the *Anderson-Burdick* Framework........................................................................................20

      A.    Plaintiffs' Equal Protection and Due Process Claims Are Subject to Dismissal Under the *Anderson-Burdick* Framework.................................................................................23

      B.    The Challenged Laws and Regulations Do Not Burden Plaintiffs' Right to Vote or Participate in Elections................25

            1.    Vote-by-Mail Statutes (Cal. Elec. Code §§ 3000.5 and 3020)....................................................................29

            2.    Signature-Verification Requirements (Cal. Elec. Code § 3019; Cal. Code Regs. tit. 2, §§ 20910, 20960-20962)..............................................................31

            3.    Uniform Standards for Vote Counting and Ballot Processing (Cal. Code Regs. tit. 2, §§ 20980-20985, 20990-20992)....................................................35

i

# TABLE OF CONTENTS
## (continued)

**Page**

        4.   Modernization of Voter Registration and Transition to All-Mailed Ballot Elections (Senate Bills 397 and 450) ....................................................37

        5.   Plaintiffs Fail to Allege that the Challenged Laws and Regulations, Taken Together, Burden the Right to Vote of any Subgroup of Voters ......................38

    C.   The Challenged Laws and Regulations Advance Important Government Interests ................................................45

II.   Plaintiffs Do Not State a Claim under the Equal Protection or Due Process Clauses ......................................................................48

    A.   Plaintiffs Fail to State an Equal Protection Claim ..................48

    B.   Plaintiffs Fail to State a Due Process Claim ...........................54

III.   The District Court Properly Dismissed the Second Amended Complaint Without Leave to Amend ..................................................57

Conclusion ......................................................................................................58

Statement of Related Cases ...........................................................................59

Certificate of Compliance ..............................................................................60

Circuit Rule 28-2.7 Addendum ......................................................................61

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Celebrezze*
460 U.S. 780 (1983)..........................................................2, 16, 22, 38

*Anderson v. United States*
417 U.S. 211 (1974)..........................................................................41

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)....................................................................19, 28

*Arizona Democratic Party v. Hobbs*
18 F.4th 1179, 1192 (9th Cir. 2021) .................................................22

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)...........................................................................19

*Bennett v. Yoshina*
140 F.3d 1218 (9th Cir. 1998).....................................................55, 56

*Black v. McGuffage*
209 F. Supp. 2d 889 (N.D. Ill. 2002).................................................52

*Bowyer v. Ducey*
506 F. Supp. 3d 699 (D. Ariz. 2020) ............................................40, 41

*Brnovich v. Democratic Nat'l Comm.*
141 S. Ct. 2321 (2021)......................................................................38

*Burdick v. Takushi*
504 U.S. 428 (1992).....................................................................*passim*

*Bush v. Gore*
531 U.S. 98 (2000).......................................................................*passim*

*Clark v. Weber*
54 F.4th 590 (9th Cir. 2022).......................................23, 25, 29, 57

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Common Cause Southern Christian Leadership Conference of*
*Greater Los Angeles v. Jones*
213 F. Supp. 2d 1106 (C.D. Cal. 2001) ...........................................52

*Crawford v. Marion Cnty. Election Bd.*
553 U.S. 181 (2008)...........................................................23, 46, 47

*Dudum v. Arntz*
640 F.3d 1098 (9th Cir. 2011)...................................................23, 47

*Dumas v. Kipp*
90 F.3d 386. (9th Cir. 1996)...........................................................57

*Dunn v. Blumstein*
405 U.S. 330 (1972)........................................................................54

*Election Integrity Project Cal., Inc. v. Weber*
2022 WL 16647768 (9th Cir. Nov. 3, 2022)...............................13, 17

*Feldman v. Ariz. Sec'y of State*
843 F.3d 366 (9th Cir. 2016)...........................................................44

*Fla. Democratic Party v. Detzner*
2016 WL 6090943 (N.D. Fla. 2016) .........................................34, 35

*Gamza v. Aguirre*
619 F.2d 449 (5th Cir. 1980)...........................................................56

*Gray v. Sanders*
372 U.S. 368 (1963).................................................................39, 40

*In re Finjan Holdings, Inc.*
58 F.4th 1048 (9th Cir. 2023)..........................................................28

*Jacobson v. Fla. Sec'y of State*
974 F.3d 1236 (11th Cir. 2020).......................................................35

*League of Women Voters of North Carolina v. North Carolina*
769 F.3d 224 (4th Cir. 2014)......................................................43, 44

# TABLE OF AUTHORITIES
## (continued)

**Page**

*League of Women Voters of Ohio v. Brunner*
  548 F.3d 463 (6th Cir. 2008) ....................................................... 18, 55

*League of Women Voters of Kansas v. Schwab*
  63 Kan. App. 2d 187 (2023) ........................................................ 52, 53

*Lemons v. Bradbury*
  538 F.3d 1098 (9th Cir. 2008) ................................................. 33, 40, 51

*Mecinas v. Hobbs*
  30 F.4th 890 (9th Cir. 2022) ..................................................... 3, 17, 22

*MHC Fin. Ltd. P'ship v. City of San Rafael*
  714 F.3d 1118 (9th Cir. 2013) ............................................................ 19

*Mi Familia Vota v. Hobbs*
  608 F. Supp. 3d 827 (D. Ariz. 2022) ...................................... 27, 38, 53

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*
  15 F.4th 885 (9th Cir. 2021) ............................................................. 19

*Ne. Ohio Coal. For the Homeless v. Husted*
  837 F.3d 612 (6th Cir. 2016) ............................................................ 54

*North Carolina State Conference of NAACP v. McCrory*
  831 F.3d 204 (4th Cir. 2016) ....................................................... 43, 44

*Peterson v. City of San Diego*
  34 Cal. 3d 225 (1983) ....................................................................... 5

*Pub. Integrity All., Inc. v. City of Tucson*
  836 F.3d 1019 (9th Cir. 2016) .................................................... *passim*

*Reynolds v. Sims*
  377 U.S. 533 (1964) ................................................................ 39, 40, 54

*Rodriguez v. Newsom*
  974 F.3d 998 (9th Cir. 2020) ...................................................... 50, 51

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Rucho v. Common Cause*
139 S. Ct. 2484 (2019) ................................................................. 40

*Short v. Brown*
893 F.3d 671 (9th Cir. 2018) ................................................ *passim*

*Soltysik v. Padilla*
910 F.3d 438 (9th Cir. 2018) ........................................ 21, 22, 25

*Soules v. Kauaians for Nukolii Campaign Comm.*
849 F.2d 1176 (9th Cir. 1988) ..................................................... 55

*Southwest Voter Registration Education Project v. Shelley*
344 F.3d 914 (9th Cir. 2003) ........................................................ 50

*Tedards v. Ducey*
951 F.3d 1041 (9th Cir. 2020) ..................................................... 25

*Thompson v. Paul*
547 F.3d 1055 (9th Cir. 2008) ..................................................... 19

*Untied States v. Corinthian Colleges*
655 F.3d 984 (9th Cir. 2011) ....................................................... 28

*Watison v. Carter*
668 F.3d 1108 (9th Cir. 2012) ..................................................... 20

*Wesberry v. Sanders*
376 U.S. 1 (1964) ............................................................... 40, 54

*Zessar v. Helander*
2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ................................. 34

**STATUTES, REGULATIONS, AND BILLS**

United States Code, Title 28
§ 1291 ................................................................................... 5
§ 1331 ................................................................................... 4
§ 1343 ................................................................................... 4

## TABLE OF AUTHORITIES
### (continued)

Page

United States Code, Title 52
  § 20510(b) ..................................................................................56

California Elections Code
  § 2196..............................................................................11, 37
  § 3000.5 ................................................................................*passim*
  § 3000.5(a) ...........................................................................29
  § 3000.5(b) ......................................................................29, 45
  § 3000.5(c) ...........................................................................29
  § 3015 ......................................................................................8
  § 3016 ......................................................................................8
  § 3016.7 ...................................................................................8
  § 3017(a)(1) ............................................................................8
  § 3019.....................................................................9, 11, 31, 34
  § 3019(a)(1) ............................................................................8
  § 3019(a)(2)(A).................................................................9, 31
  § 3019(a)(2)(B)..................................................................9, 31
  § 3019(a)(2)(D)..................................................................9, 31
  § 3019(a)(2)(E)...................................................................9, 31
  § 3019(c)(2)....................................................................6, 9, 31
  § 3019(d) ............................................................................6, 9
  § 3019(d)(1)(A) ......................................................................8
  § 3020 ..............................................................11, 30, 41
  § 3020(a) ...........................................................................8, 30
  § 3020(b) ...........................................................................8, 30
  § 3020(b)(2).....................................................................41, 42
  § 4005...............................................................................11, 37
  § 4005(a) .................................................................................6

Colo. Rev. Stat. § 1-5-401 .........................................................9

Hawaii Stat. § 11-101 ................................................................9

Nev. Rev. Stat. § 293.269911 .....................................................9

Or. Rev. Stat. § 254.465 .............................................................9

vii

# TABLE OF AUTHORITIES
## (continued)

Page

Utah Code Ann. § 20A-3a-202 ..............................................9

Vermont Stat. Ann. § 2537a...................................................9

Wash. Rev. Code § 29A.40.010 .............................................9

California Code of Regulations, title 2 ..................................35

§ 20910.................................................... 11, 31, 32, 37
§ 20960.......................................................... 11, 31, 32
§ 20960(a)................................................................32
§ 20960(f)..............................................................9, 32
§ 20960(g).............................................................9, 32
§ 20961........................................................... 11, 31, 32
§ 20962........................................................... 11, 31, 32
§ 20980............................................................... 11, 35
§ 20981............................................................... 11, 35
§ 20982............................................................... 11, 35
§ 20982(c)...............................................................36
§ 20982(c)(1)...........................................................36
§ 20983........................................................... 11, 35, 36
§ 20984........................................................... 11, 35, 36
§ 20985........................................................... 11, 35, 36
§ 20990........................................................... 11, 35, 36
§ 20990(a)...............................................................36
§ 20990(d)...............................................................36
§ 20991........................................................... 11, 35, 36
§ 20991(b)...............................................................36
§ 20991(c)...............................................................36
§ 20992............................................................... 35, 37

2021 Cal. Stat., ch. 312 (Assembly Bill 37) ...............7, 11, 29

2020 Cal. Stat., ch. 4 (Assembly Bill 860) .....................7, 11

2012 Cal. Stat., ch. 561 (Senate Bill 397)......................11, 37

2016 Cal. Stat., ch. 832 (Senate Bill 450)................5, 11, 37, 38

# TABLE OF AUTHORITIES
## (continued)

Page

2021 Cal. Stat., ch. 319 (Senate Bill 503)......................................................11, 31

2018 Cal. Stat., ch. 446 (Senate Bill 759)...........................................................6

**CONSTITUTIONAL PROVISIONS**

United States Constitution
 Article III...............................................................................................17
 First Amendment ..............................................................................3, 21
 Fourteenth Amendment....................................................................*passim*

Kansas Constitution ...................................................................................52

**COURT RULES**

Ninth Circuit Rule 28-2.7.............................................................................5

Federal Rules of Appellate Procedure
 Rule 4(a)(1)(A) ......................................................................................5

Federal Rules of Evidence
 Rule 201 ................................................................................................28

Federal Rules of Civil Procedure
 Rule 12(b)(1) .............................................................................12, 13, 14
 Rule 12(b)(6) ....................................................................................*passim*

**OTHER AUTHORITIES**

Cal. Sec'y of State, Statement of the Vote – November 8, 2016,
 General Election, https://tinyurl.com/2p86z8ap ...............................10

Cal. Sec'y of State, Statement of the Vote – General Election
 November 3, 2020, https://tinyurl.com/23c4acf4 ............................10

Cal. Sec'y of State, Statement of the Vote – November 8, 2022
 General Election, https://tinyurl.com/27fvhrb2 ...............................10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Richard Briffault, *Election Law Localism and Democracy*, 100 N.C.
    L. Rev. 1421 (2022) ........................................................................... 55

Press Release, Secretary of State Alex Padilla Certifies Record Setting
    General Election Results, Dec. 11, 2020,
    https://tinyurl.com/57m4mwuh ......................................................... 7

**INTRODUCTION**

Over several decades, the California Legislature has reformed the voting process to reduce barriers to voting for eligible residents who seek to participate in the democratic process. As part of those efforts, in 2021, California adopted an all-mailed ballot system for elections throughout the State, requiring local elections officials to mail ballots to all active, registered voters before every election, who may then vote by mail or in person on or before election day. This all-mailed ballot election system makes it easier for all Californians to vote and to have their votes counted.

Even though these reforms have lowered barriers to vote for all Californians, Plaintiffs-Appellants Election Integrity Project of California, Inc. (EIPCa) and five California voters claim that this system violates their equal protection and due process rights. They contend that the adoption of all-mailed ballot elections throughout the State fails to accord "equal dignity" to in-person voters, dilutes in-person votes through the possibility of fraudulent vote-by-mail ballots being cast and counted, and "enable[s] uneven practices" across counties in the processing and counting of ballots. Opening Br. at 2. Their operative Second Amended Complaint is a blunderbuss attack on a wide range of statutes, regulations, legislative enactments, and local practices that have, over the years, expanded voting opportunities in the State, modernized the State's elections

1

procedures, and established statewide standards for processing and counting ballots. The district court properly dismissed Plaintiffs' claims, and this Court should affirm.

On remand, the district court properly dismissed Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). The myriad laws and regulations challenged in this action treat all voters equally—whether they vote in person or by mail—and all votes cast in person or by mail are weighted equally in tabulating election results. The statewide signature verification standards that plaintiffs challenge, which include an opportunity for voters to cure rejected vote-by-mail ballots, seek to ensure that lawful votes are not arbitrarily rejected and to set general standards for local officials to follow in processing vote-by-mail ballots. These standards are not constitutionally infirm merely because different counties may administer elections differently, as they are authorized to do under state and federal law.

First, under the standards articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)—the *Anderson-Burdick* framework—the challenged laws and regulations are constitutional. The *Anderson-Burdick* framework is "the appropriate standard of review for laws regulating the right to vote." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016). It applies to Plaintiffs' claims here. The *Anderson-*

*Burdick* framework weighs the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against the State's "justifications for the burden imposed by its rule." *Mecinas v. Hobbs*, 30 F.4th 890, 902 (9th Cir. 2022) (quoting *Burdick*, 504 U.S. at 434). Only "severe" burdens on voting rights must satisfy strict scrutiny. *Id.* at 904 "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Id.* Such is the case here. Plaintiffs fail to allege *any* cognizable burden on the voting rights of Californians. Plaintiffs fail to allege that the challenged laws and regulations, individually or collectively, burden voting rights at all, including the rights of in-person voters in certain counties and minority voters. But even if the laws and regulations burden the right to vote, any such burden is at most slight, and the challenged laws and regulations are amply justified by important government interests in increasing public participation in elections and standardizing the processing and counting of ballots across counties. Because the challenged laws and regulations easily satisfy *Anderson-Burdick*, Plaintiffs cannot state a claim challenging them.

Second, even outside the *Anderson-Burdick* framework, Plaintiffs fail to state an equal protection or due process claim. Plaintiffs' equal protection claim rests largely on *Bush v. Gore*, 531 U.S. 98 (2000), but the laws and regulations

3

challenged here do not favor any group of voters over any other, and thus "afford the 'equal dignity owed to each voter.'" Opening Br. at 2 (quoting *Bush*, 531 U.S. at 104). Plaintiffs' due process claim, based on purported election "irregularities" and county-level variations, fares no better. While the right to vote is a fundamental right, Plaintiffs have not plausibly alleged that their voting rights have been adversely affected by any of the challenged laws and regulations or that California elections are so fundamentally unfair that they violate substantive due process rights of voters.

Despite multiple amendments of their complaint, Plaintiffs have failed to state a claim under the Equal Protection or Due Process Clauses, and the district court properly dismissed their claims with prejudice. Plaintiffs are free to vote by mail or in person, and their votes are weighed the same as all other votes. They may prefer a different elections system that would make it more difficult for Californians to cast ballots by mail, and easier for elections officials to reject them, but Plaintiffs' policy preferences do not amount to a well-pleaded constitutional claim. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court properly exercised jurisdiction over the claims litigated below. *See* 28 U.S.C. §§ 1331, 1343. The district court entered its order granting Defendants' motions to dismiss Plaintiffs' Second Amended Complaint on July 18,

2023. ER-4–38. The district court entered judgment on August 15, 2023. ER-3. Plaintiffs timely appealed on August 17, 2023. ER-225–228; Fed. R. App. P. 4(a)(1)(A). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether the district court properly dismissed Plaintiffs' claims under the *Anderson-Burdick* framework.

2.      Whether the district court properly dismissed Plaintiffs' claims under the Due Process or Equal Protection Clauses.

2.      Whether the district court properly exercised its discretion in dismissing the Second Amended Complaint without leave to amend on the ground that further amendment would be futile.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory and regulatory provisions is attached to this brief. 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.   California's All-Mailed Ballot Election System

Since 1978, California voters have been able to vote by mail or in person at a polling location. Initially, any registered voter in California could request to vote by mail through an absentee ballot regardless of the reason for not traveling to a polling place. *Peterson v. City of San Diego*, 34 Cal. 3d 225, 229 (1983). In 2016, California enacted Senate Bill 450 (2016 Cal. Stat., ch. 832)—the "Voter's Choice

Act"—to increase voter participation in the democratic process by adopting an all-mailed ballot election system, whereby all registered voters in a county would be mailed ballots before election day that they could return by mail or in person. *Short v. Brown*, 893 F.3d 671, 674 (9th Cir. 2018); ER-50. The Voter's Choice Act authorized fourteen counties to "opt in" to this all-mailed ballot election system on or after January 1, 2018, with all other counties authorized to adopt an all-mailed ballot election system on or after January 1, 2020. Cal. Elec. Code § 4005(a).

When the Voter's Choice Act was enacted, county elections officials were authorized by state statute to reject a vote-by-mail ballot if the signature on the identification envelope did not match the voter's signature on file, with no notice that the ballot had been rejected and opportunity for the voter to cure the ballot. *See* Cal. Elec. Code § 3019(c)(2) (2018) ("If upon conducting the comparison of signatures . . . the elections official determines that the signatures do not compare, the identification envelope shall not be opened and the ballot shall not be counted."). In 2018, the Legislature passed Senate Bill 759 (2018 Cal. Stat., ch. 446) to require elections officials to notify a voter if the voter's signature on the identification envelope does not match the signature on file and to provide an opportunity for the voter to cure the ballot. Cal. Elec. Code § 3019(d); ER-51.

In 2020, the COVID-19 pandemic presented significant challenges to the efficient and safe administration of the November 2020 general election. In response to the public-health threat, the Legislature enacted Assembly Bill 860 (2020 Cal. Stat., ch. 4), requiring election officials to mail a vote-by-mail ballot to every active-status, registered voter for the November 3, 2020 General Election. ER-52. In September 2020, former California Secretary of State Alex Padilla issued emergency regulations relating to signature verification, ballot processing, and vote counting. *Id.* The 2020 General Election exceeded 70% turnout of the eligible voting age population and set a record for the number of votes cast in a California election.[1]

In September 2021, the Legislature passed Assembly Bill 37 (2021 Cal. Stat., ch. 312) to implement all-mailed ballot elections statewide on a permanent basis. Assembly Bill 37 codified the election-related requirements that are in effect today. Under its terms, elections officials must mail a ballot to each active registered voter in California in advance of each election. Cal. Elec. Code § 3000.5. On or before election day, voters may then return completed vote-by-mail ballots by mail or in person to the elections official who issued the ballot, return it in person to a member of a precinct board at a polling place or vote center

---

[1] Press Release, Secretary of State Alex Padilla Certifies Record Setting General Election Results, Dec. 11, 2020, https://tinyurl.com/57m4mwuh.

within the State, or return it to a vote-by-mail ballot drop-off location within the State. *Id.* § 3017(a)(1); *id.* § 3016.7 (authorizing any voter to cast a ballot "using a certified remote accessible vote by mail system"). Alternatively, voters may (1) vote in person at a polling place or vote center by casting a non-provisional ballot if they surrender their vote-by-mail ballot, or if the elections official verifies that the vote-by-mail ballot has not already been returned and updates the voter's record to ensure it will not be cast later, *id.* § 3015; or (2) if they are ineligible to cast a non-provisional ballot, vote in person by casting a provisional ballot at a polling place or vote center, *id.* § 3016.

All completed vote-by-mail ballots must be received by the elections official no later than the close of the polls on election day. *Id.* § 3020(a). A vote-by-mail ballot will also be considered "timely cast" if (1) it is received within seven days of election day and is postmarked on or before election day; or (2) if there is no indication of the date on which the ballot was mailed, the identification envelope is signed and dated by the voter on or before election day. *Id.* § 3020(b).

When elections officials process vote-by-mail ballots, officials must compare the signature on the identification envelope containing the ballot against the signatures in the voter's registration record. *Id.* § 3019(a)(1). The signature verification process is subject to several requirements, including the following provisions: (1) the signature on an identification envelope is presumed to be the

voter's signature, *id.* § 3019(a)(2)(A); (2) the signatures need not match exactly to be valid so long as they share "similar characteristics," *id.* § 3019(a)(2)(B); (3) elections officials may not review a voter's party preference, race, or ethnicity when comparing signatures, *id.* § 3019(a)(2)(D); (4) two additional officials must agree that a signature does not match before rejecting a ballot if the official determines that a signature does not match, *id.* § 3019(c)(2); and (5) when a ballot is rejected, the voter must be given an opportunity to cure the ballot, as specified in the section, *id.* § 3019(d).

The California Secretary of State has also promulgated regulations relating to the signature-verification process. *See* Cal. Elec. Code § 3019(a)(2)(E). California Code of Regulations section 20960 supplements California Elections Code section 3019 by providing a list of characteristics that elections officials should consider in comparing signatures. *See* Cal. Code. Regs. tit. 2, § 20960(f), (g).

California is not alone in adopting an all-mailed ballot election system. Currently, eight states—California, Colorado, Hawaii, Nevada, Oregon, Utah, Vermont, and Washington—have adopted statewide all-mailed ballot election systems. *See* Cal. Elec. Code § 3000.5; Colo. Rev. Stat. § 1-5-401; Hawaii Stat. § 11-101; Nev. Rev. Stat. § 293.269911; Or. Rev. Stat. § 254.465; Utah Code Ann. § 20A-3a-202; Vermont Stat. Ann. § 2537a; Wash. Rev. Code § 29A.40.010. Since California adopted an all-mailed ballot elections system, California voters

have demonstrated an overwhelming preference for voting by mail, with more than 87% of all votes in the 2022 general election being cast by mail.[2]

## B. Plaintiffs' Second Amended Complaint

EIPCa and five California registered voters filed the Second Amended Complaint against California Secretary of State Shirley Weber and California Attorney General Rob Bonta (together, State Defendants), as well as fifteen County Registrars of Voters (collectively, County Defendants), challenging California's all-mailed ballot election system, statewide signature-verification requirements, and other elections regulations. ER-39–78; D. Ct. Dkt. 132, ¶¶ 11-22, 149-167. Plaintiffs allege that over the last three decades, California officials and legislators have "passed election laws, orders, and regulations under the guise of increasing voter participation" that "have systematically undermined election integrity and enabled pervasive irregularities." ER-48, ¶ 48. Plaintiffs assert equal protection and due process claims challenging the following laws and regulations governing all-mailed ballot elections, signature-verification, ballot

---

[2] *See* Cal. Sec'y of State, Statement of the Vote – November 8, 2016, General Election, at 3 (57.79% voted by mail), https://tinyurl.com/2p86z8ap; Cal. Sec'y of State, Statement of the Vote – General Election November 3, 2020, at 3 (86.72% voted by mail), https://tinyurl.com/23c4acf4; Cal. Sec'y of State, Statement of the Vote – November 8, 2022 General Election, at 3 (2022) (87.52% voted by mail), https://tinyurl.com/27fvhrb2.

processing, and vote counting: Cal. Elec. Code §§ 3000.5, 3019, 3020; Cal. Code Regs. tit. 2, §§ 20910, 20960-20962, 20980-20985, 20990-20991. ER-77–78.[3] They also purport to "challenge[] all bills and future bills that have or will expand [vote-by-mail and all regulations that have or will not provide uniform requirements regarding observation, signature verification, ballot remaking, and voter rolls." ER-78 n.3.

The Second Amended Complaint seeks sweeping relief. Plaintiffs pray for a declaratory judgment that the challenged bills, statutes, and regulations are unconstitutional on their face and as applied; a declaratory judgment that "Defendants' lack of uniform and secure vote counting, laws, regulations, and procedures a violation of the Equal Protection Clause and Due Process Clause to the Fourteenth Amendment"; an injunction "preventing the Defendants from enforcing and/or applying a lack of uniform and secure vote counting laws,

---

[3] Plaintiffs also challenge bills that codified or amended the statutes challenged in this action: Assembly Bill 860 (2020 Cal. Stat., ch. 4) (adding California Elections Code section 3000.5); Assembly Bill 37 (2021 Cal. Stat., ch. 312) (amending California Elections Code section 3000.5); and Senate Bill 503 (2021 Cal. Stat., ch. 319) (amending California Elections Code section 3019). ER-77–78. Plaintiffs challenge one bill, Senate Bill 397 (2012 Cal. Stat., ch. 561), which authorized online voter registration, without challenging the underlying statute (Cal. Elec. Code § 2196). ER-78; *see also* ER-18 (noting that Plaintiffs "did not allege the relevant Elections Code section" implemented by Senate Bill 397). Plaintiffs also challenge Senate Bill 450 (2016 Cal. Stat., ch. 832), which permitted certain counties to adopt all-mailed ballot elections, codified at California Elections Code section 4005.

regulations, and procedures"; and damages, including nominal damages.
ER-77–78. Plaintiffs also pray for orders directing Defendants to preserve for
inspection and audit all vote-by-mail ballots and envelopes and all voting
machines, election software, computers, reports, and "other data and equipment"
used since the November 2020 election to cast, examine, count, and store votes.
ER-77.

### C. Procedural History

#### 1. Pre-Remand Proceedings and the Prior Appeal

This action was originally filed on January 4, 2021. D. Ct. Dkt. 1; ER-240.
The next day, Plaintiffs filed an application for a temporary restraining order to
prevent Defendants from destroying certain election-related documents, which the
district court denied. D. Ct. Dkt. 21, 35; ER-242–243. On February 12, 2021,
Defendants filed initial motions to dismiss under Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6). D. Ct. Dkt. 43, 45; ER-243. Rather than oppose the
motions, EIPCa and individual Plaintiffs, as both voters and unsuccessful
congressional candidates, filed a First Amended Complaint asserting claims under
the Equal Protection Clause, Due Process Clause, Elections Clause, and Guarantee
Clause against State Defendants, the California Governor, and the County
Defendants. D. Ct. Dkt. 68; ER-246. Defendants then moved to dismiss Plaintiffs'

amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

D. Ct. Dkt. 84, 85; ER-247.

On June 14, 2021, the district court issued an order granting Defendants'
motions to dismiss, with prejudice, for lack of subject-matter jurisdiction under
Federal Rule of Civil Procedure 12(b)(1). D. Ct. Dkt. 111; ER-250. The court
held that the individual Plaintiffs lacked standing as voters or candidates, and that
EIPCa failed to establish organizational standing. *Id.* at 10-11. The court also
dismissed Plaintiffs' claim under the Elections Clause for lack of standing, and
their Guarantee Clause claim as not justiciable. *Id.* at 11-13. The court entered
judgment on August 30, 2021. D. Ct. Dkt. 113; ER-250.

Plaintiffs appealed that judgment. In an unpublished memorandum, a divided
panel of this Court affirmed in part and reversed in part. D. Ct. Dkt. 121; ER-251;
*Election Integrity Project Cal., Inc. v. Weber*, 9th Cir. No. 21-56061, Dkt. 70-1,
2022 WL 16647768 (9th Cir. Nov. 3, 2022). The Court affirmed the dismissal of
the Guarantee Clause claim, D. Ct. Dkt. 121 at 6, but held that EIPCa had
sufficiently alleged organizational standing in the First Amended Complaint, *id.* at
5-6. Because one plaintiff had standing, the Court did not "reach the question
whether any other plaintiff has standing." *Id.* at 6. Judge Thomas dissented in
part, reasoning that she would have held that EIPCa lacked organizational
standing. D. Ct. Dkt. 121 at 1 n.1 (Thomas, J., dissenting). Judge Thomas noted

13

that she would have also reached the question of the individual Plaintiffs' standing and would have held that they also lacked standing. *Id.* at 4 n.2 (Thomas, J., dissenting). The case was remanded for further proceedings.

### 2. Post-Remand Dismissal and the Current Appeal

Following remand, Plaintiffs filed the operative Second Amended Complaint in February 2023. D. Ct. Dkt. 132; ER-39–78. The Second Amended Complaint—brought by EIPCa and five individual Plaintiffs solely in their capacity as voters—asserts claims only under the Equal Protection and Due Process Clauses. ER-74–77, ¶¶ 149-167. The Second Amended Complaint omitted claims brought by congressional candidates, removed the Governor as a defendant, and added two additional County Defendants. *Compare* D. Ct. Dkt. 68 (1st Am. Compl.), ¶¶ 22-51, *with* ER-43–46 (2d Am. Compl.), ¶¶ 11-39.

Defendants filed motions to dismiss the Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). D. Ct. Dkt. 162, 163; ER-254. After a hearing on the motions, the district court issued an order granting Defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) and dismissed the Second Amended Complaint with prejudice. D. Ct. Dkt. 180; ER-4–38, 255.[4] The court first held that Plaintiffs failed to plead a claim under the

---

[4] The district court declined to address Defendants' arguments under Federal Rule of Civil Procedure 12(b)(1) because one plaintiff (EIPCa) had standing. ER-12.

*Anderson-Burdick* framework for constitutional claims challenging elections laws, ER-12–18, the primary basis for the State Defendants' motion to dismiss, *see* ER-144–155. The court determined that the various bills, statutes, and regulations challenged in the Second Amended Complaint are "generally applicable and do not burden Plaintiffs' right to vote." ER-19. The court also concluded that the State's election laws advance sufficient government interests, including increasing voter participation in the democratic process, modernizing the process for allowing online voter registration, establishing statewide standards for signature verification, and setting a window for the timely receipt of vote-by-mail ballots. *Id.*

The district court also held that the Second Amended Complaint failed to state equal protection or due process claims. ER-20–37. The court concluded that Plaintiffs' theory of vote dilution through voter fraud was not cognizable because Plaintiffs failed to allege that any votes are weighted or treated differently as a result of the challenged laws and regulations. ER-21. That undermined the basis for any equal protection or due process claim. And the court distinguished *Bush v. Gore*, 531 U.S. 98, reasoning that alleged "irregularities" did not amount to a constitutional violation. ER-24–37.

Finally, the district court determined that "any amendment to the complaint would be futile." ER-37. Thus, the court granted Defendants' motions to dismiss

15

under Federal Rule of Civil Procedure 12(b)(6) and dismissed the Second

Amended Complaint with prejudice.  ER-38.

The court entered judgment on August 15, 2023.  D. Ct. Dkt. 182; ER-3, 255.

Thereafter, on August 17, 2023, Plaintiffs noticed this appeal.  D. Ct. Dkt. 184;

ER-225–228, 256.

## SUMMARY OF ARGUMENT

Plaintiffs' Second Amended Complaint challenges California's all-mailed

ballot election system and signature-verification requirements, among other laws

and regulations, that were implemented to increase voter participation in elections

and establish statewide standards for those elections.  The various statutes and

regulations challenged in this action do not impermissibly favor any group of

voters over another, as all registered California voters receive a mail ballot and are

free to vote that ballot by mail or in person.  Plaintiffs' allegations fail to amount to

a constitutional violation under any standard and were properly dismissed without

leave to amend.

First, Plaintiffs' claims fail as a matter of law under the *Anderson-Burdick* test

governing constitutional challenges to elections laws and regulations.  *See Burdick*,

504 U.S. at 434; *Anderson*, 460 U.S. at 789.  The *Anderson-Burdick* framework is

"the appropriate standard of review for laws regulating the right to vote."  *Pub.*

*Integrity All., Inc.*, 836 F.3d at 1024.  It applies here.  *See Short*, 893 F.3d at 677

16

(evaluating equal protection challenge to all-mailed ballot elections in certain counties under *Anderson-Burdick*).  Under the *Anderson-Burdick* standard, "[l]esser burdens" on the right to vote are examined under "less exacting review," where the State's "'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"  *Mecinas*, 30 F.4th at 904.  Plaintiffs have failed to allege that the challenged laws and regulations burden their right to vote in any way; if anything, the laws reduce any burden on their ability to vote by making it easier for them—and all other voters—to cast a ballot.[5]  And the challenged provisions are readily justified by the State's important interest in expanding voter participation in elections and establishing statewide standards for the administration of elections by local officials.  They are the type of laws "repeatedly upheld as 'not severe,'" as they are "generally applicable, even handed, politically neutral, and protect the reliability and integrity of the election process."  *Pub. Integrity All., Inc.*, 836 F.3d at 1024-1025; *see also* ER-19.

---

[5] Because the challenged laws and regulations do not burden Plaintiffs' right to vote, Plaintiffs as voters have not suffered any cognizable injury to have standing under Article III.  Nor could they trace any injury to the challenged provisions or remedy that injury by enjoining them.  Nevertheless, because a single plaintiff (EIPCa) has organizational standing, *Election Integrity Project Cal., Inc.*, 2022 WL 16647768, at *1; ER-12, State Defendants do not separately address standing under Article III.

Second, while *Anderson-Burdick* disposes of Plaintiffs' claims challenging the laws and regulations at issue in this case, Plaintiffs otherwise failed to plead a violation of the Equal Protection or Due Process Clauses. The claims fail for similar reasons that they fail under *Anderson-Burdick*. The challenged laws and regulations do not favor vote-by-mail voters over in-person voters, and they do not deny anyone their right to vote. And to the extent Plaintiffs' claim is premised on the application of different election rules depending on the county in which voters reside, such variation does not amount to an equal protection violation under *Bush v. Gore*, because the challenged laws and regulations comprise the kind of statewide standards that were absent in *Bush*. *Bush*, 531 U.S. at 105. And critically, *Bush* did not call into question "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id.* (emphasis added). And Plaintiffs' due process claim, which is based on purported election irregularities, similarly fails. The various allegations of purported "irregularities" do not amount to a claim that this is "the exceptional case" where the State's voting system is so "fundamentally unfair" that it violates the Due Process Clause. *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008).

Finally, the district court did not abuse its discretion in dismissing the Second Amended Complaint without leave to amend. The district court explained that

further amendment would be futile. On appeal, Plaintiffs have not suggested what additional particularized facts they could allege to save their claims from dismissal. The district court properly dismissed their case with prejudice.

## STANDARD OF REVIEW

A district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is reviewed de novo. *See Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). An order of dismissal may be affirmed on any ground supported by the record. *Thompson v. Paul*, 547 F.3d 1055, 1058-59 (9th Cir. 2008).

Whether a district court properly dismissed a complaint without leave to amend is reviewed for abuse of discretion. *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1126 (9th Cir. 2013). Dismissal without leave to amend is appropriate when the court "determines that the pleading could not possibly be

cured by the allegation of other facts." *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012) (citation omitted).

## ARGUMENT

Plaintiffs' Second Amended Complaint challenges California's all-mailed ballot election system and statewide signature-verification standards under a variety of theories, none of which states a claim for which relief may be granted. Plaintiffs allegations fail as a matter of law under the *Anderson-Burdick* balancing test, which Plaintiffs acknowledge governs their claims. The Second Amended complaint alleges no cognizable burden on Plaintiffs' voting rights, and the challenged rules are plainly justified by important government interests, which Plaintiffs ignore. Even outside the *Anderson-Burdick* framework, Plaintiffs otherwise fail to state any equal protection or due process claim under applicable case law. Plaintiffs' Second Amended Complaint failed to state a claim, despite repeated attempts over the past several years, and the district court properly exercised its discretion in dismissing it without leave to amend. The Court should affirm the dismissal of Plaintiffs' claims with prejudice.

## I.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE *ANDERSON-BURDICK* FRAMEWORK

Plaintiffs' equal protection and due process claims fail as a matter of law under the *Anderson-Burdick* framework applicable to constitutional challenges to elections laws. Though "'voting is of the most fundamental significance under our

constitutional structure,'" "[i]t does not follow . . . that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick*, 504 U.S. at 433 (citations omitted). It is a matter of "[c]ommon sense, as well as constitutional law," that "government must play an active role in structuring elections," *id.* and "any election system 'inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.'" *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018) (quoting *Burdick*, 504 U.S. at 433). To accommodate this inevitability, the U.S. Supreme Court has developed, and this Court has regularly applied, the *Anderson-Burdick* framework—a "sliding scale test, where the more severe the burden [on the right to vote], the more compelling the state's interest must be." *Id.* (quotation omitted). And in cases challenging "an electoral *system*, as opposed to a discrete election rule"—like this case—the Court's "respect for governmental choices in running elections has particular force." *Pub. Integrity All., Inc.*, 836 F.3d at 1114 (emphasis added).

Under the *Anderson-Burdick* test, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which

21

those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504
U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). While severe burdens on voting
rights "must meet strict scrutiny," laws imposing lesser burdens "trigger less
exacting review." *Mecinas*, 30 F.4th at 904. A law imposing a "minimal" or
"slight" burden must be upheld if it advances "an important regulatory interest."
*Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1192 (9th Cir. 2021). Laws
that impose a burden that is less than severe but more than slight is subject to
review that is "neither strict nor wholly deferential," and may require the
government to show that less burdensome alternatives were not available. *Soltysik*,
910 F.3d at 445 (holding that law designating candidates of minor parties as having
no party on ballots was not justified by important interests).

Plaintiffs have failed to state a claim because none of the challenged statutes
or regulations burdens in any way their right to vote. To the contrary, those rules
protect and expand the right to vote for all Californians and facilitate the consistent
and efficient administration of elections across counties. But even if they do
impose some burden on voting rights, under *Anderson-Burdick*, they are not
subject to heightened scrutiny, and they are sufficiently justified by important
government interests in increasing voluntary participation in the democratic
process and safeguarding public confidence in California's elections.

### A. Plaintiffs' Equal Protection and Due Process Claims Are Subject to Dismissal Under the *Anderson-Burdick* Framework

*Anderson-Burdick* is "the appropriate standard of review for laws regulating the right to vote," and strict scrutiny is appropriate only "when First or Fourteenth Amendment rights 'are subjected to 'severe' restrictions." *Pub. Integrity All., Inc.*, 836 F.3d at 1024 (quoting *Burdick*, 504 U.S. at 434); *see, e.g.*, *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) ("The Supreme Court has addressed [due process and equal protection] claims collectively using a single analytic framework. . . . We do the same here." (internal citations omitted)); *Clark v. Weber*, 54 F.4th 590, 592, 594 (9th Cir. 2022) (applying the *Anderson-Burdick* test to claims that "California recall process would violate [plaintiffs'] Fourteenth Amendment due process and equal protection rights"). The *Anderson-Burdick* framework applies to a wide range of constitutional claims "respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring). Though Plaintiffs did not address the *Anderson-Burdick* test in the court below—beyond dismissing the standard as a "red herring," *see* ER-13—Plaintiffs now appear to acknowledge that the standard applies to their claims, *see* Opening Br. at 13-16 (addressing State Defendants' *Anderson-Burdick*

23

arguments). *Anderson-Burdick* applies to all of Plaintiffs' claims in this action against State Defendants.[6]

This Court's decision in *Short v. Brown* is instructive. The Court applied *Anderson-Burdick* to an equal protection challenge to the Voter's Choice Act's rollout of all-mailed ballot elections in California (also challenged in this case). 893 F.3d at 677. In that case, the plaintiffs claimed that California's "county-by-county structure" for administrating elections "inequitably 'dilutes' votes in 'disfavored' counties" that were not yet allowed to implement all-mailed ballot elections "and therefore warrants strict scrutiny." *Id.* But this Court rejected that "attempt to sidestep more deferential review" under the *Anderson-Burdick* framework. *Id.* at 676. The Court should similarly reject Plaintiffs' attempts to bypass *Anderson-Burdick* here.

And Plaintiffs are wrong that this case cannot be dismissed at the pleadings stage under *Anderson-Burdick*. *See* Opening Br. at 15-16 ("Whether the challenged laws, regulations, and procedures burden Appellants is an issue of fact

---

[6] In addition to challenging certain state laws and regulations, Plaintiffs also challenge County Defendants' "practices" in administering all-mailed ballot elections. Opening Br. at 2. In the proceedings below, County Defendants addressed Plaintiffs' allegations concerning the *manner* in which elections are conducted in certain counties, including allegations of purported election irregularities in some counties. *See* ER-94, 111–118. State Defendants focus on the constitutionality of the challenged laws and regulations.

not suitable for resolution on a motion to dismiss.").  A challenge to an election law may be dismissed at the pleadings stage where the well-pleaded facts establish only a minimal burden on the right to vote.  *See, e.g.*, *Tedards v. Ducey*, 951 F.3d 1041, 1068 (9th Cir. 2020) ("Given that the burden of th[e] timing [of the vacancy election] on Plaintiffs' right to vote is 'reasonable' and 'nondiscriminatory,' the 'important' state interests raised above are sufficient to affirm the dismissal of Plaintiffs' First and Fourteenth Amendment challenges."); *Clark*, 54 F.4th at 594 (affirming dismissal of complaint without leave to amend where challenged recall election procedures impose "only a non-severe burden on the right to vote" and "serve[] an important government interest"); *see also Soltysik*, 910 F.3d at 447-450 (remanding case for development of an "evidentiary record" where the challenged law could cause voter confusion and imposed more than a slight, but less than a severe, burden on voting rights).  Consistent with those cases, the district court properly determined that *Anderson-Burdick* applies to Plaintiffs' claims.

## B.  The Challenged Laws and Regulations Do Not Burden Plaintiffs' Right to Vote or Participate in Elections

Applying the *Anderson-Burdick* framework, Plaintiffs fail at the threshold to plausibly allege that any of the challenged laws or regulations burden their right to vote or participate in the democratic process, let alone that they impose the kind of severe burden that is necessary to trigger strict scrutiny review.  *See* Opening Br. at 13.  The district court correctly concluded, based on a review of the complaint and

the challenged laws and regulations, that none of the laws—individually or collectively—imposes a burden on the right to vote. Even if there were a burden, heightened scrutiny under *Anderson-Burdick* would not be warranted.

In *Short*, this Court applied the *Anderson-Burdick* framework, concluding that the Plaintiffs' equal protection challenge to the Voter's Choice Act did not even raise "serious questions" as to the law's constitutionality. *Id.* at 676-677. The Court reasoned that the law—which allowed some counties to adopt all-mailed ballot elections—did "not burden anyone's right to vote." *Id.* at 677. To the contrary, it "ma[de] it easier for some voters to cast their ballots by mail" in counties that adopted all-mailed ballot elections, while other voters' "access to the ballot [was] exactly the same as it was prior to the [Voter's Choice Act's] enactment." *Id.* The rollout of all-mailed ballot elections in some counties did not result in any "disproportionate weighting" of votes or "allocate representation differently among voters, so its distinction along county lines [did] not trigger heightened scrutiny" under *Anderson-Burdick*. *Id.* at 678.

Plaintiffs' efforts to distinguish *Short* are unpersuasive. Plaintiffs focus on the Court's analysis of the slight burden imposed on voters in counties that were not allowed to implement the kind of all-mailed ballot elections that now apply statewide. Opening Br. at 15. But they ignore the Court's observation that the implementation of all-mailed ballot elections for voters in some counties made it

"easier for [those] voters to cast their ballots by mail." *Short*, 893 F.3d at 677.

Moreover, it does not matter that *Short* was an interlocutory appeal from a denial

of a preliminary injunction, where the Court could consider evidence outside the

pleadings, *see* Opening Br. at 15, because the Court's analysis did not involve

consideration of any evidence—it was a legal determination based on its review of

the challenged law, *see Short*, 893 F.3d at 677 (noting that the plaintiffs "have not

even alleged—let alone introduced evidence to demonstrate—that the [Voter's

Choice Act] will prevent anyone from voting"); *see also Mi Familia Vota v.*

*Hobbs*, 608 F. Supp. 3d 827, 853 (D. Ariz. 2022) (rejecting argument that *Short* is

distinguishable because it was decided in an interlocutory posture).

Applying the *Anderson-Burdick* test, Plaintiffs fail to allege anything more

than a slight (or nonexistent) burden on the right to vote. It could be said that this

case is even stronger than *Short* because, now, voters in all California counties are

subject to the same all-mailed ballot election system, which this Court determined

imposes no burden on the voting rights of any Californian; indeed, it makes it

"easier" for voters to cast their ballots, and Plaintiffs, like those in *Short*, fail to

"explain[] how a law that makes it easier to vote would violate the Constitution."

*Id.* at 677-678. The district court properly determined that the challenged laws and

regulations do not burden Plaintiffs' voting rights.

Plaintiffs argue that the district court improperly "gave greater weight" to Defendants' arguments than Plaintiffs' allegations. Opening Br. at 13. But conclusory allegations that contradict the challenged laws and regulations are not entitled to any weight. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."). The district court was free to examine the text of the challenged statutes and regulations, and disregard allegations that conflict with those provisions. *See In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023) ("When a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling.").[7]

Here, Plaintiffs challenge four distinct groups of laws and regulations, but fail to allege that any of them—individually or collectively—burdens the right to vote or disproportionately impacts the voting rights of any group of voters.[8] Instead,

---

[7] Plaintiffs cite *Untied States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011), to argue that the district court could not consider information outside the Second Amended Complaint. Opening Br. at 28-29. That case merely explained the general rule that courts may not, on a motion to dismiss, consider "evidence outside of the [c]omplaint" or judicially notice facts "that could reasonably be disputed." *Corinthian Colleges*, 655 F.3d at 999 (citing Fed. R. Evid. 201).

[8] The Second Amended Complaint purports to challenge "all bills and future bills that have or will expand [vote-by-mail] and all regulations that have or will not provide uniform requirements regarding observation, signature verification, ballot

they are "neutral" rules that apply statewide, "across the lines of political affiliation, race, religion, and gender." *Clark*, 54 F.4th at 594.

### 1. Vote-by-Mail Statutes (Cal. Elec. Code §§ 3000.5 and 3020)

Plaintiffs challenge the all-mailed ballot election procedures set forth in California Elections Code sections 3000.5 and 3020, as amended by Assembly Bills 860 (2020) and 37 (2021). Section 3000.5 requires elections officials to mail a vote-by-mail ballot to all registered voters in advance of each election.[9] Cal. Elec. Code § 3000.5(a). Elections officials must mail a ballot to all registered voters at least 29 days before the election and no later than 5 days if the voter registered on the 29th day before the election or later. *Id.* Section 3000.5 specifies that the mailing of ballots to all registered voters "does not prevent a voter from voting in person at a polling place, vote center, or other authorized location," and it does not authorize elections officials to mail a ballot to any voter with an "inactive voter registration status." *Id.* § 3000.5(b), (c).

---

remaking, and voter rolls." ER-78 n.3. The district court properly determined that Plaintiffs' challenge to legislation that has not been (and may never be) enacted is "improper as future bills are not before the Court." ER-13–14 n.1.

[9] Though the current title of California Elections Code section 3000.5 suggests that it applies only to elections conducted before January 1, 2022, Assembly Bill 37 amended the statute to apply to "each election" without also amending the title of statute. *See* Cal. Elec. Code § 3000.5(a).

Section 3020 regulates the time in which a ballot must be received by mail to count as "timely cast." Cal. Elec. Code § 3020(b). Under that statute, all vote-by-mail ballots must be received by the elections official that mailed the ballot or the precinct board no later than the close of the polls on election. *Id.* § 3020(a). However, any vote-by-mail ballot received by the elections official by the United States Postal Service or bona fide private mail delivery company no later than seven days after election must be treated as timely cast if either of two conditions are satisfied: (1) the ballot is postmarked, or stamped by a bona fide private mail delivery company, on or before election day; or (2) if the ballot has no postmark, a postmark with no date, or an illegible postmark, and there is no other information available from the postal service or mail delivery company to indicate the date on which the ballot was mailed, the ballot identification envelope is date stamped by the elections official upon receipt and is signed and dated by the voter on or before election day. *Id.* § 3020(b).

Sections 3000.5 and 3020 do not burden voting rights. The district court correctly determined that these vote-by-mail provisions "are generally applicable and expand the opportunity for *all* registered voters to cast their votes by mail"— including Plaintiffs. ER-14.

## 2. Signature-Verification Requirements (Cal. Elec. Code § 3019; Cal. Code Regs. tit. 2, §§ 20910, 20960-20962)

Plaintiffs also challenge a statute and regulations setting statewide standards for signature verification, and an opportunity for voters to cure ballots that are rejected based on a signature mismatch. ER-14–18, 51, 60. Under section 3019, as amended in 2021 by Senate Bill 503, the following standards apply when comparing a signature on a vote-by-mail identification envelope with the voter's registration record: (1) there is a presumption that the signature on a vote-by-mail identification envelope is the voter's signature, Cal. Elec. Code § 3019(a)(2)(A); (2) an exact signature match is not required where it is determined that sufficient similar characteristics exist, *id.* § 3019(a)(2)(B); (3) two officials must agree that a signature does not match before rejecting a ballot, *id.* § 3019(c)(2); (4) elections officials may not review a voter's party preference, race, or ethnicity when comparing signatures, *id.* § 3019(a)(2)(D); and (5) when a ballot is rejected, the voter must be notified and provided an opportunity to cure the ballot before certification of the election, *id.* § 3019(d)(1)(A).

Section 3019 also makes specific reference to the regulations promulgated by the Secretary of State that identify certain characteristics that may be considered when determining whether a given signature matches. *See* Cal. Elec. Code § 3019(a)(2)(E). California Code of Regulations section 20960 supplements section 3019 by providing a comprehensive list of characteristics that should be

31

considered, such as the slant of the signatures, how certain letters are crossed or looped, and similar endings to the signatures. *See* Cal. Code. Regs. tit. 2, § 20960(f), (g).[10] The statute and the regulations recognize that over time, signatures can change, and the regulations provide a consistent means of assessing such changes without improperly rejecting valid votes.

Plaintiffs claim that these regulations provide no "consistent means" of comparing signatures on an identification envelope and a voter's file, claiming that section 20960 gives officials "discretion" by stating that they "may" consider certain enumerated characteristics. Opening Br. at 28. But Plaintiffs ignore the mandatory language contained elsewhere in the challenged regulations, *see* Cal. Code Regs. tit. 2, § 20960(a). Officials are required to compare the signature on an identification envelope with the signature in the voter's registration record and may

---

[10] In addition to section 20960, Plaintiffs challenge other regulations governing signature verification and vote tabulation. Section 20910 merely announces the purpose of the signature-verification regulations: "to ensure uniform application and practices for elections officials . . . for signature verification on local and statewide election-related petitions, vote-by-mail identification envelopes, and provisional ballot envelopes." Section 20961 provides that, if an elections official uses "signature verification technology" to compare signatures and the technology rejects the signature, the official must conduct a manual comparison. Section 20962 requires the Secretary of State to provide a yearly training program for elections officials who are responsible for signature verification. Plaintiffs do not explain how these regulations conceivably burden the right to vote. The district court properly determined that they do not. ER-16.

consider specific factors; it would be an absurd reading of the regulation to conclude that elections officials, in performing their duty to compare signatures, could do so without considering *any* of the factors. While the statute and regulations do not require elections officials to use signature-verification technology or identify a specific "number of points of comparison," Opening Br. at 14, they do provide statewide standards to govern the comparison that elections officials are statutorily obligated to perform.[11]

In *Lemons v. Bradbury*, this Court upheld signature-verification requirements applicable to referendum petitions under *Anderson-Burdick*, even though voters were not provided notice and an opportunity to cure rejected ballots. 538 F.3d 1098, 1104 (9th Cir. 2008). Much like the signature-verification law and regulations challenged here, the Oregon Secretary of State issued an administrative rule requiring election officials to verify the signatures on a petition using voter registration records, including a comparison of the signatures "to identify whether the signature [on the petition] is genuine and must be counted." *Id.* at 1106 (citation omitted). But Oregon's rules did not specify *any* factors to consider when

---

[11] Plaintiffs incorrectly characterize the signature comparison as "determining the intent of a voter." Opening Br. at 28. Assessing the validity of a signature on a ballot identification envelope is different—and "far simpler"—than evaluating the intent of a voter in selecting options on a ballot. *Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) (upholding signature-verification requirements for petitions under *Anderson-Burdick*).

comparing signatures, let alone a minimum number of "points of comparison." Opening Br. at 28. Nevertheless, this Court upheld Oregon's signature-verification requirements under *Anderson-Burdick* as imposing a "minimal burden" on voting rights. *Id.* at 1102.

As the district court correctly held, the factors specified in section 3019 and the Secretary of State's regulations for verifying a voter's signature on a vote-by-mail ballot do not burden the right to vote. ER-15–17. If anything, these provisions safeguard against a vote-by-mail ballot being erroneously rejected, which would burden the rights of vote-by-mail voters. Indeed, other state laws permitting vote-by-mail without an adequate opportunity to cure a signature discrepancy have been struck down because they have been found to severely burden the right to vote. *See, e.g.*, *Zessar v. Helander*, 2006 WL 642646, at *7, *9 (N.D. Ill. Mar. 13, 2006) (noting the *Anderson-Burdick* framework and holding that Illinois law permitting a voter to cure a signature mismatch for future elections, but not the election in which the ballot was cast, would "irremediably den[y]" the voter's right to vote in that election); *Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *6 (N.D. Fla. 2016) (holding that Florida law permitting elections officials to reject mail-in ballots with mismatched signatures without an opportunity to cure imposed a "severe burden on the right to vote"

under *Anderson-Burdick*), *declined to follow on other grounds by Jacobson v. Fla.
Sec'y of State*, 974 F.3d 1236, 1256 (11th Cir. 2020).

It would be Plaintiffs' preferred signature-verification requirements—and not
the challenged statute and regulations—that would severely burden the right to
vote. *See Detzner*, 2016 WL 6090943, at *6 ("If disenfranchising thousands of
eligible voters [whose vote-by-mail ballots are rejected for mismatched signatures]
does not amount to a severe burden on the right to vote, then this Court is at a loss
of what does."). California's signature verification requirements do not burden the
right to vote.

> **3. Uniform Standards for Vote Counting and Ballot
> Processing (Cal. Code Regs. tit. 2, §§ 20980-20985, 20990-
> 20992)**

Plaintiffs also challenge various regulations set forth in chapter 8.3, division
7, of title 2 of the California Code of Regulations, establishing uniform standards
for vote counting and ballot processing that apply statewide.

First, Plaintiffs challenge a set of regulations in article 8 concerning vote
counting applicable to votes cast in person and by mail. Section 20980 sets out the
purpose of the article, which is "to ensure uniform application and practices for
elections officials . . . for signature verification on local and statewide election-
related petitions, vote-by-mail identification envelopes, and provisional ballot
envelopes" Section 20981 simply provides definitions, and section 20982 lays out

35

the general vote counting standards, under which improperly marked ballots may be counted so long as "it is clear that" the improper mark "represents the voter's choice and is the technique consistently used by the voter to indicate his or her selections." Cal. Code Regs. tit. 2, § 20982(c). For instance, if a voter circles the voter's ballot selections, rather than completely filling them in, that ballot could be counted. *See id.* § 20982(c)(1). Sections 20983, 20984, and 20985 outline similar standards that are to be used with particular types of voting systems.

Second, Plaintiffs challenge another set of regulations in article 9 concerning the processing of vote-by-mail and provisional ballots. Section 20990 requires that upon receipt, election officials "immediately . . . enter the return status of that ballot into the statewide voter registration system," and mandates a cure process for rejected ballots. *See id.* §§ 20990(a), (d). Section 20991 details the standards for both valid and invalid vote-by-mail ballots. Generally, a ballot shall be considered valid if the election official is able to sufficiently determine that the ballot was cast by a registered voter and was postmarked by election day or otherwise received within the statutory window for timely receipt, and the voter's choices are clearly marked and identifiable. *See id.* § 20991(b). A ballot shall be considered invalid if the voter's signature cannot be matched to a voter registration record or the ballot was not timely received. *See id.* §§ 20991(c). Similar

36

provisions concerning signature verification are made applicable to provisional ballots in section 20992.  *See id.* § 20992.

These provisions in no way burden the right to vote.  ER-15–17.  Rather, they demonstrate the Secretary of State's concern to provide uniform standards and procedures across the State, *see id.* § 20910, while still affording local officials the ability to tailor elections procedures to local needs, consistent with statewide standards and other state and federal law.

### 4. Modernization of Voter Registration and Transition to All-Mailed Ballot Elections (Senate Bills 397 and 450)

Plaintiffs challenge Senate Bill 397 (2012 Cal. Stat., ch. 561) and Senate Bill 450 (2016 Cal. Stat., ch. 832).  ER-50, ¶¶ 55, 56.  Senate Bill 397 implemented online voter registration in California.  *See* Cal. Elec. Code § 2196. Senate Bill 450, the Voter's Choice Act, established a system under which voters in certain counties would be automatically mailed a vote-by-mail ballot, and would be permitted to return the ballot at any ballot drop-off location in the county, rather than just one specific precinct location.  *See id.* § 4005.  Plaintiffs allege that Senate Bill 450 "eliminated neighborhood precinct voting and reduced the number of in-person polling places," ER-50, ¶ 56, but fail to note that counties that opted into the all-mailed ballot election system were required to establish "vote centers"—"voting-resource hub[s] that replac[d] traditional polling places," *Short*, 893 F.3d at 674—where voters could deliver ballots or vote in person.

37

Neither of these laws imposed any burden—let alone a severe burden—on the right to vote.  Allowing for online voter registration is a commonsense reform that expanded the ability of all Californians to register to vote.  And this Court rejected an equal protection challenge to the Voter's Choice Act (Senate Bill 450), holding that it "does not burden anyone's right to vote" under *Anderson-Burdick*.  *Short*, 893 F.3d at 676-677; *see supra* at p. 6.  "Instead, [the Voter's Choice Act] ma[de] it easier for some voters to cast their ballots by mail."  *Id.* at 677.  Senate Bills 397 and 450 impose no burden on the right to vote.  ER-18–19.

### 5. Plaintiffs Fail to Allege that the Challenged Laws and Regulations, Taken Together, Burden the Right to Vote of any Subgroup of Voters

Plaintiffs claim that the "combination of laws, regulations, and procedures," "taken together," "disproportionately impacts voters in specific counties." Opening Br. at 14.  They also argue that the rules "disproportionately burden minority voters."  *Id.* at 24.  Under *Anderson-Burdick*, even where a law imposes a greater burden on a subgroup of voters, a plaintiff must still show that the "character *and magnitude* of the asserted injury to the rights" of those voters is sufficient to warrant heightened scrutiny.  *Anderson*, 460 U.S. at 789 (emphasis added); *Mi Familia Vota*, 608 F. Supp. 3d at 850 (noting that "minimal burden" may affect certain minority and disabled voters, that burden "remains minimal in the context of those subgroups' members' overall ability to vote"); *Brnovich v.*

38

*Democratic Nat'l Comm.*, __ U.S. __, 141 S. Ct. 2321, 2344-2345 (2021) (noting that the "racial disparity in burdens allegedly caused by the out-of-precinct policy," which rejected votes cast by voters outside of their designated precinct, "is small in *absolute terms*" (emphasis added)). Here, Plaintiffs have failed to allege any burden on any subgroup of voters. They do not explain how the challenged laws and regulations disproportionately burden any subgroup of voters—let alone to a sufficient degree to trigger heightened scrutiny—where those rules, individually, do not burden the right to vote. *See supra* at pp. 29-38. Nevertheless, even when examined together, the challenged laws and regulations do not burden the voting rights of any Californian under any of Plaintiffs' various disparate-impact theories.

### a. Plaintiffs Fail to Allege Dilution of In-Person Votes

Plaintiffs fail to allege that the challenged laws and regulations impose a disparate burden on in-person voters to trigger heightened scrutiny. *See* Opening Br. at 17; ER-74–77, ¶¶ 149-167. Plaintiffs' conception of "vote dilution" based on purported opportunities for potential voter error or voter fraud is not supported by the case law, which recognizes only unequal weighting of votes or unequal representation in government as viable theories of vote dilution. *See, e.g.*, *Gray v. Sanders*, 372 U.S. 368, 381 (1963) (striking down "county unit" system for political primaries because it valued votes differently based on geographic location); *Reynolds v. Sims*, 377 U.S. 533, 583 (1964) (invalidating state legislative

apportionment plans); *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964) (invalidating state law apportioning congressional districts that "contracts the value of some votes and expands that of others"); *see also Lemons*, 538 F.3d at 1104 (noting that "the Supreme Court has subjected only two types of voting regulations to strict scrutiny: regulations that unreasonably deprive some voters from voting in an election and regulations that dilute the voting power of some voters through unequal weighing of votes); ER-21–23. Vote dilution claims require the unequal weighing of votes or unequal representation, which is not alleged here. "Simply put, *Gray* and *Reynolds*," and the similar cases cited by Plaintiffs, *see* Opening Br. at 18, 25, "are nothing like this case." *Short*, 893 F.3d at 678.[12]

"As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud." *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020); *see also Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019) ("More fundamentally, 'vote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry equal weight."). Plaintiffs do not allege that in-person votes were not counted or were weighted any differently from other votes cast. Rather, they attempt to base their vote dilution allegations on the theory that the current voting

---

[12] *Bush v. Gore* is also nothing like this case and does not support any finding of a severe burden here. *See infra* at pp. 49-51.

system allows more fraudulent votes to be cast. *See* ER-24. Even if Plaintiffs had adequately alleged that ineligible vote-by-mail ballots were cast (and, critically, counted) in any of the elections at issue, any resulting harm to voters would not be limited to in-person voters; voter fraud would harm all voters in an election *equally*. *See Bowyer*, 506 F. Supp. 3d at 711; *see* D. Ct. Dkt. 121 at 1-2 n.1 (Thomas, J., dissenting). And there is no allegation that purported fraud was so pervasive that it rendered any of the elections at issue in this case fundamentally unfair. *See infra* at pp. 55-56. While each voter in an election has a right to have their "vote fairly counted, without its being distorted by fraudulently cast votes," Opening Br. at 1 (quoting *Anderson v. United States*, 417 U.S. 211, 227 (1974)), any voter fraud would affect each voter's right in the same manner. As such, the challenged laws would not be favoring any group of voters over another, even assuming Plaintiffs adequately pleaded voter fraud (which they have not).

Plaintiffs also argue that in-person voters are treated differently because vote-by-mail ballots can be cast after election day. Opening Br. at 15. But that is not correct. All vote-by-mail ballots must be dated on or before election day. *See* Cal. Elec. Code § 3020. Plaintiffs challenge section 3020(b)(2), which deems ballots without a postmark or with a postmark that is illegible or lacks a date "timely cast" if the identification envelope is signed and dated by the voter on or before election day. While it might be *possible* for a voter to violate the statutory requirements

41

and attempt to cast a vote-by-mail ballot after election day by "backdate[ing] the date next to [the voter's] signature" on the identification envelope, Opening Br. at 23, the ballot would not be counted unless the envelope lacks a postmark or has a postmark that does not display the date the ballot was mailed, Cal. Elec. Code § 3020(b)(2)—which would be out of the voter's control. Such speculation fails to state a claim. And Plaintiffs do not allege that such illegal conduct has happened or that the challenged laws and regulations would have *caused* that illegal conduct; under existing law, voters are not allowed to cast their vote-by-mail ballot after the polls close on election day.[13]

Plaintiffs' attempt to manufacture a constitutional claim based on different procedures that may apply to in-person voters and voters in certain counties fails. *See, e.g.*, Opening Br. at 22. County of residence is not a "suspect classification warranting heightened scrutiny." *Short*, 893 F.3d at 678-679. Nor is method of voting (in-person or vote-by-mail). And the challenged laws and regulations do not burden a fundamental right "for some citizens but not for others," *id.* at 679,

---

[13] The Second Amended Complaint includes an allegation that former Secretary of State Padilla issued guidance in 2020 stating that vote-by-mail voters could vote by dropping off ballots in mailboxes until 11:59 p.m. on election day and still have their ballots postmarked on election day and be counted. ER-71, ¶ 131. As the district court observed, there is no record of any such guidance, and it is unclear how the California Secretary of State would have authority over how the U.S. Postal Service postmarks mail that it processes. ER-27.

because they apply to all voters equally depending on the manner in which they decide to cast a ballot. As in *Short*, there is no differential burden warranting application of heightened scrutiny.

### b. Plaintiffs Fail to Allege a Disparate Burden on Minority Voters

Plaintiffs fail to allege that the challenged laws and regulations burden the voting rights of minority voters.[14] *See* Opening Br. at 24. Plaintiffs' argument that the challenged laws and regulations disproportionately burden minority voters hinges on a *single* allegation in the Second Amended Complaint: "Laws that disadvantage in-person voters inherently disadvantage minority voters because data shows these communities have historically relied upon in-person voting to a greater degree than other groups." ER-72, ¶ 141.[15] Plaintiffs' fail to show any burden on the rights of minority voters.

In support of this allegation, the Second Amended Complaint cites two out-of-circuit cases. *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014), and *North Carolina State Conference of NAACP v.*

---

[14] Plaintiffs do not allege any discriminatory motive behind any of the challenged laws or regulations, and they do not appear to suggest one here. Opening Br. at 14 ("Appellants do they [sic] challenge Appellees' motives. Thus, Appellees' reasons for expanding universal [vote-by-mail] are immaterial.").

[15] In their opening brief, Plaintiffs go beyond the allegation in the complaint to claim that minority voters "have historically *preferred* to vote in person." Opening Br. at 24 (emphasis added).

*McCrory*, 831 F.3d 204 (4th Cir. 2016).  ER-72, ¶ 141.  Neither provides any

support for the allegation that minority voters have historically used in-person

voting at higher rates than other voters in California.  *See League of Women Voters

of N.C.*, 769 F.3d at 245 (discussing evidence that elimination of same-day

registration and out-of-precinct voting "imposes a discriminatory burden on

members of a protected class"); *McCrory*, 831 F.3d at 230 (noting that "data

revealed that African Americans disproportionately use early voting, same-day

registration, and out-of-precinct voting, and disproportionately lacked DMV-issued

ID").  Because these cases did not find that minority voters have historically

preferred voting in person, Plaintiffs are left with a conclusory allegation that is

insufficient to support their claims.

And neither case supports Plaintiffs' constitutional claims here, because those

cases concerned the *elimination* of registration and voting methods

disproportionately utilized by minority voters in a state with a "history of voting

discrimination."  *League of Women Voters of N.C.*, 769 F.3d at 242; *see also

McCrory*, 831 F.2d at 233 (taking into account the state's "history of voting

discrimination").  Here, by contrast, the cumulative effect of the challenged

provisions is *increased* opportunities for all registered voters, including minority

voters, to participate in elections.  Even if minority voters have historically voted

in person more than other voters, *but see Feldman v. Ariz. Sec'y of State*, 843 F.3d

44

366, 395 (9th Cir. 2016) (Thomas, C.J., dissenting) (vote by mail is "one of the most popular and effective methods by which minority voters cast their ballots"), all California voters—including minority voters—are still able to vote in person. *See* Cal. Elec. Code § 3000.5(b) (noting that the all-mailed ballot election system "does not prevent a voter from voting in person at a polling place, vote center, or other authorized location").

Ultimately, Plaintiffs' scattershot allegations and baseless legal theories cannot overcome the fact that the statutes and regulations challenged here protect voting rights and are "generally applicable, evenhanded, politically neutral." *Pub. Integrity All., Inc.*, 836 F.3d at 1024. They do not burden (let alone severely burden) any voter's right to vote and, thus, are not subject to strict scrutiny.

## C. The Challenged Laws and Regulations Advance Important Government Interests

Under the *Anderson-Burdick* balancing test, the challenged laws and regulations readily pass constitutional scrutiny. Here, Plaintiffs fail to allege *any* burden on the right to vote. But even assuming the challenged laws and regulations impose some burden on voting rights, any such burden is at most slight, and heightened scrutiny should not apply. Thus, under *Anderson-Burdick*, the

challenged statutes and regulations must be upheld if they serve important government interests. *Burdick*, 504 U.S. at 434. They plainly do. ER-19–20.[16]

The challenged laws and regulations expanding all-mailed ballot elections throughout the state and providing online voter registration increase voter turnout and voluntary participation in the democratic process. These interests are sufficiently important to justify the challenged laws and regulations. *See Short*, 893 F.3d at 679. By allowing for online voter registration and expanding vote-by-mail to all registered California voters, more voters are able to participate in the electoral process more easily. While not required under *Anderson-Burdick*, recent elections confirm that California's all-mailed ballot election system is accomplishing that goal. *See supra* at p. 7.

Another interest furthered by the challenged laws and regulations is the safeguarding of public confidence in California's elections. By establishing statewide standards for signature verification and vote counting, and providing a process for ballot curing, voters can have more confidence that their vote will be counted and not arbitrarily rejected without their knowledge. *See Crawford*, 553 U.S. at 197 (explaining that protecting the public's confidence in the "integrity of

---

[16] Plaintiffs do not dispute that the challenged laws and regulations serve important government interests. Instead, Plaintiffs addressed only whether the challenged provisions burden the right to vote and argue that strict scrutiny applies. *See* Opening Br. at 13-16. But it does not. *See supra* at pp. 21-45.

the electoral process" has "independent significance" because it "encourages citizen participation in the democratic process").

In addition, some of the challenged laws seek to modernize the registration and voting process, which is a sufficient interest to uphold them. *See id.* at 191 (noting states have a "valid interest" in "improv[ing] and moderniz[ing] election procedures"). And the State undoubtedly has an interest in ensuring the efficient and consistent administration of elections, which is furthered by laws and regulations setting statewide standards, including a seven-day window for the timely receipt of vote-by-mail ballots and requirements for signature verification of vote-by-mail ballots. Given that the burdens in this case are slight (or nonexistent), "the State need not establish a compelling interest to tip the constitutional scales in its direction." *Burdick*, 504 U.S. at 439. These "important governmental interests are more than sufficient to outweigh the extremely limited burdens" that the challenged laws and regulations impose on voters. *See Dudum*, 640 F.3d at 1117.

Under the *Anderson-Burdick* test, all of the statutes and regulations challenged by Plaintiffs survive constitutional scrutiny because they further important governmental interests. Accordingly, Plaintiffs have failed to state a claim under the Fourteenth Amendment, and their claims were properly dismissed.

## II. PLAINTIFFS DO NOT STATE A CLAIM UNDER THE EQUAL PROTECTION OR DUE PROCESS CLAUSES

Plaintiffs' claims challenging the laws and regulations at issue here should all be dismissed under the *Anderson-Burdick* framework. *See supra* at pp. 20-47. No separate analysis is required. Nevertheless, Plaintiffs appear to argue that some of their equal protection and due process claims should be evaluated outside the *Anderson-Burdick* framework. *See* Opening Br. at 17-29. Even considering Plaintiffs' allegations outside the *Anderson-Burdick* framework, they have failed to state any claim for relief.

### A. Plaintiffs Fail to State an Equal Protection Claim

Even though the challenged laws and regulations implicate the fundamental right to vote, they do not violate the Equal Protection Clause. Plaintiffs claim that the Equal Protection Clause prohibits the State from "giv[ing] the votes of similarly situated voters different effect based on the happenstance of the county of district in which those voters live." Opening Br. at 17. As discussed, the challenged laws and regulations do not treat voters differently depending on their county of residence and they have failed to establish any disparate impact on any subgroup of voters. *See supra* at pp. 38-45. The vote dilution cases cited by Plaintiffs are readily distinguishable because they weighted votes of individuals differently and resulted in a malapportionment of legislative representation. *See supra* at pp. 39-40. Because Plaintiffs' disparate-impact claims failed to allege any

48

appreciable burden on any voter's right to vote under *Anderson-Burdick*, those allegations similarly fail to state a claim outside that framework.

Plaintiffs' equal protection claim is largely based on *Bush v. Gore*, 531 U.S. 98. *See* Opening Br. at 1, 2, 11, 19-25. That case has no bearing on Plaintiffs' equal protection claim here. If anything, Plaintiffs' extensive reliance on that case confirms the weaknesses of their equal protection claim. *Bush* involved an equal protection challenge to a court-ordered statewide manual recount in the 2000 presidential election in Florida. 531 U.S. at 100. There, the Court observed that Florida's use of "punchcard balloting machines can produce an unfortunate number of ballots which are not punched in a clean, complete way by the voter," and that the "closeness" of the Florida election "brought into sharp focus" the problem of ballots not registering any vote for president. *Id.* at 103-104. In ordering a statewide manual recount, the Florida Supreme Court required local elections officials to determine "the intent of the voter," but failed to prescribe "specific standards to ensure its equal application." *Id.* at 105-106; *see id.* at 106 ("The search for intent can be confined by specific rules designed to ensure uniform treatment."). The lack of guidance from the Florida Supreme Court "led to unequal evaluation of ballots," *id.* and the United States Supreme Court held that the recount process was "inconsistent with the minimum procedures necessary to

protect the fundamental right of each voter in the special instance of a statewide recount under the authority of a single state judicial officer," *id.* at 109.

*Bush* did not announce a new equal protection standard applicable to any election law case. The Court acknowledged that "the problem of equal protection in election processes generally presents many complexities" and expressly "limited" its holding "to the present circumstances" of the 2000 Florida recount. *Id.* at 109. *Bush* concerned the unique situation in which "a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards" in a closely contested presidential election. *Id.* The Court clarified that the question before it was "*not* whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id.* (emphasis added). And yet, that is the precise question Plaintiffs raise in the present case.

This Court has repeatedly questioned the weight to give *Bush* in other contexts. *See Rodriguez v. Newsom*, 974 F.3d 998, 1006-07 (9th Cir. 2020) (noting that "[t]he precedential value of *Bush* is limited"). In *Southwest Voter Registration Education Project v. Shelley*, for example, this Court, sitting en banc, affirmed the district court's denial of a preliminary injunction to enjoin the use of punch-card balloting machines in the 2003 California Gubernatorial Recall Election. 344 F.3d 914, 920 (9th Cir. 2003) (en banc). In so doing, the Court reversed a panel opinion

50

that "applied the Supreme Court's decision in *Bush v. Gore*." *Id.* at 917. Relying

on *Bush*'s disclaimer that it did not concern "whether local entities, in the exercise

of their expertise, may develop different systems for implementing elections," *id.*

at 918 (quoting *Bush*, 531 U.S. at 109), the Court held that the district court did not

abuse its discretion in holding that the Plaintiffs failed to show a likelihood of

success on the merits of their equal protection claim. *Id.*

And in *Lemons*, which concerned an equal protection and due process

challenge to Oregon's signature-verification requirements for referendum petitions,

this Court again questioned the precedential value of *Bush*. 538 F.3d at

1101-1102, 1106. The Court suggested that *Bush* has limited reach and that a

state's minimum signature-verification rules would pass muster under *Bush*:

"Even were *Bush* applicable to more than the one election to which the Court

appears to have limited it, Oregon's standard for verifying referendum signatures

would be sufficiently uniform and specific to ensure equal treatment of voters." *Id.*

at 1106. The Court also observed that Oregon's "uniform standard" for signature

verification "would satisfy the requirements of *Bush*, if it were applicable." *Id.* at

1107. As in *Lemons*, and as the district court held, ER-25, California's uniform

signature-verification requirements for vote-by-mail ballots would also pass muster

under *Bush*, if it were applicable here.

51

Plaintiffs' reliance on the district court decisions in *Common Cause Southern Christian Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1106, 1108-1110 (C.D. Cal. 2001), and *Black v. McGuffage*, 209 F. Supp. 2d 889, 898-899 (N.D. Ill. 2002), which both relied on *Bush v. Gore*, is also misplaced. *See* Opening Br. at 19-20. Those cases concerned the same punch-card balloting machines at issue in *Bush*, which increased the likelihood that voters in counties employing those machines would have their right to vote *denied*. ER-25–26. Such facts are not present in this case.

Plaintiffs also cite *League of Women Voters of Kansas v. Schwab*, a decision of a Kansas intermediate appellate court, which held that strict signature-verification requirements impaired the right to vote under the Kansas Constitution. 63 Kan. App. 2d 187, 209 (2023), *review granted*, No. 125,084 (Kan. June 23, 2023); Opening Br. at 20. That case did not hold, as Plaintiffs suggest, that the signature verification requirements were unconstitutional because they lacked "uniform standards to determine what constitutes a signature match." Opening Br. at 20. Instead, the court held that "an overly strict regulation"—like one preferred

by Plaintiffs here, including the elimination of an opportunity to cure—"can impair the right to vote." *League of Women Voters of Kansas*, 63 Kan. App. 2d at 210.[17]

Consistent with *Bush*, local election officials are permitted to implement different procedures in ballot processing, vote counting, and signature verification, so long as they are not enacted with a discriminatory motive and do not severely burden voting rights. *See Short*, 893 F.3d at 676, 679 (different voting procedures employed in different counties did not raise any "serious question[]" of an equal protection violation due to slight burden on voting rights in certain counties); *Mi Familia Vota*, 608 F. Supp. 3d at 862 (noting that the Fourteenth Amendment "prohibits voting laws and practices adopted with a discriminatory purpose"). Plaintiffs do not allege any discriminatory motive any of the laws, regulations, and practices challenged here. Accordingly, Plaintiffs' reliance on *Bush* is misplaced, and they have failed to state an equal protection claim.

---

[17] The court did not apply the *Anderson-Burdick* framework or federal law. *League of Women Voters of Kansas*, 63 Kan. App. 2d at 206 ("Federal law is not controlling here. Federal courts use a flexible balancing test when evaluating the constitutionality of election laws that govern the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself (and that thereby burden the right to vote). The standard is known as the *Anderson-Burdick* flexible balancing test.").

### B.   Plaintiffs Fail to State a Due Process Claim

Plaintiffs' due process claim fares no better.[18]  Plaintiffs argue that the right to vote is fundamental and that this right requires that all voters be treated equally under the law.  *See* Opening Br. at 25.[19]  Like their equal protection claim, Plaintiffs' due process claim is based on different county practices in verifying signatures and alleged election "irregularities."  *See* Opening Br. at 25-29.  Local administration of elections, and variations in elections procedures and practices across local jurisdictions, has long been an accepted part of our constitutional framework.  *See Ne. Ohio Coal. For the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016) ("Arguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected . . . .  In fact, that flexibility is part and parcel of the right of 'local entities, in the exercise of their expertise, [to] develop different systems for implementing elections" (quoting *Bush*, 551 U.S. at

---

[18] As discussed, Plaintiffs fail to allege any burden on their right to vote, or an unequal burden applicable to any subgroup of voters.  *See supra* at pp. 21-45.  As such, Plaintiffs have not alleged any violation of substantive due process.

[19] In support of their due process claim, Plaintiffs cite cases (*see* Opening Br. at 25) that did not involve analysis of any due process claim.  *See Bush*, 531 U.S. at 103 (equal protection); *Dunn v. Blumstein*, 405 U.S. 330, 331 (1972) (same); *Reynolds*, 377 U.S. at 536-537 (same); *Wesberry*, 376 U.S. at 8 n.10 (declining to address due process or equal protection claims).

109)).[20]  Thus, there is no due process violation by the mere application of different elections rules in different counties, in the exercise of local discretion consistent with State and federal law.

As for the alleged election irregularities, the district court correctly held that they do not rise to the level of a due process violation.  ER-20.  "Mere fraud or mistake will not render an election invalid," and courts will "strike down an election on substantive due process grounds" only if (1) voters likely relied on "an established election procedure" or "official pronouncements" about an upcoming election and (2) "significant disenfranchisement" results from a change in those procedures.  *Bennett v. Yoshina*, 140 F.3d 1218, 1226-1227 (9th Cir. 1998); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1184 (9th Cir. 1988) ("Only a pervasive error which undermines the 'organic processes' of the ballot is sufficient to trigger constitutional scrutiny.").  Only in an "exceptional case," where "a state's voting system is fundamentally unfair," will the Due Process Clause warrant invalidation of election rules and procedures.  *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008).  This is not that case.

---

[20] *See also* Richard Briffault, *Election Law Localism and Democracy*, 100 N.C. L. Rev. 1421, 1426 (2022) (noting that the "administration of our elections— including elections for federal office—has long been and continues to be highly decentralized, with local governments playing the leading operational role").

Plaintiffs have not plausibly alleged any "pattern of practice that has 'systematically den[ied] equality in voting." Opening Br. at 29 (quoting *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980)); ER-72, ¶ 138. Instead, Plaintiffs' scattershot allegations of election irregularities in some counties do not amount to an allegation that any election was invalid—let alone that the challenged laws and regulations *caused* any of the alleged irregularities.[21] Plaintiffs allegations comprise the kind of "garden variety election irregularities" that are insufficient to allege "a denial of substantive due process" or that any elections were "conducted in a manner that is fundamentally unfair." *Bennett*, 140 F.3d at 1226 (rejecting substantive due process claim challenging *ex post* clarification of election law because it was "hardly a pervasive error that undermines the integrity of the vote"). Accordingly, Plaintiffs have failed to state a due process claim.

While Plaintiffs equal protection and due process claims should be dismissed under the *Anderson-Burdick* framework under settled law, *see supra* at pp. 20-47, Plaintiffs have likewise failed to plead any claim under the Equal Protection or

---

[21] Plaintiffs claim that county voter rolls have not been maintained and that ineligible voters received vote-by-mail ballots. Opening Br. at 27; ER-41, ¶ 3. They do not, however, pray for any relief regarding the maintenance of the voter rolls, and they do not bring any claim under the National Voter Registration Act, 52 U.S.C. § 20510(b). And they fail to connect any improper voter registrations to the casting (and counting) of any improper votes. *See* ER-36–37.

Due Process Clauses when viewed through traditional equal protection and due process doctrine.

### III. THE DISTRICT COURT PROPERLY DISMISSED THE SECOND AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

The district court properly exercised its discretion in dismissing the Second Amended Complaint without leave to amend and with prejudice. When amendment of a complaint would be futile, the district court may dismiss the complaint without leave to amend. *See, e.g.*, *Dumas v. Kipp*, 90 F.3d 386, 393. (9th Cir. 1996); *Clark*, 54 F.4th at 592, 594 (affirming dismissal of first amended complaint with prejudice where the challenged law was constitutional under *Anderson-Burdick*).

Here, the district court correctly concluded that further amendment would be futile. ER-37. This is the third complaint filed in a case. *See* D. Ct. Dkts. 1, 68, 132. With each amendment, the scope of the case narrowed, but the gravamen of Plaintiffs' claims remained the same. *See* D. Ct. Dkt. 1 at 3, ¶ 2; D. Ct. Dkt. 68 at 4, ¶ 6; ER-41, ¶ 3. Plaintiffs' repeated amendments have not cured any deficiencies relating to the pleading of their claims, notwithstanding three rounds of motion to dismiss briefings. *See supra* at pp. 12-16. In asking the district court for leave to file another amended complaint, Plaintiffs did not identify any ways in which the pleadings could be cured. *See* ER-179. Here, Plaintiffs claim that "none of the impediments to stating a claim for relief are incurable," Opening Br. at 30,

57

but again fail to suggest any facts they could plausibly allege to save their claims from dismissal.  The Court should affirm the district court's dismissal without leave to amend.

## CONCLUSION

For these reasons, the Court should affirm the district court's dismissal of Plaintiffs' Second Amended Complaint without leave to amend.

Dated:  October 30, 2023          Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANTHONY R. HAKL
Supervising Deputy Attorney General

s/ John D. Echeverria

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendants-Appellees Shirley N. Weber, in her official capacity as California Secretary of State, and Rob Bonta, in his official capacity as California Attorney General*

58

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated:  October 30, 2023                                        s/ John D. Echeverria

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55726

I am the attorney or self-represented party.

**This brief contains** | 13,481 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ John D. Echeverria | **Date** | October 30, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                      *Rev. 12/01/22*

60

**CIRCUIT RULE 28-2.7 ADDENDUM**

# CIRCUIT RULE 28-2.7 ADDENDUM TO
# STATE DEFENDANTS' ANSWERING BRIEF

## Table of Contents

Description                                                    Page

Cal. Code Elec. § 2196 .....................................................A-1

Cal. Code Elec. § 3000.5...................................................A-4

Cal. Code Elec. § 3019 .....................................................A-5

Cal. Code Elec. § 3020 ...................................................A-12

Cal. Code Elec. § 4005 ...................................................A-14

Cal. Code Regs. tit. 2, § 20910.......................................A-27

Cal. Code Regs. tit. 2, § 20960.......................................A-29

Cal. Code Regs. tit. 2, § 20961.......................................A-33

Cal. Code Regs. tit. 2, § 20962.......................................A-34

Cal. Code Regs. tit. 2, § 20980.......................................A-35

Cal. Code Regs. tit. 2, § 20981.......................................A-36

Cal. Code Regs. tit. 2, § 20982.......................................A-38

Cal. Code Regs. tit. 2, § 20983.......................................A-40

Cal. Code Regs. tit. 2, § 20984.......................................A-43

Cal. Code Regs. tit. 2, § 20985.......................................A-44

Cal. Code Regs. tit. 2, § 20990.......................................A-46

Cal. Code Regs. tit. 2, § 20991.......................................A-48

KeyCite Red Flag - Severe Negative Treatment

Enacted Legislation  Amended by  2023 Cal. Legis. Serv. Ch. 131 (A.B. 1754) (WEST),

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 2. Voters (Refs & Annos)
      Chapter 2.5. Online Voter Registration (Refs & Annos)

West's Ann.Cal.Elec.Code § 2196

§ 2196. Submitting affidavit of voter registration electronically to Secretary of State; development of
process to allow for transfer of electronic copy of signature; use of printed hard copy of completed affidavit

Effective: January 1, 2023
Currentness

(a)(1) Notwithstanding any other law, a person who is qualified to register to vote and who has a valid California driver's license or state identification card may submit an affidavit of voter registration electronically on the Secretary of State's internet website.

(2) An affidavit submitted pursuant to this section is effective upon receipt of the affidavit by the Secretary of State if the affidavit is received on or before the last day to register for an election to be held in the precinct of the person submitting the affidavit.

(3) The affiant shall affirmatively attest to the truth of the information provided in the affidavit.

(4) The affidavit shall contain, before or at the time that the applicant affirmatively assents to the use of the applicant's signature pursuant to paragraph (5), a statement that the county elections official shall compare the affiant's signature appearing on an identification envelope for the return of a vote by mail ballot cast in a future election with the signatures appearing in the voter's registration record, including the signature appearing on the applicant's driver's license or state identification card.

(5) For voter registration purposes, the applicant shall affirmatively assent to the use of the applicant's signature from the applicant's driver's license or state identification card.

(6) For each electronic affidavit, the Secretary of State shall obtain an electronic copy of the applicant's signature from the applicant's driver's license or state identification card directly from the Department of Motor Vehicles.

(7) The Secretary of State shall require a person who submits an affidavit pursuant to this section to submit all of the following:

(A) The number from the person's California driver's license or state identification card.

(B) The person's date of birth.

(C) The last four digits of the person's social security number.

(D) Any other information the Secretary of State deems necessary to establish the identity of the affiant.

(8) Upon submission of an affidavit pursuant to this section, the electronic voter registration system shall provide for immediate verification of both of the following:

(A) That the applicant has a California driver's license or state identification card and that the number for that driver's license or identification card provided by the applicant matches the number for that person's driver's license or identification card that is on file with the Department of Motor Vehicles.

(B) That the date of birth provided by the applicant matches the date of birth for that person that is on file with the Department of Motor Vehicles.

(9) The Secretary of State shall employ security measures to ensure the accuracy and integrity of affidavits of voter registration submitted electronically pursuant to this section.

(b) The Department of Motor Vehicles shall use the electronic voter registration system required by this section to comply with its duties and responsibilities as a voter registration agency pursuant to the federal National Voter Registration Act of 1993 (52 U.S.C. Sec. 20501 et seq.).

(c) The Department of Motor Vehicles and the Secretary of State shall maintain a process and the infrastructure to allow the electronic copy of the applicant's signature and other information required under this section that is in the possession of the department to be transferred to the Secretary of State and to the county election management systems to allow a person who is qualified to register to vote in California to register to vote under this section.

(d) If an applicant cannot electronically submit the information required pursuant to paragraph (6) of subdivision (a), the applicant shall nevertheless be able to complete the affidavit of voter registration electronically on the Secretary of State's internet website, print a hard copy of the completed affidavit, and mail or deliver the hard copy of the completed affidavit to the Secretary of State or the appropriate county elections official.

**Credits**
(Added by Stats.2008, c. 613 (S.B.381), § 1, operative contingent. Amended by Stats.2011, c. 561 (S.B.397), § 2, operative contingent; Stats.2012, c. 162 (S.B.1171), § 45, operative contingent; Stats.2015, c. 732 (A.B.1536), § 13, eff. Jan. 1, 2016; Stats.2015, c. 728 (A.B.1020), § 54, eff. Jan. 1, 2016, operative Sept. 26, 2016; Stats.2016, c. 86 (S.B.1171), § 87, eff. Jan. 1, 2017; Stats.2022, c. 102 (A.B.1619), § 2, eff. Jan. 1, 2023.)

**Editors' Notes**

**OPERATIVE EFFECT**

<For operative effect of Stats.2015, c. 728 (A.B.1020), see § 88 of that Act.>

West's Ann. Cal. Elec. Code § 2196, CA ELEC § 2196
Current with Ch. 1 of 2023-24 1st Ex.Sess. and urgency legislation through Ch. 888 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

§ 3000.5. Elections proclaimed or conducted prior to January 1,..., CA ELEC § 3000.5

 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 3. Vote by Mail Voting, New Resident, and New Citizen Voting (Refs & Annos)
      Chapter 1. Vote by Mail Application and Voting Procedures (Refs & Annos)

West's Ann.Cal.Elec.Code § 3000.5

§ 3000.5. Elections proclaimed or conducted prior to January 1, 2022; mailing of
ballot materials; in person voting not prohibited; inactive voter registration status

Effective: January 1, 2022
Currentness

(a) Notwithstanding any other law, for each election, the elections official shall, no later than 29 days before the day of the election, begin mailing the materials specified in Section 3010 to every registered voter. The elections official shall have five days to mail a ballot to each person who is registered to vote on the 29th day before the day of the election and five days to mail a ballot to each person who is subsequently registered to vote. The elections official shall not discriminate against any region or precinct in choosing which ballots to mail first within the prescribed five-day mailing period.

(b) The distribution of vote by mail ballots to all registered voters does not prevent a voter from voting in person at a polling place, vote center, or other authorized location.

(c) Consistent with paragraph (2) of subdivision (a) of Section 2226, this section is not intended and shall not be construed to authorize a voter with an inactive voter registration status to receive a vote by mail ballot for an election.

**Credits**
(Added by Stats.2020, c. 4 (A.B.860), § 2, eff. June 18, 2020. Amended by Stats.2021, c. 3 (S.B.29), § 2, eff. Feb. 19, 2021; Stats.2021, c. 312 (A.B.37), § 1, eff. Jan. 1, 2022.)

West's Ann. Cal. Elec. Code § 3000.5, CA ELEC § 3000.5
Current with Ch. 1 of 2023-24 1st Ex.Sess், and urgency legislation through Ch. 888 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Enacted Legislation   Amended by   2023 Cal. Legis. Serv. Ch. 673 (A.B. 1037) (WEST),

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

West's Annotated California Codes
   Elections Code (Refs & Annos)
      Division 3. Vote by Mail Voting, New Resident, and New Citizen Voting (Refs & Annos)
         Chapter 1. Vote by Mail Application and Voting Procedures (Refs & Annos)

West's Ann.Cal.Elec.Code § 3019

§ 3019. Signature comparison; use of duplicate file of affidavits, facsimiles of signatures, or signature verification technology; effect of determination that signatures do not compare; notice to voters of opportunity to verify signatures; signature verification statement; procedures where voter fails to sign envelope

Effective: January 1, 2023

Currentness

(a)(1) Upon receiving a vote by mail ballot, the elections official shall compare the signature on the identification envelope with either of the following to determine if the signatures compare:

(A) The signature appearing on the voter's affidavit of registration or any previous affidavit of registration of the voter.

(B) The signature appearing on a form issued by an elections official that contains the voter's signature and that is part of the voter's registration record.

(2) All of the following apply to the comparison of signatures pursuant to this section:

(A) A presumption exists that the signature on the identification envelope, signature verification statement, unsigned identification envelope statement, or provisional ballot envelope is the voter's signature.

(B) An exact match is not required for an elections official to determine that a voter's signature is valid. The fact that signatures share similar characteristics is sufficient to determine that a signature is valid.

(C) Except as provided in subparagraph (D), the elections official shall consider explanations for discrepancies between signatures that are specified in regulations promulgated by the Secretary of State. For purposes of this subparagraph, explanations include a variation in signature style over time and the haste with which a signature is written.

(D) When comparing signatures, an elections official shall not review or consider a voter's party preference, race, or ethnicity.

(E) The elections official may consider characteristics of the written signature that are specified in regulations promulgated by the Secretary of State. For purposes of this subparagraph, characteristics include the slant of the signature, letter formation, and whether the signature is printed or written in cursive.

(F) The elections official may use facsimiles of voters' signatures, provided that the method of preparing and displaying the facsimiles complies with the law.

(G) In comparing signatures pursuant to this section, an elections official may use signature verification technology. If signature verification technology determines that the signatures do not compare, the signature is subject to the additional procedures described in paragraph (2) of subdivision (c).

(H) The variation of a signature caused by the substitution of initials for the first or middle name, or both, is not grounds for the elections official to determine that the signatures do not compare.

(I) A signature made using a mark such as an "X", or made by a signature stamp, shall be presumed valid and shall be accepted if the signature meets the requirements of Section 354.5.

(b) If upon conducting the comparison of signatures pursuant to subdivision (a) the elections official determines that the signatures compare, the elections official shall deposit the ballot, still in the identification envelope, in a ballot container in the elections official's office.

(c)(1) If upon conducting the comparison of signatures pursuant to subdivision (a) the elections official determines that the signature possesses multiple, significant, and obvious differing characteristics when compared to all signatures in the voter's registration record, the signature is subject to the additional procedures described in paragraph (2).

(2) If the elections official makes the determination described in paragraph (1), the signature shall be rejected only if two additional elections officials each find beyond a reasonable doubt that the signature differs in multiple, significant, and obvious respects from all signatures in the voter's registration record. If the officials determine that the signatures do not compare, the identification envelope shall not be opened and the ballot shall not be counted. The elections official shall write the cause of the rejection on the face of the identification envelope only after completing the procedures described in subdivision (d).

(d)(1)(A) Except as provided in subparagraph (D), on or before the next business day after a determination that a voter's signature does not compare pursuant to subdivision (c), but not later than eight days prior to the certification of the election, the elections official shall send by first-class mail notice to the voter of the opportunity to verify the voter's signature no later than 5 p.m. two days prior to the certification of the election. The notice shall include a return envelope, with postage paid, for the voter to return a signature verification statement.

(B) Unless required pursuant to Section 3026, the elections official may send additional written notices to a voter identified pursuant to subdivision (c), and may also notify the voter in person, by telephone or email, or by other means of the opportunity to verify the voter's signature.

(C) Unless required pursuant to Section 3026, the elections official may use any information in a county's election management system, or otherwise in the election official's possession, for the purpose of notifying the voter of the opportunity to verify the voter's signature.

(D) If it is impracticable under the circumstances for the elections official to send the notice described in subparagraph (A) on or before the next business day, including in the event of technological failure, the elections official shall send the notice as soon as practicable, but not later than eight days prior to the certification of the election.

(2) The notice and instructions shall be in substantially the following form:

"READ THESE INSTRUCTIONS CAREFULLY. FAILURE TO FOLLOW THESE

INSTRUCTIONS MAY CAUSE YOUR VOTE BY MAIL BALLOT NOT TO

COUNT.

1. We have determined that the signature you provided on your vote by mail ballot does not compare with the signature(s) on file in your voter record. In order to ensure that your vote by mail ballot will be counted, the signature verification statement must be completed and returned as soon as possible.

2. The signature verification statement must be received by the elections official of the county where you are registered to vote no later than 5 p.m. two days prior to certification of the election.

3. You must sign your name where specified on the signature verification statement (Voter's Signature).

4. Place the signature verification statement into the postage-paid return envelope if it is included with these instructions. If a return envelope is not included with these instructions, use your own mailing envelope addressed to your local elections official. Mail, deliver, or have the completed statement delivered to the elections official. If you mail your completed statement using your own envelope, be sure there is sufficient postage and that the address of the elections official is correct.

5. If you do not wish to send the signature verification statement by mail or have it delivered, you may submit your completed statement by email or facsimile transmission to your local elections official, or submit your completed statement to a polling place within the county or a ballot dropoff box before the close of the polls on election day."

(3) The notice and instructions shall be translated in all languages required in that county by Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10503).

(4) The elections official shall not reject a vote by mail ballot identified pursuant to subdivision (c) if each of the following conditions is satisfied:

(A) The voter delivers, in person, by mail, by fax, or by email, a signature verification statement signed by the voter and the elections official receives the statement no later than 5 p.m. two days prior to the certification of the election, or the voter, before the close of the polls on election day, completes and submits a signature verification statement to a polling place within the county or a ballot dropoff box.

A-7

(B) Upon receipt of the signature verification statement, the elections official shall compare the signature on the statement with the signature on file in the voter's record.

(i) If upon conducting the comparison of signatures the elections official determines that the signatures compare, the elections official shall deposit the ballot, still in the identification envelope, in a ballot container in the elections official's office.

(ii) If, under the standards and procedures of subdivision (c), a determination is made that the signatures do not compare, the identification envelope shall not be opened and the ballot shall not be counted. The elections official shall write the cause of the rejection on the face of the identification envelope.

(5) The signature verification statement shall be in substantially the following form and may be included on the same page as the notice and instructions specified in paragraph (2):

"SIGNATURE VERIFICATION STATEMENT

I,_____, am a registered voter of _____ County, State of California. I declare under penalty of perjury that I requested (or I received) and returned a vote by mail ballot. I am a resident of the precinct in which I have voted, and I am the person whose name appears on the vote by mail ballot envelope. I understand that if I commit or attempt any fraud in connection with voting, or if I aid or abet fraud or attempt to aid or abet fraud in connection with voting, I may be convicted of a felony punishable by imprisonment for 16 months or two or three years. I understand that my failure to sign this statement means that my vote by mail ballot will be invalidated.

Voter's Signature

Address"

(6) An elections official shall include the vote by mail ballot signature verification statement and instructions provided in this subdivision on the elections official's internet website and shall provide the elections official's mailing address, email address, and facsimile transmission number on the internet web page containing the statement and instructions.

(7) If the elections official determines that the signatures compare, the official shall use the signature in the signature verification statement, even if returned untimely, to update the voter's signature for future elections.

(e)(1)(A) Notwithstanding any other law, if an elections official determines that a voter has failed to sign the identification envelope, the elections official shall not reject the vote by mail ballot if the voter does any of the following:

(i) Signs the identification envelope at the office of the elections official during regular business hours no later than 5 p.m. two days prior to the certification of the election.

(ii) No later than 5 p.m. two days prior to the certification of the election, completes and submits an unsigned identification envelope statement in substantially the following form:

"UNSIGNED IDENTIFICATION ENVELOPE STATEMENT

A-8

I,_____, am a registered voter of _____ County, State of California. I declare under penalty of perjury that I requested (or I received) and returned a vote by mail ballot and that I have not and will not vote more than one ballot in this election. I am a resident of the precinct in which I have voted, and I am the person whose name appears on the vote by mail ballot envelope. I understand that if I commit or attempt any fraud in connection with voting, or if I aid or abet fraud or attempt to aid or abet fraud in connection with voting, I may be convicted of a felony punishable by imprisonment for 16 months or two or three years. I understand that my failure to sign this statement means that my vote by mail ballot will be invalidated.

Voter's Signature

Address"

(iii) Before the close of the polls on election day, completes and submits an unsigned identification envelope statement, in the form described in clause (ii), to a polling place within the county or a ballot dropoff box.

(B)(i) Except as provided in clause (iv), or before the next business day after discovering that a voter has failed to sign the identification envelope, but not later than eight days prior to the certification of the election, the elections official shall send by first-class mail notice and instructions to the voter of the opportunity to provide a signature no later than 5 p.m. two days prior to the certification of the election. The notice shall include a return envelope, with postage paid, for the voter to return the unsigned identification envelope statement.

(ii) Unless required pursuant to Section 3026, the elections official may send additional written notices to a voter identified pursuant to this subdivision, and may also notify the voter in person, by telephone or email, or by other means of the opportunity to provide a signature.

(iii) Unless required pursuant to Section 3026, the elections official may use any information in the county's election management system, or otherwise in the election official's possession, for the purpose of notifying the voter of the opportunity to provide a signature.

(iv) If it is impracticable under the circumstances for the elections official to send the notice described in clause (i) on or before the next business day, including in the event of technological failure, the elections official shall send the notice as soon as practicable, but not later than eight days prior to the certification of the election.

(C) If timely submitted, the elections official shall accept any completed unsigned identification envelope statement. Upon receipt of the unsigned identification envelope statement, the elections official shall compare the voter's signature on the statement in the manner provided by this section.

(i) If the elections official determines that the signatures compare, the elections official shall attach the unsigned identification envelope statement to the identification envelope and deposit the ballot, still in the identification envelope, in a ballot container in the elections official's office.

(ii) If, under the standards and procedures of subdivision (c), a determination is made that the signatures do not compare, the identification envelope shall not be opened and the elections official shall provide notice to the voter pursuant to subdivisions (c) and (d).

(D) An elections official may use methods other than those described in subparagraph (A) to obtain a voter's signature on an unsigned identification envelope.

(2) Instructions shall accompany the unsigned identification envelope statement in substantially the following form:

"READ THESE INSTRUCTIONS CAREFULLY BEFORE COMPLETING THE

STATEMENT. FAILURE TO FOLLOW THESE INSTRUCTIONS MAY CAUSE

YOUR BALLOT NOT TO COUNT.

1. In order to ensure that your vote by mail ballot will be counted, your statement should be completed and returned as soon as possible, but no later than 5 p.m. two days prior to the certification of the election.

2. You must sign your name on the line above (Voter's Signature).

3. Place the statement into the postage-paid return envelope if it is included with these instructions. If a return envelope is not included with these instructions, use your own mailing envelope addressed to your local elections official. Mail, deliver, or have delivered the completed statement to the elections official. If you mail your completed statement using your own envelope, be sure there is sufficient postage and that the address of the elections official is correct.

4. If you do not wish to send the statement by mail or have it delivered, you may submit your completed statement by facsimile or email transmission to your local elections official, or submit your completed statement to a polling place within the county or a ballot dropoff box before the close of the polls on election day."

(3) The notice and instructions shall be translated in all languages required in that county by Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10503).

(4) An elections official shall include the unsigned identification envelope statement and instructions described in this subdivision on the elections official's internet website and shall provide the elections official's mailing address, email address, and facsimile transmission number on the internet web page containing the statement and instructions.

(f) A ballot shall not be removed from its identification envelope until the time for processing ballots. A ballot shall not be rejected for cause after the identification envelope has been opened.

(g) For purposes of this section, "certification of the election" means the date the particular elections official submits a certified statement of the results of the election to the governing body pursuant to Section 15372, even if that occurs before the deadline to submit the certified statement of the election results set forth in Section 15372.

(h) In comparing signatures pursuant to this section, including when using signature verification software or other technology, an elections official shall adhere to all applicable regulations promulgated by the Secretary of State.

**Credits**

(Added by Stats.2013, c. 271 (A.B.1135), § 2. Amended by Stats.2014, c. 906 (A.B.2530), § 1, eff. Jan. 1, 2015; Stats.2015, c. 726 (A.B.477), § 1, eff. Jan. 1, 2016; Stats.2015, c. 728 (A.B.1020), § 74.5, eff. Jan. 1, 2016; Stats.2017, c. 820 (A.B.840), § 1, eff. Jan. 1, 2018; Stats.2018, c. 446 (S.B.759), § 2, eff. Sept. 17, 2018; Stats.2019, c. 568 (S.B.523), § 2, eff. Jan. 1, 2020; Stats.2020, c. 370 (S.B.1371), § 106, eff. Jan. 1, 2021; Stats.2021, c. 319 (S.B.503), § 2, eff. Jan. 1, 2022; Stats.2022, c. 166 (A.B.2967), § 2, eff. Jan. 1, 2023.)

Notes of Decisions (2)

West's Ann. Cal. Elec. Code § 3019, CA ELEC § 3019

Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 888 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**                               © 2023 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 3. Vote by Mail Voting, New Resident, and New Citizen Voting (Refs & Annos)
      Chapter 1. Vote by Mail Application and Voting Procedures (Refs & Annos)

West's Ann.Cal.Elec.Code § 3020

§ 3020. Time for return of ballots

Effective: January 1, 2022
Currentness

(a) All vote by mail ballots cast under this division shall be received by the elections official from whom they were obtained or by the precinct board no later than the close of the polls on election day.

(b) Notwithstanding subdivision (a), any vote by mail ballot cast under this division shall be timely cast if it is received by the voter's elections official via the United States Postal Service or a bona fide private mail delivery company no later than seven days after election day and either of the following is satisfied:

(1) The ballot is postmarked on or before election day or is time stamped or date stamped by a bona fide private mail delivery company on or before election day, or it is otherwise indicated by the United States Postal Service or a bona fide private mail delivery company that the ballot was mailed on or before election day.

(2) If the ballot has no postmark, a postmark with no date, or an illegible postmark, and no other information is available from the United States Postal Service or the bona fide private mail delivery company to indicate the date on which the ballot was mailed, the vote by mail ballot identification envelope is date stamped by the elections official upon receipt of the vote by mail ballot from the United States Postal Service or a bona fide private mail delivery company, and is signed and dated pursuant to Section 3011 on or before election day.

(c) For purposes of this section, "bona fide private mail delivery company" means a courier service that is in the regular business of accepting a mail item, package, or parcel for the purpose of delivery to a person or entity whose address is specified on the item.

**Credits**

(Stats.1994, c. 920 (S.B.1547), § 2. Amended by Stats.2007, c. 508 (A.B.1243), § 33; Stats.2014, c. 618 (S.B.29), § 1, eff. Jan. 1, 2015; Stats.2016, c. 225 (A.B.2071), § 1, eff. Jan. 1, 2017; Stats.2020, c. 4 (A.B.860), § 5, eff. June 18, 2020; Stats.2021, c. 312 (A.B.37), § 5, eff. Jan. 1, 2022.)

Notes of Decisions (4)

West's Ann. Cal. Elec. Code § 3020, CA ELEC § 3020

Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 888 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**© 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Red Flag - Severe Negative Treatment
Enacted Legislation  Amended by  2023 Cal. Legis. Serv. Ch. 479 (A.B. 1762) (WEST),

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 4. Mail Ballot Elections (Refs & Annos)
      Chapter 1. Conditions for Mail Ballot Election (Refs & Annos)

West's Ann.Cal.Elec.Code § 4005

§ 4005. Counties of Calaveras, Inyo, Madera, Napa, Nevada, Orange, Sacramento, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sierra, Sutter, and Tuolumne; conduct of all-mailed ballot election; conditions

Effective: January 1, 2020
Currentness

(a) Notwithstanding Section 4000 or any other law, on or after January 1, 2018, the Counties of Calaveras, Inyo, Madera, Napa, Nevada, Orange, Sacramento, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sierra, Sutter, and Tuolumne, and, except as provided in Section 4007, on or after January 1, 2020, any county may conduct any election as an all-mailed ballot election if all of the following apply:

(1)(A) At least two ballot dropoff locations are provided within the jurisdiction where the election is held or the number of ballot dropoff locations are fixed in a manner so that there is at least one ballot dropoff location provided for every 15,000 registered voters within the jurisdiction where the election is held, as determined on the 88th day before the day of the election, whichever results in more ballot dropoff locations. For purposes of this subparagraph, a vote center that includes an exterior ballot drop box counts only as a single ballot dropoff location. Ballot dropoff locations shall comply with the regulations adopted pursuant to subdivision (b) of Section 3025.

(B) A ballot dropoff location provided for under this section consists of a secure, accessible, and locked ballot box located as near as possible to established public transportation routes and that is able to receive voted ballots. All ballot dropoff locations shall be open at least during regular business hours beginning not less than 28 days before the day of the election, and on the day of the election. At least one ballot dropoff location shall be an accessible, secured, exterior drop box that is available for a minimum of 12 hours per day including regular business hours.

(2)(A) The county elections official permits a voter residing in the county to do any of the following at a vote center:

(i) Return, or vote and return, the voter's vote by mail ballot.

(ii) Register to vote, update the voter's voter registration, and vote pursuant to Section 2170.

(iii) Receive and vote a provisional ballot pursuant to Section 3016 or Article 5 (commencing with Section 14310) of Chapter 3 of Division 14.

(iv) Receive a replacement ballot upon verification that a ballot for the same election has not been received from the voter by the county elections official. If the county elections official is unable to determine if a ballot for the same election has been received from the voter, the county elections official may issue a provisional ballot.

(v) Vote a regular, provisional, or replacement ballot using accessible voting equipment that provides for a private and independent voting experience.

(B) Each vote center shall have at least three voting machines that are accessible to voters with disabilities.

(3)(A) On the day of the election, from 7 a.m. to 8 p.m., inclusive, and on each of the three days before the election, for a minimum of eight hours per day, at least one vote center is provided for every 10,000 registered voters within the jurisdiction where the election is held, as determined on the 88th day before the day of the election. At least 90 percent of the number of vote centers required by this subparagraph shall be open for all four days during the required times. Up to 10 percent of the number of vote centers required by this subparagraph may be open for less than four days if at least one vote center is provided for every 10,000 registered voters on each day.

(B) Notwithstanding subparagraph (A), for a jurisdiction with fewer than 20,000 registered voters, a minimum of two vote centers are provided on the day of the election and on each of the three days before the election within the jurisdiction where the election is held.

(4)(A) Beginning 10 days before the day of the election and continuing daily up to and including the fourth day before the election, for a minimum of eight hours per day, at least one vote center is provided for every 50,000 registered voters within the jurisdiction where the election is held, as determined on the 88th day before the day of the election.

(B) Notwithstanding subparagraph (A), for a jurisdiction with fewer than 50,000 registered voters, a minimum of two vote centers are provided within the jurisdiction where the election is held.

(C) The vote centers provided under this section are established in accordance with the accessibility requirements described in Article 5 (commencing with Section 12280) of Chapter 3 of Division 12, the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12101 et seq.), the federal Help America Vote Act of 2002 (52 U.S.C. Sec. 20901 et seq.), and the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.).

(D) The vote centers provided under this section are equitably distributed across the county so as to afford maximally convenient options for voters and are established at accessible locations as near as possible to established public transportation routes. The vote centers shall be equipped with voting units or systems that are accessible to individuals with disabilities and that provide the same opportunity for access and participation as is provided to voters who are not disabled, including the ability to vote privately and independently in accordance with Sections 12280 and 19240.

(E)(i) The vote centers provided under this section have an electronic mechanism for the county elections official to immediately access, at a minimum, all of the following voter registration data:

(I) Name.

(II) Address.

(III) Date of birth.

(IV) Language preference.

(V) Party preference.

(VI) Precinct.

(VII) Whether or not the voter has been issued a vote by mail ballot and whether or not a ballot has been received by the county elections official.

(ii) The electronic mechanism used to access voter registration data shall not be connected in any way to a voting system.

(5) A method is available for voters with disabilities to request and receive a blank vote by mail ballot and, if a replacement ballot is necessary, a blank replacement ballot that voters with disabilities can read and mark privately and independently pursuant to the federal Help America Vote Act of 2002 (52 U.S.C. Sec. 20901 et seq.).

(6)(A) Except as otherwise provided for in this section, election boards for the vote centers established under this section meet the requirements for eligibility and composition pursuant to Article 1 (commencing with Section 12300) of Chapter 4 of Division 12.

(B) Each vote center provides language assistance in all languages required in the jurisdiction under subdivision (c) of Section 12303 or Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.) in a manner that enables voters of the applicable language minority groups to participate effectively in the electoral process. Each vote center shall post information regarding the availability of language assistance in English and all other languages for which language assistance is required to be provided in the jurisdiction under subdivision (c) of Section 12303 or Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.).

(i) If a vote center is located in, or adjacent to, a precinct, census tract, or other defined geographical subsection required to establish language requirements under subdivision (c) of Section 12303 or Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.), or if it is identified as needing language assistance through the public input process described in clause (ii), the county elections official shall ensure that the vote center is staffed by election board members who speak the

required language. If the county elections official is unable to recruit election board members who speak the required language, alternative methods of effective language assistance shall be provided by the county elections official.

(ii) The county elections official shall solicit public input regarding which vote centers should be staffed by election board members who are fluent in a language in addition to English pursuant to subdivision (c) of Section 12303 and Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.).

(iii) The county elections official shall provide notice in the sample ballot, in vote by mail materials, and on the official's internet website of the specific language services available at each vote center.

(C) Each vote center provides election materials translated in all languages required in the jurisdiction under subdivision (a) of Section 14201 and Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.).

(D) Each vote center provides reasonable modifications and auxiliary aids and services as required by the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12101 et seq.) and the federal Rehabilitation Act of 1973 (29 U.S.C. Sec. 701 et seq.).

(7)(A) Beginning 10 days before the election, the county elections official maintains, in an electronic format, an index of voters who have done any of the following at one of the vote centers established pursuant to this section:

(i) Registered to vote or updated the voter's voter registration.

(ii) Received and voted a provisional ballot or replacement ballot.

(iii) Voted a ballot using equipment at the vote center.

(B) The index required by subparagraph (A) includes the same information for each voter as is required to be included on copies of the roster that are posted pursuant to Section 14294. The index required by subparagraph (A) shall be updated continuously during any time that a vote center is open in the jurisdiction.

(8)(A) No later than 29 days before the day of the election, the county elections official begins mailing to registered voters a vote by mail ballot packet that includes a return envelope with instructions for the use and return of the vote by mail ballot. The county elections official shall have five days to mail a ballot to each person who is registered to vote on the 29th day before the day of the election and five days for each subsequent registered voter. The county elections official shall not discriminate against any region or precinct in the county in choosing which ballots to mail first within the prescribed five-day mailing period.

(B) The county elections official delivers to each voter, with either the sample ballot sent pursuant to Section 13303 or with the vote by mail ballot packet, all of the following:

(i) A notice, translated in all languages required under subdivision (a) of Section 14201 and Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.), that informs voters of all of the following:

(I) An all-mailed ballot election is being conducted and each eligible voter will be issued a vote by mail ballot by mail.

(II) The voter may cast a vote by mail ballot in person at a vote center during the times and days specified in subparagraph (A) of paragraph (4) or on election day.

(III) No later than seven days before the day of the election, the voter may request the county elections official to send a vote by mail ballot in a language other than English pursuant to Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.) or a facsimile copy of the ballot printed in a language other than English pursuant to Section 14201.

(IV) No later than seven days before the day of the election, the voter may request the county elections official to send or deliver a ballot that voters with disabilities can read and mark privately and independently pursuant to the federal Help America Vote Act of 2002 (52 U.S.C. Sec. 20901 et seq.).

(ii) A list of the ballot dropoff locations and vote centers established pursuant to this section, including the dates and hours they are open. The list shall also be posted on the internet website of the county elections official in a format that is accessible for people with disabilities pursuant to Section 11135 of the Government Code.

(iii) A postage-paid postcard that the voter may return to the county elections official for the purpose of requesting a vote by mail ballot in a language other than English or for the purpose of requesting a vote by mail ballot in an accessible format.

(C) Upon request, the county elections official provides written voting materials to voters with disabilities in an accessible format, as required by the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12101 et seq.) and the federal Rehabilitation Act of 1973 (29 U.S.C. Sec. 701 et seq.).

(9)(A) The county elections official establishes a language accessibility advisory committee that is comprised of representatives of language minority communities. The committee shall be established no later than October 1 of the year before the first election conducted pursuant to this section. The committee shall hold its first meeting no later than April 1 of the year in which the first election is conducted pursuant to this section.

(B) The county elections official establishes a voting accessibility advisory committee that is comprised of voters with disabilities. The committee shall be established no later than October 1 of the year before the first election conducted pursuant to this section. The committee shall hold its first meeting no later than April 1 of the year in which the first election is conducted pursuant to this section.

(C) A county with fewer than 50,000 registered voters may establish a joint advisory committee for language minority communities and voters with disabilities.

(10)(A) The county elections official develops a draft plan for the administration of elections conducted pursuant to this section in consultation with the public, including both of the following:

(i) One meeting, publicly noticed at least 10 days in advance of the meeting, that includes representatives, advocates, and other stakeholders representing each community for which the county is required to provide voting materials and assistance in a language other than English under subdivision (a) of Section 14201 and the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.).

(ii) One meeting, publicly noticed at least 10 days in advance of the meeting, that includes representatives from the disability community and community organizations and individuals that advocate on behalf of, or provide services to, individuals with disabilities.

(B) The county elections official, when developing the draft plan for the administration of elections conducted pursuant to this section, considers, at a minimum, all of the following:

(i) Vote center and ballot dropoff location proximity to public transportation.

(ii) Vote center and ballot dropoff location proximity to communities with historically low vote by mail usage.

(iii) Vote center and ballot dropoff location proximity to population centers.

(iv) Vote center and ballot dropoff location proximity to language minority communities.

(v) Vote center and ballot dropoff location proximity to voters with disabilities.

(vi) Vote center and ballot dropoff location proximity to communities with low rates of household vehicle ownership.

(vii) Vote center and ballot dropoff location proximity to low-income communities.

(viii) Vote center and ballot dropoff location proximity to communities of eligible voters who are not registered to vote and may need access to same day voter registration.

(ix) Vote center and ballot dropoff location proximity to geographically isolated populations, including Native American reservations.

(x) Access to accessible and free parking at vote centers and ballot dropoff locations.

(xi) The distance and time a voter must travel by car or public transportation to a vote center and ballot dropoff location.

(xii) The need for alternate methods for voters with disabilities for whom vote by mail ballots are not accessible to cast a ballot.

(xiii) Traffic patterns near vote centers and ballot dropoff locations.

(xiv) The need for mobile vote centers in addition to the number of vote centers established pursuant to this section.

(xv) Vote center location on a public or private university or college campus.

(C) The county elections official publicly notices the draft plan for the administration of elections conducted pursuant to this section and accepts public comments on the draft plan for at least 14 days before the hearing held pursuant to subparagraph (D).

(D)(i) Following the 14-day review period required by subparagraph (C), the county elections official holds a public meeting to consider the draft plan for the administration of elections conducted pursuant to this section and to accept public comments. The meeting shall be publicly noticed at least 10 days in advance of the meeting on the internet websites of the clerk of the county board of supervisors and the county elections official, or, if neither the clerk of the county board of supervisors nor the county elections official maintain an internet website, in the office of the county elections official.

(ii) After the public hearing to consider the draft plan for the administration of elections conducted pursuant to this section and to accept public comments, the county elections official shall consider any public comments the official receives from the public and shall amend the draft plan in response to the public comments to the extent the official deems appropriate. The county elections official shall publicly notice the amended draft plan and shall accept public comments on the amended draft plan for at least 14 days before the county elections official may adopt the amended draft plan pursuant to subparagraph (E).

(E)(i) Following the 14-day review and comment period required by clause (ii) of subparagraph (D), the county elections official may adopt a final plan for the administration of elections conducted pursuant to this section, and shall submit the voter education and outreach plan that is required by clause (i) of subparagraph (I) to the Secretary of State for approval.

(ii) The Secretary of State shall approve, approve with modifications, or reject a voter education and outreach plan submitted pursuant to clause (i) of subparagraph (I) within 14 days after the plan is submitted by the county elections official.

(iii) The draft plan, the amended draft plan, and the adopted final plan for the administration of elections conducted pursuant to this section shall be posted on the internet website of the county elections official in each language in which the county is required to provide voting materials and assistance under subdivision (a) of Section 14201 and the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.), and the Secretary of State's internet website in a format that is accessible for people with disabilities pursuant to Section 11135 of the Government Code.

(F) Public meetings held pursuant to this paragraph shall, upon request, provide auxiliary aids and services to ensure effective communication with people with disabilities.

(G) Within two years of the adoption of the first plan for the administration of elections conducted pursuant to this section, the county elections official shall hold public meetings in accordance with the procedures described in subparagraphs (C) to (F), inclusive, to consider revising the first plan for the administration of elections conducted pursuant to this section. Every four years thereafter, the county elections official shall hold public meetings in accordance with the procedures described in

A-20

subparagraphs (C) to (F), inclusive, to consider revising the plan for the administration of elections conducted pursuant to this section.

(H)(i) With reasonable public notification, a county elections official may amend a plan for the administration of elections conducted pursuant to this section no more than 120 days before the date of an election held pursuant to this section.

(ii) With reasonable public notification, a county elections official may amend a plan for the administration of elections conducted pursuant to this section more than 120 days before the date of an election held pursuant to this section if the official provides at least 30 days to accept public comments on the amended plan.

(I) The plan for the administration of elections conducted pursuant to this section, includes all of the following:

(i) A voter education and outreach plan that is approved by the Secretary of State and that includes all of the following:

(I) A description of how the county elections official will use the media, including social media, newspapers, radio, and television that serve language minority communities for purposes of informing voters of the upcoming election and promoting the toll-free voter assistance hotline.

(II) A description of how the county elections official will use the media, including social media, newspapers, radio, and television for purposes of informing voters of the availability of a vote by mail ballot in an accessible format and the process for requesting such a ballot.

(III) A description of how the county elections official will have a community presence to educate voters regarding the provisions of this section.

(IV) A description of the accessible information that will be publicly available on the accessible internet website of the county elections official.

(V) A description of the method used by the county elections official to identify language minority voters.

(VI) A description of how the county elections official will educate and communicate the provisions of this section to the public, including:

(ia) Communities for which the county is required to provide voting materials and assistance in a language other than English under subdivision (a) of Section 14201 and the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.). The county elections official shall hold at least one bilingual voter education workshop for each language in which the county is required to provide voting materials and assistance in a language other than English under subdivision (a) of Section 14201 and the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.).

(ib) The disability community, including organizations and individuals that advocate on behalf of, or provide services to, individuals with disabilities. The county elections official shall hold at least one voter education workshop to increase accessibility and participation of eligible voters with disabilities.

(VII) A description of how the county will spend the necessary resources on voter education and outreach to ensure that voters are fully informed about the election. This description shall include information about the amount of money the county plans to spend on voter education and outreach activities under the plan, and how that compares to the amount of money spent on voter education and outreach in recent similar elections in the same jurisdiction that were not conducted pursuant to this section.

(VIII) At least one public service announcement in the media, including newspapers, radio, and television, that serve English-speaking citizens for purposes of informing voters of the upcoming election and promoting the toll-free voter assistance hotline. Outreach made under this subclause shall include access for voters who are deaf or hard of hearing and voters who are blind or visually impaired.

(IX) At least one public service announcement in the media, including newspapers, radio, and television, that serve non-English-speaking citizens for each language in which the county is required to provide voting materials and assistance under subdivision (a) of Section 14201 and the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.) for purposes of informing voters of the upcoming election and promoting the toll-free voter assistance hotline.

(X) At least two direct contacts with voters for purposes of informing voters of the upcoming election and promoting the toll-free voter assistance hotline. The two direct contacts are in addition to any other required contacts including, but not limited to, sample ballots and the delivery of vote by mail ballots.

(ii) A description of how a voter with disabilities may request and receive a blank vote by mail ballot and, if a replacement ballot is necessary, a blank replacement ballot that a voter with disabilities can mark privately and independently.

(iii) A description of how the county elections official will address significant disparities in voter accessibility and participation identified in the report required by subdivision (g).

(iv) A description of the methods and standards that the county elections official will use to ensure the security of voting conducted at vote centers.

(v) Information about estimated short-term and long-term costs and savings from conducting elections pursuant to this section as compared to recent similar elections in the same jurisdiction that were not conducted pursuant to this section.

(vi) To the extent available at the time of publication, information on all of the following:

(I) The total number of vote centers to be established.

(II) The total number of ballot dropoff locations to be established.

(III) The location of each vote center.

(IV) The location of each ballot dropoff location and whether it is inside or outside.

(V) A map of the locations of each vote center and ballot dropoff location.

(VI) The hours of operation for each vote center.

(VII) The hours of operation for each ballot dropoff location.

(VIII) The security and contingency plans that would be implemented by the county elections official to do both of the following:

(ia) Prevent a disruption of the vote center process.

(ib) Ensure that the election is properly conducted if a disruption occurs.

(IX) The number of election board members and the number of bilingual election board members and the languages spoken.

(X) The services provided to voters with disabilities, including, but not limited to, the type and number of accessible voting machines and reasonable modifications at each vote center.

(XI) The design, layout, and placement of equipment inside each vote center that protects each voter's right to cast a private and independent ballot.

(vii) A toll-free voter assistance hotline that is accessible to voters who are deaf or hard of hearing, and that is maintained by the county elections official that is operational no later than 29 days before the day of the election until 5 p.m. on the day after the election. The toll-free voter assistance hotline shall provide assistance to voters in all languages in which the county is required to provide voting materials and assistance under subdivision (a) of Section 14201 and the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.).

(J) The plan for the administration of elections conducted pursuant to this section is posted in a format that is accessible to persons with disabilities on the internet website of the Secretary of State and on the internet website of the county elections official.

(b) Notwithstanding Section 4000 or any other law, on or after January 1, 2018, the Counties of Calaveras, Inyo, Madera, Napa, Nevada, Orange, Sacramento, San Luis Obispo, San Mateo, Santa Clara, Shasta, Sierra, Sutter, and Tuolumne, and on or after January 1, 2020, any county may conduct a special election as an all-mailed ballot election under this section if all of the following apply:

(1) The county elections official has done either of the following:

(A) Previously conducted an election as an all-mailed ballot election in accordance with subdivision (a).

(B) Adopted a final plan for the administration of elections pursuant to clause (i) of subparagraph (E) of paragraph (10) of subdivision (a), in which case the county elections official shall complete all activities provided for in the voter education and outreach plan that is required by clause (i) of subparagraph (I) of paragraph (10) of subdivision (a) before the day of the special election.

(2)(A) On the day of election, from 7 a.m. to 8 p.m., inclusive, at least one vote center is provided for every 30,000 registered voters. If the jurisdiction is not wholly contained within the county, the county elections official shall make a reasonable effort to establish a vote center within the jurisdiction where the special election is held.

(B) Notwithstanding subparagraph (A), for a jurisdiction with fewer than 30,000 registered voters, the county elections official makes a reasonable effort to establish a vote center.

(3)(A) Not less than 10 days before the day of the election, for a minimum of eight hours per day, at least one vote center is provided for every 60,000 registered voters. If the jurisdiction is not wholly contained within the county, the county elections official shall make a reasonable effort to establish a vote center within the jurisdiction where the special election is held.

(B) Notwithstanding subparagraph (A), for a jurisdiction with fewer than 30,000 registered voters, the county elections official makes a reasonable effort to establish a vote center.

(4)(A) At least one ballot dropoff location is provided for every 15,000 registered voters. At least one ballot dropoff location shall be located within the jurisdiction where the special election is held. All ballot dropoff locations shall be open at least during regular business hours beginning not less than 28 days before the day of the election, and on the day of the election.

(B) Notwithstanding subparagraph (A), for a jurisdiction with fewer than 15,000 registered voters, at least one ballot dropoff location shall be provided.

(c) Except as otherwise provided in this section, the election day procedures shall be conducted in accordance with Division 14 (commencing with Section 14000).

(d) The county elections official may provide, at the official's discretion, additional ballot dropoff locations and vote centers for purposes of this section.

(e) The return of voted vote by mail ballots is subject to Sections 3017 and 3020.

(f) For the sole purpose of reporting the results of an election conducted pursuant to this section, upon completion of the ballot count, the county elections official shall divide the jurisdiction into precincts pursuant to Article 2 (commencing with Section

12220) of Chapter 3 of Division 12 and shall prepare a statement of the results of the election in accordance with Sections 15373 and 15374.

(g)(1)(A) Within six months of each election conducted pursuant to this section or Section 4007, the Secretary of State shall report to the Legislature, to the extent possible, all of the following information by categories of race, ethnicity, language preference, age, gender, disability, permanent vote by mail status, historical polling place voters, political party affiliation, and language minorities as it relates to the languages required under subdivision (a) of Section 14201 and Section 203 of the federal Voting Rights Act of 1965 (52 U.S.C. Sec. 10101 et seq.):

(i) Voter turnout.

(ii) Voter registration.

(iii) Ballot rejection rates.

(iv) Reasons for ballot rejection.

(v) Provisional ballot use.

(vi) Accessible vote by mail ballot use.

(vii) The number of votes cast at each vote center.

(viii) The number of ballots returned at ballot dropoff locations.

(ix) The number of ballots returned by mail.

(x) The number of persons who registered to vote at a vote center.

(xi) Instances of voter fraud.

(xii) Any other problems that became known to the county elections official or the Secretary of State during the election or canvass.

(B) The report required by subparagraph (A) shall be posted on the internet website of the Secretary of State in a format that is accessible for people with disabilities pursuant to Section 11135 of the Government Code.

(C) The report required by subparagraph (A) shall be submitted to the Legislature in compliance with Section 9795 of the Government Code.

(D) If an election is conducted pursuant to this section, the county shall submit, to the extent possible, to the Secretary of State the information needed for the Secretary of State to prepare the report required by subparagraph (A).

(E) The Secretary of State may contract with any qualified person or organization for purposes of preparing the report required by subparagraph (A).

(2) The county elections official shall post on the official's internet website a report that compares the cost of elections conducted pursuant to this section to the costs of previous elections. The report shall be posted in a format that is accessible for people with disabilities pursuant to Section 11135 of the Government Code.

(h) The Secretary of State shall enforce the provisions of this section pursuant to Section 12172.5 of the Government Code.

(i) For purposes of this section, "disability" has the same meaning as defined in subdivisions (j), (m), and (n) of Section 12926 of the Government Code.

**Credits**

(Added by Stats.2016, c. 832 (S.B.450), § 3, eff. Jan. 1, 2017. Amended by Stats.2017, c. 180 (S.B.117), § 3, eff. Aug. 24, 2017; Stats.2017, c. 845 (A.B.918), § 4, eff. Jan. 1, 2018; Stats.2019, c. 553 (A.B.49), § 3, eff. Jan. 1, 2020; Stats.2019, c. 554 (A.B.59), § 1.5, eff. Jan. 1, 2020.)

Notes of Decisions (4)

West's Ann. Cal. Elec. Code § 4005, CA ELEC § 4005
Current with Ch. 1 of 2023-24 1st Ex.Sess, and urgency legislation through Ch. 888 of 2023 Reg.Sess. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

A-26

Barclays California Code of Regulations
  Title 2. Administration
    Division 7. Secretary of State
      Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
        Article 1. General

2 CCR § 20910

§ 20910. Applicability of This Chapter.

Currentness

(a) The regulatory purpose of this Chapter is to ensure uniform application and practices for elections officials related to the examination of initiative, referendum, recall, nominating petition or paper, signature in-lieu of filing fee, and any other petition or paper, as well as for signature verification on local and statewide election-related petitions, vote-by-mail identification envelopes, and provisional ballot envelopes.

(b) In addition, the regulatory purpose of this Chapter is to provide uniform vote counting standards for consistent application of ballot processing and counting throughout the state. The regulations set forth in this Chapter shall apply to ballots cast in elections held pursuant to the California Elections Code.

**Credits**

NOTE: Authority cited: Sections 3026 and 14314, Elections Code; and Section 12172.5, Government Code. Reference: 52 U.S.C. 21081(a)(6); Sections 100, 333, 3019 and 14310, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New chapter 8.3 (articles 1, 6, 8 and 9, sections 20910, 20960-20962, 20980-20985 and 20990-20993), article 1 (section 20910) and section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New chapter 8.3 (articles 1, 6, 8 and 9, sections 20910, 20960-20962, 20980-20985 and 20990-20993), article 1 (section 20910) and section refiled, including amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New chapter 8.3 (articles 1, 6, 8 and 9, sections 20910, 20960-20962, 20980-20985 and 20990-20993), article 1 (section 20910) and section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order, including amendment of chapter heading and subsection (a), transmitted to OAL 1-31-2022 and filed 3-15-2022; amendments effective 3-15-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20910, 2 CA ADC § 20910

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Barclays California Code of Regulations
    Title 2. Administration
        Division 7. Secretary of State
            Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
                Article 6. Signature Comparison

2 CCR § 20960

§ 20960. Signature Verification Process.

Currentness

(a) For signature verification, the elections official must compare the signature on an initiative, referendum, recall, nominating petition or paper, signature in-lieu of filing fee, and any other petition or paper must be compared to the voter's signature(s) in the voter's registration record. In addition, the elections official must compare the signature on a voted vote-by-mail envelope and a voted provisional ballot envelope to the voter's signature(s) in the voter's registration record prior to counting a ballot.

(b) On initial review, elections officials shall seek to eliminate the visibility of identifying information. When comparing signatures, the elections official shall not review or consider a voter's party preference, race, or ethnicity.

(c) The comparison of a signature shall begin with the basic presumption that the signature on the petition, the vote-by-mail identification envelope, signature verification statement, unsigned ballot statement, or provisional ballot envelope is the voter's signature.

(d) Exact matches are not required for an elections official to confirm a valid signature. The fact that signatures share similar characteristics is sufficient to determine that a signature is valid.

(e) Similar characteristics between a signature being compared and any signature in the voter's registration record are sufficient to determine a signature is valid.

(f) In comparing the signatures, the elections official may consider the following characteristics when visually comparing a signature to determine whether the signatures are from the same signer:

    (1) Slant of the signature.

    (2) Signature is printed or in cursive.

    (3) Size, proportions, or scale.

    (4) Individual characteristics, such as how the "t's" are crossed, "i's" are dotted, or loops are made on the letters f, g, j, y, or z.

(5) Spacing between the letters within the first and/or last name and between first and last name.

(6) Line direction.

(7) Letter formations.

(8) Proportion or ratio of the letters in the signature.

(9) Initial strokes and connecting strokes of the signature.

(10) Similar endings such as an abrupt end, a long tail, or loop back around.

(11) Speed of the writing.

(12) Presence or absence of pen lifts.

(13) Misspelled names.

(g) In comparing signatures on a petition, vote-by-mail identification envelope, signature verification statement, unsigned ballot statement, or provisional ballot envelope, elections officials shall consider as explanations for the following discrepancies in signatures:

(1) Evidence of trembling or shaking in a signature could be health-related or the result of aging.

(2) The voter may have used a variation of their full legal name, including, but not limited to the use of initials, or the rearrangement of components of their full legal name, such as a reversal of first and last names, use of a middle name in place of a first name, or omitting a second last name.

(3) The voter's signature style may have changed over time.

(4) The signature may have been written in haste.

(5) A signature in the voter's registration file may have been written with a stylus pen or other electronic signature tool that may result in a thick or fuzzy quality.

(6) The surface of the location where the signature was made may have been hard, soft, uneven, or unstable.

(h) In addition to the characteristics listed in subdivisions (f) and (g), the elections official may also consider factors applicable to a particular voter, such as the age of the voter, the age of the signature(s) contained in the voter's record, the possibility that the voter is disabled, the voter's primary language, and the quality of any digitized signature(s) contained in the voter's record.

(i) Only a signature possessing multiple, significant, and obvious differing characteristics with all signatures in the voter's registration record will be subject to additional review by the elections official.

(j) A signature that the initial reviewer identifies as possessing multiple, significant, and obvious distinctive differing characteristics from the signature(s) in the voter's registration record shall only be rejected if two different elections officials unanimously find beyond a reasonable doubt that the signature differs in multiple, significant, and obvious respects from all signatures in the voter's registration record.

(k) When evaluating signatures, elections officials may review using broad characteristics to evaluate an entire signature as a unit or they may narrow the scope of their examination to that of specific letters within a signature.

(*l*) A signature made using a mark, such as an "X", or made by a signature stamp is presumed valid and shall be accepted if it meets the requirements set forth in Elections Code section 354.5.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: Sections 354.5, 3019 and 14310, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New article 6 (sections 20960-20962) and section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order oN-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New article 6 (sections 20960-20962) and section refiled 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New article 6 (sections 20960-20962) and section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order, including amendment of section and NOTE, transmitted to OAL 1-31-2022 and filed 3-15-2022; amendments effective 3-15-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20960, 2 CA ADC § 20960

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-32**

Barclays California Code of Regulations
 Title 2. Administration
  Division 7. Secretary of State
   Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
    Article 6. Signature Comparison

2 CCR § 20961

§ 20961. Signature Verification Technology.

Currentness

In the event the elections official uses signature verification technology to compare the signature on a vote-by-mail ballot identification envelope to the signature(s) in the voter's registration file, and the technology rejects the signature, the elections official shall utilize the provisions of Elections Code section 3019 and Section 20960 to manually compare the signature.

**Credits**
NOTE: Authority cited: Section 12172.5, Government Code. Reference: Section 3019, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order transmitted to OAL 1-31-2022 and filed 3-15-2022 (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20961, 2 CA ADC § 20961

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Barclays California Code of Regulations
    Title 2. Administration
        Division 7. Secretary of State
            Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
                Article 6. Signature Comparison

2 CCR § 20962

§ 20962. Signature Verification Training.

Currentness

The Secretary of State shall, in coordination with county elections officials, provide a yearly training program for elections officials and staff who are responsible for the signature verification process.

**Credits**
NOTE: Authority cited: Section 12172.5, Government Code. Reference: Section 3019, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order, including amendment of first paragraph and repealer of subsections (a)-(g), transmitted to OAL 1-31-2022 and filed 3-15-2022; amendments effective 3-15-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20962, 2 CA ADC § 20962

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Barclays California Code of Regulations
  Title 2. Administration
    Division 7. Secretary of State
      Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
        Article 8. Uniform Vote Counting Standards

2 CCR § 20980

§ 20980. Purpose of This Article.

Currentness

The purpose of this article is to provide standards to define the circumstances under which "marking" of a ballot constitutes a vote and when a vote will or will not count for each category of voting system certified and in use in California.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: 52 U.S.C. 21081(a)(6); and Section 12172.5, Government Code.

HISTORY

1. New article 8 (sections 20980-20985) and section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New article 8 (sections 20980-20985) and section refiled, including amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New article 8 (section 20980-20985) and section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order transmitted to OAL 1-31-2022 and filed 3-15-2022 (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20980, 2 CA ADC § 20980

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Barclays California Code of Regulations
  Title 2. Administration
    Division 7. Secretary of State
      Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
        Article 8. Uniform Vote Counting Standards

2 CCR § 20981

§ 20981. Definitions.

Currentness

As used in this Article, the following words have the following meanings:

(a) A "blank ballot" is a ballot on which the voter has made no marks in any voting position target, or one which has been marked with an unreadable marker, or one which has been consistently marked outside of the "read" area of the ballot scanner.

(b) "Candidate" means a person who is seeking nomination or election to a specified office and who either has met the legal requirements to have their name printed on the ballot or is eligible to have their name written in on the ballot and counted as the voter's choice for the contest.

(c) A "damaged ballot" is a ballot that has been torn, bent, or otherwise mutilated or rendered unreadable such that it cannot be processed by the ballot tabulating equipment designed for use with the ballot.

(d) A "duplicated ballot" is a ballot which is a true copy of the originally cast ballot. It is created when damage, improper marking or some other action/defect prevents the original ballot from being read by a ballot tabulating machine and is used to properly process and count the votes originally cast by the voter. A duplicated ballot also is necessary for a ballot cast using a remote accessible vote-by-mail ballot.

(e) A "listed candidate" is a candidate whose name appears on the ballot at the time the voter received the ballot, as opposed to a write-in candidate.

(f) A "measure" is a ballot proposition, which appears on a ballot and requires voter action in order to enact or reject a proposed law.

(g) An "overvote" occurs when a voter marks more than the maximum number of voting position targets allowed in the contest.

(h) "Personal information" shall have the meaning set forth in Elections Code section 14287.

(i) An "undervote" occurs when a voter marks less than the maximum number of voting position targets allowed in a contest.

---

(j) A "voting position target" refers to that area of the ballot adjacent to each candidate or measure, or that area of the ballot, specifically designated to record the voter's choice for that contest. The term applies to all types of voting position targets on ballots, regardless of what form they may take, including, but not limited to, rectangle, oval, circle, square, hole punch, cross punch, slotting and open arrow.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: 52 U.S.C. 21081(a)(6); Sections 303.3, 14287 and 15210, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled, including amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order transmitted to OAL 1-31-2022 and filed 3-15-2022 (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20981, 2 CA ADC § 20981

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

§ 20982. General Vote Counting Standards., 2 CA ADC § 20982

Barclays California Code of Regulations
  Title 2. Administration
    Division 7. Secretary of State
      Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
        Article 8. Uniform Vote Counting Standards

2 CCR § 20982

§ 20982. General Vote Counting Standards.

Currentness

The following general standards shall apply in the counting of all ballots and votes, regardless of the voting system used, for both the initial count and for any recount.

(a) A ballot that is not marked as provided by law must be segregated and counted in the manner directed by the elections official. Any ballot that contains personal information, or that is torn, bent, or mutilated shall be segregated as directed by the elections official and a duplicate ballot shall be prepared pursuant to Elections Code section 15210. A ballot that contains marks or markings not related to an indication of the vote choice for a contest and that are not personal information shall be counted. Duplication is not required unless the ballot contains personal information, or the condition of the ballot or markings on the ballot interfere with the ability of the vote tabulation equipment to tally the ballot.

(b) A vote for any candidate or ballot measure shall not be rejected solely because the voter failed to follow instructions for marking the ballot. If, for any reason, it is impossible to determine the choice of the voter for any candidate or ballot measure, the vote for that candidate or ballot measure shall be considered void.

(c) A mark is considered valid when it is clear that it represents the voter's choice and is the technique consistently used by the voter to indicate their selections.

(1) Such marks may include, but are not limited to, properly filled-in voting position targets, checkmarks, X's, circles, completed arrows, or any other clear indication of the voter's choice, such as the word "yes" next to a candidate's name or a voting position target for a ballot measure.

(2) Conversely, a mark crossed out by the voter, or the word "no" next to a candidate's name or a voting position target for a ballot measure shall not be considered to be a valid vote but will, instead, be deemed an indication that the voter did not choose to cast a vote for that candidate or measure.

(d) In determining the validity of a partially filled-in voting position target, the consistency of a voter's marks on the entire ballot shall be taken into consideration. A "hesitation mark" such as a dot in the voting position target shall not be considered a valid mark unless it is demonstrated that the voter consistently marked their ballot in such a manner.

A-38

(e) If a contest is marked with more choices than there are offices to be filled or measures that may prevail, the vote shall not be counted for that contest, but shall be counted in all other contests in which there is no overvote and the voter's choice can be clearly determined.

(f) If a contest is marked with fewer choices than there are offices to be filled or measures that may prevail, the vote choice(s) for all otherwise properly marked candidates or measures shall be counted.

(g) Write-in votes shall be counted pursuant to the provisions established in Elections Code sections 14420, 15342 and 15342.5.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: 52 U.S.C. 21081(a)(6); Sections 13204, 14287, 14420, 15154, 15208, 15210, 15342 and 15342.5, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled, including amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order, including amendment of subsections (c) and (d), transmitted to OAL 1-31-2022 and filed 3-15-2022; amendments effective 3-15-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20982, 2 CA ADC § 20982

---

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Barclays California Code of Regulations
    Title 2. Administration
        Division 7. Secretary of State
            Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
                Article 8. Uniform Vote Counting Standards

2 CCR § 20983

§ 20983. Optical Scan Voting Systems.

Currentness

(a) When optical scan technology is used to count the votes on a ballot, the provisions of this section shall apply.

(b) The following standards shall be used to determine whether there is a clear indication on the ballot that the voter has made a definite choice. The examples used in this section refer to the "voting position target" as defined in Section 20981. The same principles demonstrated in the examples below shall apply to all types of voting position targets on optical scan ballots, regardless of what form they may take (e.g., rectangle, oval, circle, square, open arrow).

(c) A voter's choice shall be considered a valid vote if the voter:

  (1) Indicates their vote choice by consistently filling inside the entire voting position target.

  (2) Indicates their vote choice by consistently filling in less than the entire voting position target for all vote choices on the ballot and the ballot is processed in a manner consistent with the use procedures provided and approved for the voting system used in the county.

  (3) Indicates their vote choice by consistently placing a distinctive mark, such as (X) or (#) or (←), inside the associated voting position target for a candidate choice or ballot measure.

  (4) Indicates their vote choice by consistently placing a distinctive mark, such as (X) or (#) or (←), in the corresponding space directly above, below or beside the associated voting position target for a candidate or ballot measure.

  (5) Marks their vote choices by encircling the entire voting position target for a candidate or ballot measure, or the candidate's name or Yes/No option for a measure.

  (6) Indicates a voting error correction by using correction tape, strikeover, white-out or generic written note of instruction and marks another vote choice for the same contest on the ballot.

  (7) Writes in a qualified write-in candidate's name, or a reasonable facsimile of the spelling of the name, in the designated write-in spaces directly below the list of candidates for that office and marks the associated write-in voting target position.

(8) Writes in a listed candidate's name in the designated write-in space and marks the associated write-in voting target position. In such case, the vote shall be counted as a single vote for the listed candidate.

(9) Marks a voting target position for a listed candidate and also enters the listed candidate's name in the designated candidate write-in space. In such case, the vote shall be counted as a single vote for the listed candidate.

(10) Writes in a qualified write-in candidate's name, or a reasonable facsimile of the spelling of the name, on the secrecy sleeve envelope or stub and indicates the contest for which the vote is being cast, in the case of voting systems where write-in spaces appear separately from the list of candidates for an office and do not provide voting position targets.

(d) A voter's choice shall be considered an invalid vote if the voter:

(1) Uses random markings, indentations, punctures or impressions, squiggly/dimpled or crimp marks, pinholes or pinpricks on a ballot, and there is no distinctive and consistent voting pattern to clearly indicate the voter's choice(s).

(2) Indicates vote choice by filling in less than the entire voting position target, and the voter has not consistently marked the entire ballot in the same manner, making the voter's choice unclear.

(3) Inconsistently places a mark above, below or beside the associated voting position target on a ballot, instead of inside the voting position target, and the voter's choice cannot be clearly determined.

(4) Writes in the name of a person who has not qualified as a write-in candidate.

(5) Writes in a listed candidate's name in the designated write-in space and fills in the associated voting position target for a different listed candidate in the same contest.

(6) Writes in a candidate name that is unrecognizable/undecipherable and it cannot be determined for whom the vote is intended to be cast.

(7) Writes in a qualified write-in candidate's name in the designated write-in space and does not fill in the associated voting position target for the write-in candidate. However, in the event of a manual recount, pursuant to Elections Code section 15342.5 if the intent of the voter can be determined, the vote shall be counted regardless of whether the voter has filled in the associated voting position target for the write-in candidate.

(8) Uses pressure-sensitive stickers, rubber stamps, glued stamps, or any other device not provided for in the voting procedures for the approved voting system used by the county to indicate the name of the voter's choice for a write-in candidate.

(e) If the voter leaves the voting booth without casting the ballot, the precinct official shall cause the ballot to be cast without examining the ballot.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: 52 U.S.C. 21081(a)(6); Sections 15154 and 15342.5, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled, including amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order, including amendment of subsection (c)(10), transmitted to OAL 1-31-2022 and filed 3-15-2022; amendments effective 3-15-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20983, 2 CA ADC § 20983

End of Document        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Barclays California Code of Regulations
  Title 2. Administration
    Division 7. Secretary of State
      Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
        Article 8. Uniform Vote Counting Standards

2 CCR § 20984

§ 20984. Other Paper Voting Systems.

Currentness

(a) A paper ballot shall be subject to the standards in the section applicable to the voting system on which it is processed.

(b) When paper ballots, or voting responses on paper other than a ballot, are counted by the hand and eye, the provisions of Section 20983 shall apply.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: 52 U.S.C. 21081(a)(6); and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled, including amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order transmitted to OAL 1-31-2022 and filed 3-15-2022 (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20984, 2 CA ADC § 20984

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Barclays California Code of Regulations
  Title 2. Administration
    Division 7. Secretary of State
      Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
        Article 8. Uniform Vote Counting Standards

2 CCR § 20985

§ 20985. Direct Recording Electronic (DRE) Voting Systems.

Currentness

(a) When direct recording electronic (DRE) technology is used to cast and count the votes on a ballot, the provisions of this section shall apply. The following standards shall be used to determine whether the voter has made a definite choice.

(b) A voter's choice shall be considered a valid vote if the voter:

(1) Operates the DRE in a manner to cause an "X" or "#" or "highlight" or similar designation to display in the voting target position of the name of the candidate or measure for which the voter chooses to vote, followed by the voter activating the cast vote indicator.

(2) Operates the DRE in a manner to cause the name of a qualified write-in candidate to be entered in the designated write-in space, followed by the voter activating the cast vote indicator.

(3) Operates the DRE in a manner to cause the name of a candidate listed on the ballot to be entered in the designated write-in space, followed by the voter activating the cast vote indicator.

(4) Operates the DRE in a manner to cause the cast ballot indicator to be activated and has not voted for more contests or candidates than the number for which the voter is eligible to vote.

(c) If the voter leaves the voting booth without causing the ballot to be cast, the precinct official shall cause the ballot to be cast, without examining how any votes have been recorded on the machine.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: 52 U.S.C. 21081(a)(6); and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled, including redesignation of second subsection (a) as subsection (c) and amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order transmitted to OAL 1-31-2022 and filed 3-15-2022 (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20985, 2 CA ADC § 20985

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

> Barclays California Code of Regulations
>     Title 2. Administration
>         Division 7. Secretary of State
>             Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
>                 Article 9. Processing of Vote-By-Mail and Provisional Ballots

2 CCR § 20990

§ 20990. Vote-by-mail Ballot Processing and Return Status.

Currentness

(a) Upon receipt of a voted vote-by-mail ballot, the elections official shall, immediately upon receipt and/or processing the ballot identification envelope, enter the return status of that ballot into the statewide voter registration system pursuant to Section 19091(c) of Article 2.5 of Chapter 1 of Division 7 of Title 2 of the California Code of Regulations.

(b) The received vote-by-mail ballot shall be processed in accordance with Elections Code section 3019.

(c) The signature on the vote-by-mail ballot identification envelope shall be examined pursuant to Section 20960 and Elections Code section 3019. The examination of the signature shall be liberally construed in the favor of the voter.

(d) If the voter did not sign the vote-by-mail ballot identification envelope, or if the elections official has determined that the signature on the vote-by-mail ballot identification envelope does not compare to the signature(s) of the voter in the voter's record, the elections official shall, unless impracticable under the circumstances, on or before the next business day after the signature issue was discovered, provide the voter with the applicable notice to cure the missing or mismatched signature pursuant to Elections Code section 3019(d) or (e).

(e) For the notice described in subdivision (d), the elections official shall:

    (1) Provide the notice to the voter in the voter's preferred language that is covered by Section 203 of the Federal Voting Rights Act of 1965.

    (2) Include a statement on the notice that the signature provided by the voter may be added to the voter's registration record to be used for signature comparison purposes in future elections, if the signature provided in the cure compares to the signature(s) of the voter in the voter's record.

    (3) Include a postage-paid return envelope with the notice for the voter to return their signature cure.

(f) Upon the final adjudication of the voted vote-by-mail ballot, the elections official shall enter the appropriate reason code for the disposition of the ballot into the statewide voter registration system in accordance with Section 19092 of Article 2.5 of Chapter 1 of Division 7 of Title 2 of the California Code of Regulations.

---

**Credits**

NOTE: Authority cited: Section 3026, Elections Code; and Section 12172.5, Government Code. Reference: 52 U.S.C. 10503; Sections 3010, 3019 and 14201, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New article 9 (sections 20990-20993) new section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New article 9 (sections 20969-20993) and new section refiled 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New article 9 (sections 20969-20993) and section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order, including amendment of subsections (a), (d) and (f), transmitted to OAL 1-31-2022 and filed 3-15-2022; amendments effective 3-15-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20990, 2 CA ADC § 20990

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Barclays California Code of Regulations
    Title 2. Administration
        Division 7. Secretary of State
            Chapter 8.3. Petition Processing, Signature Verification, Ballot Processing, and Ballot Counting
            Article 9. Processing of Vote-By-Mail and Provisional Ballots

2 CCR § 20991

§ 20991. Standards for Valid and Invalid Vote-by-Mail Ballots.

Currentness

(a) A vote-by-mail ballot shall be subject to the standards provided in the approved use procedures for the system on which it is processed and the provisions of the Elections Code. In addition, the following standards shall also apply.

(b) A voter's ballot shall be considered a valid ballot, if the:

(1) Voter's signature on the returned vote-by-mail identification envelope compares with the signature(s) in the voter's registration record.

(2) Damaged, torn or otherwise non-processable ballot can be duplicated to exactly reflect the voter's choices and thereby enable the ballot to be processed on the system provided for that purpose. Standards for duplicating ballots are set forth in Elections Code section 15210 and in the applicable voting system use procedures for the county. In addition, a ballot received from a voter who uses a remote accessible vote-by-mail ballot system shall have their ballot duplicated for processing.

(3) Voter prints their name on the signature portion of the vote-by-mail ballot identification envelope, and it compares with a printed signature(s) in the voter's registration record.

(4) Voter uses a variation of the signature(s) appearing in the voter's registration record caused by the substitution of initials for the first or middle name, or both, and the signature compares with the affidavit of registration or the signature(s) in the voter's registration record, as identified in Section 20960(g)(2).

(5) Voter does not sign the vote-by-mail ballot identification envelope in the appropriate space, but the signature does appear elsewhere on the identification envelope and compares with the signature(s) in the voter's registration record.

(6) Voter uses a mark on both the vote-by-mail ballot identification envelope and the affidavit of voter registration, and the mark compares.

(7) Vote-by-mail ballot is postmarked or date stamped on or before Election Day by a bona fide private mail delivery service and received by the elections official in accordance with Elections Code section 3020.

---

(8) Vote-by-mail ballot identification envelope has no dated postmark, the postmark is illegible, and there is no date stamp for receipt from a bona fide private mail delivery service, but the voter has dated the vote-by-mail ballot identification envelope or the envelope otherwise indicates that the ballot was executed on or before Election Day and the ballot was received by the elections official in accordance with Elections Code section 3020.

(9) Voter, instead of using their official ballot, marks a sample ballot and mails it in the vote-by-mail ballot identification envelope and the signature on the identification envelope compares with the signature(s) in the voter's registration record.

(10) Two or more ballots are returned in one vote-by-mail ballot identification envelope, and there are an equal number of distinct signatures on the identification envelope that can be attributed to eligible vote-by-mail voters and each of these signatures compares with the signature(s) in the applicable voter's registration record.

(11) The voter returns their vote-by-mail ballot identification envelope of a different voter, but the elections official is able to identify the correct voter and the voter's signature compares with the signature(s) in the voter's registration record.

(12) A military or overseas voter who is temporarily living outside of the territorial limits of the United States or the District of Columbia and transmits a voted ballot by facsimile pursuant to Elections Code section 3106.

(13) Information provided by the California Department of Public Health or other sources that clearly and convincingly states that the voter died after the date the vote-by-mail ballot was cast Absent convincing evidence otherwise, it shall be presumed that a ballot was validly cast before the voter died.

(c) A voter's ballot shall be considered an invalid ballot, if the:

(1) Elections official has determined that the signature on the vote-by-mail ballot identification envelope does not compare to the voter's signature in the voter's registration record, and pursuant to California Elections Code section 3019(d), the voter does not cure the ballot by providing the elections official with a signed form within the timeframe provided by Section 3019(d).

(2) Vote-by-mail ballot envelope is not signed by the voter and pursuant to California Elections Code section 3019(e), the voter does not cure the ballot by providing the elections official with a signed form within the timeframe provided by Section 3019(e).

(3) Vote-by-mail ballot identification envelope is signed using power of attorney.

(4) Vote-by-mail ballot is not timely received by the voter's elections official via the United States Postal Service or a bona fide private mail delivery company in accordance with Elections Code section 3020.

(5) Vote-by-mail ballot is delivered by USPS or bona fide private mail service to the elections official in accordance with Elections Code section 3020, but the postmark or private mail service date stamp indicates that it was received by the carrier after Election Day.

(6) Vote-by-mail ballot is delivered by USPS or bona fide private mail service to the elections official in accordance with Elections Code section 3020 without a legible postmark date or date stamp from the private mail service and the vote-by-mail ballot identification envelope indicates the ballot was executed after Election Day.

(7) Vote-by-mail ballot is received by elections official after Election Day by some method other than USPS or bona fide private mail service.

(8) Voter, who is not a military or overseas voter, transmits their voted ballot by facsimile.

(9) The signature on the form provided by either Elections Code section 3019(d) or (e), when compared to the signature(s) in the voter's registration record, does not appear to be the same.

(10) Vote-by-mail ballot identification envelope contains two or more voted vote-by-mail ballots but there are less than an equal number of distinct signatures on the vote-by-mail envelope. In this instance neither ballot shall be counted.

(11) Information provided by the California Department of Public Health or other sources that clearly and convincingly states that the voter died prior to the date the vote-by-mail ballot was cast.

**Credits**

NOTE: Authority cited: Section 12172.5, Government Code. Reference: 52 U.S.C. Section 21081(a)(6); Sections 303.3, 3009, 3011, 3017, 3019, 3020, 3106 and 15210, Elections Code; and Section 12172.5, Government Code.

HISTORY

1. New section filed 9-28-2020 as an emergency; operative 9-28-2020. Emergency expiration extended 60 days (Executive Order N-40-20) plus an additional 60 days (Executive Order N-66-20) (Register 2020, No. 40). A Certificate of Compliance must be transmitted to OAL by 7-27-2021 or emergency language will be repealed by operation of law on the following day.

2. New section refiled, including amendment of NOTE, 7-12-2021 as an emergency; operative 7-28-2021 (Register 2021, No. 29). A Certificate of Compliance must be transmitted to OAL by 10-26-2021 or emergency language will be repealed by operation of law on the following day.

3. New section refiled 11-4-2021 as an emergency; operative 11-4-2021 (Register 2021, No. 45). A Certificate of Compliance must be transmitted to OAL by 2-2-2022 or emergency language will be repealed by operation of law on the following day.

4. Certificate of Compliance as to 11-4-2021 order, including amendments, transmitted to OAL 1-31-2022 and filed 3-15-2022; amendments effective 3-15-2022 pursuant to Government Code section 11343.4(b)(3) (Register 2022, No. 11).

This database is current through 10/20/23 Register 2023, No. 42.

Cal. Admin. Code tit. 2, § 20991, 2 CA ADC § 20991

© 2023 Thomson Reuters. No claim to original U.S. Government Works.