**Court of Appeal No. 23-55726**

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ELECTION INTEGRITY PROJECT CALIFORNIA, INC., *et al.*,

*Plaintiffs-Appellants*,

*vs.*

SHIRLEY WEBER, *et al.*,

*Defendants-Appellees*

_____

*Appeal from the Order of the United States District Court for the Central District of California,*

*Case No. 2:21-cv-00032-AB-MAA*
*The Honorable André Birotte Jr., District Judge*

_____

**APPELLANTS' REPLY BRIEF**

_____

ADVOCATES FOR FAITH &
FREEDOM
Mariah Gondeiro, Ca Bar No. 323683
mgondeiro@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Tel: (951) 600-2733

  *Counsel for Appellants Election Integrity Project California, Inc. et al.*

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................1

II. ARGUMENT .....................................................................3

    A.    APPELLANTS HAVE ALLEGED A CLAIM UNDER THE *ANDERSON-BURDICK* FRAMEWORK.................................................................3

    B.    APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE EQUAL PROTECTION CLAUSE .............................................11

    C.    APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE DUE PROCESS CLAUSE ................................................................15

    D.    THE LOWER COURT IMPROPERLY DISMISSED THE CASE WITHOUT LEAVE TO AMEND...............................................20

III. CONCLUSION..................................................................21

CERTIFICATE OF COMPLIANCE.....................................22

CERTIFICATE OF SERVICE .............................................23

i

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ............................................................................4

*Black v. McGuffage*,
    209 F. Supp. 2d 889 (N.D. Ill. 2002) ......................................... 14, 19

*Bodine v. Elkhart County Elec. Bd.*,
    788 F.2d 1270 (7th Cir. 1986) ...........................................................17

*Bowles v. Reade*,
    198 F.3d 752 (9th Cir. 1999) .............................................................20

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ......................................................................4, 10

*Bush v. Gore*
    531 U.S. 98 (2000) ................................................................... passim

*Clark v. Weber*,
    54 F.4th 590 (9th Cir. 2022) .............................................................10

*Colegrove v. Green*,
    328 U.S. 549 (1946) ............................................................................2

*Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones*,
    213 F. Supp. 2d 1106 (C.D. Cal. 2001) .............................................14

*Curry v. Baker*,
    802 F.2d 1302 (11th Cir. 1986) ........................................................16

*Gamza v. Aguirre*,
    619 F.2d 449 (5th Cir. 1980) ...................................................... 15, 16

*Gray v. Sanders*,
    372 U.S. 368 (1963) ..........................................................................11

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ............................................................................4

*League of Women Voters of Kansas v. Schwab*,
    525 P.3d 803 (2023) .............................................................. 2, 14, 15

*League of Women Voters of Ohio v. Brunner*,
    548 F.3d 463 (6th Cir. 2008) .............................................................14

*Lemons v. Bradbury*,
    538 F.3d 1098 (9th Cir. 2008) .............................................. 6, 7, 8, 12

ii

*McIntyre v. Ohio Elections Comm'n,*
   514 U.S. 334 (1995) ...............................................................3
*Miller v. Rykoff-Sexton, Inc.,*
   845 F.2d 209 (9th Cir. 1988) ............................................20
*Moore v. Ogilvie,*
   394 U.S. 814 (1969) .............................................................11
*Northeast Ohio Coalition for the Homeless v. Husted,*
   837 F.3d 612 (6th Cir. 2016) ............................................17
*Short v. Brown,*
   893 F.3d 671 (9th Cir. 2018) ..................................5, 6, 12
*Soltysik v. Padilla,*
   910 F.3d 438 (9th Cir. 2018) .........................................9, 10
*Soules v. Kauaians for Nukolii Campaign Comm.,*
   849 F.2d 1176 (9th Cir. 1988) ..........................................16
*Stewart v. Blackwell,*
   444 F.3d 843 (6th Cir. 2006) ...................................2, 4, 14
*Tedards v. Ducey,*
   951 F.3d 1041 (9th Cir. 2020) ..........................................10
*United States v. Corinthian Colleges,*
   655 F.3d 984 (9th Cir. 2011) ............................................19
*Wyler Summit P'ship v. Turner Broad. Sys., Inc.,*
   135 F.3d 658 (9th Cir. 1998) ............................................18

Statutes

California Elections Code section 3019.............................................8, 13

Regulations

2 CCR sections 20960-20962 ......................................................8
2 CCR sections 20980-20985 ..................................................8, 13

## I.    INTRODUCTION

Appellee County Registrars (the "County") and Appellees Shirley Weber and Rob Bonta (collectively, the "State") claim Appellants do not state a claim under the Equal Protection Clause or Due Process Clause because California's laws and regulations are uniform, and the alleged irregularities are not due to systemic issues in the election system but random mistakes. State Br. at 25-56, ECF No. 26; County Br. at 18-36, ECF No. 24. These arguments are red herrings and dismiss Appellants' well-pled allegations.

Appellants state a claim for relief under the Equal Protection Clause because they allege that Appellee County Registrars' disparate practices regarding signature verification, ballot remaking, and the maintenance of voter rolls inherently leads to uneven results across counties. ER 63-72. California's election laws and regulations enable these irregularities because they do not require election officials to run ballots through a machine, calibrate their signature verification rate to a specific error rate, or apply a specific number of points of comparison. ER 63-64, 71. Appellants also allege that Appellee County Registrars do not consistently remove ineligible registrants, which has enabled the counting of ineligible VBM ballots. ER 72.

Appellants state a claim for relief under the Due Process Clause because the alleged irregularities that have transpired over the years represent a pattern of

1

practice, not a temporary or accidental machine malfunction. Since California gutted signature verification requirements and solidified universal vote-by-mail ("VBM"), EIPCa has received more incident reports demonstrating that election officials do not adequately vet VBM ballots in the counties that Appellee County Registrars oversee. ER 71. The irregularities that transpired in 2020 continued with the same frequency in 2021 and 2022. *Id.* Appellee County Registrars have also failed to remove ineligible voters from the voter rolls for at least a decade and, in some instances, counted ineligible ballots. ER 50, 52, 57, 72.

Appellants' claims are supported by Supreme Court precedent. Indeed, if this Court were to find Appellants' equal protection or due process claims were not viable, it would render *Bush v. Gore* a dead letter. 531 U.S. 98 (2000). *Bush* and its progeny establish that vote dilution is not limited to malapportionment or state reapportionment cases but occurs any time a state-sanctioned system increases the chances that a portion of the electorate will have their votes diluted. *See, e.g., id.* at 106-09, 125; *Stewart v. Blackwell*, 444 F.3d 843, 869-71 (6th Cir. 2006); *League of Women Voters of Kansas v. Schwab,* 525 P.3d 803, 838 (2023), review granted (June 23, 2023). Vote dilution can occur by deficiencies in election machines or manual vote counting procedures. *See Colegrove v. Green*, 328 U.S. 549, 569-71 (1946) (Black, J., dissenting) ("[T]he Constitutionally guaranteed right to vote and the right to have one's vote counted clearly imply the policy that state election systems, no

matter what their form, should be designed to give approximately equal weight to each vote cast.").

Accordingly, this Court should reverse the lower court's decision and remand the case back for further proceedings.

## II.   ARGUMENT

### A.   APPELLANTS HAVE ALLEGED A CLAIM UNDER THE *ANDERSON-BURDICK* FRAMEWORK

Appellees erroneously claim that Appellants do not state a claim under the *Anderson-Burdick* framework because the challenged laws and regulations do not burden Appellants' right to vote but rather expand the opportunity for all registered voters to vote by mail. State Br. at 22-24; County Br. at 30-31. These arguments are red herrings and misapprehend the nature of Appellants' claims.

As a threshold matter, it is not clear whether the *Anderson-Burdick* framework applies to Appellants' vote dilution claims. The Supreme Court has not applied the *Anderson-Burdick* framework to vote dilution claims. *See, e.g., McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 344-45 (1995); *Bush*, 531 U.S. at 104-09 (finding that the disparate treatment of ballots during the 2000 Florida recount denied voters equal protection).

In any event, whether the *Anderson-Burdick* framework applies to vote dilution cases is immaterial because Appellants have alleged a claim under the

3

framework. In *Burdick v. Takushi*, the Supreme Court established that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." 504 U.S. 428, 434 (1992). "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). However, strict scrutiny applies when state election laws "are subjected to 'severe' restrictions." *Id.* (citation omitted).

*Stewart* is instructive. There, the Sixth Circuit applied strict scrutiny to determine whether the use of "two challenged technologies in some jurisdictions but not others is a practice 'narrowly tailored to further compelling government interests.'" 444 F.3d at 869 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). The plaintiffs alleged that some counties in Ohio used technologies that increased the risk that one's vote would not be counted. *Stewart*, 444 F.3d at 871. The Sixth Circuit found that the technologies did not "provide the minimal adequate procedural safeguards to prevent the unconstitutional dilution of votes based on where a voter resides." *Id.* at 870 (citing *Bush*, 531 U.S. at 109).

*Stewart* is distinguishable from *Short v. Brown*, where the plaintiffs challenged California's Voter Choice Act passed in 2018 because it permitted voters

4

in some counties to receive an automatic VBM ballot, while requiring voters in other counties to register before receiving a VBM ballot. 893 F.3d 671, 677 (9th Cir. 2018). The Ninth Circuit found that having to register to receive a ballot was an "extremely small" burden and chose not to preliminary enjoin the Act. *Id.*

This Court's "observation that the implementation of all-mailed ballot elections for voters in some counties made it 'easier for [those] voters to cast their ballots….'" is inapplicable to this case because the nature of Appellants' claims is different. State Br. at 26-27 (quoting *Short*, 893 F.3d at 677). Appellants do not challenge VBM alone, but a combination of laws, regulations, and procedures. Specifically, Appellants allege that the combination of laws, regulations, and procedures increase the likelihood that some ballots will not be counted, and that some counties implemented precarious practices that led to election workers counting ineligible ballots. ER 63-72. The plaintiffs in *Short* do not make these allegations. 893 F.3d at 677-80.

Appellants' allegations are analogous to the claims brought in *Stewart* because Appellants allege that California's voting laws, regulations, and procedures, taken together, dilute the votes of specific voters based upon where they reside and how they vote. For instance, they allege that several counties like Santa Clara County, Orange County, and Riverside County did not compare signatures using multiple points of comparison or rushed through the signature verification process.

5

ER 63-66. In some cases, election workers counted ballots when the signatures did not match. *Id.* Los Angeles County calibrated their machine to such a rapid speed that it flagged few ballots, "despite observers noting clear discrepancies in the signatures." ER 66-67. In 2020, Appellant EIPCa reported that Kern County, Riverside County, Orange County, and Los Angeles County reported higher discrepancies by percentage "between VBM votes counted and VBM registrants with voting histories than non-defendant counties like Butte County and Glenn County." ER 72. Appellants allege that these irregularities are the result of universal VBM, California's election regulations, and the inadequate maintenance of voter rolls. ER 71-72.

Contrary to Appellees arguing California's laws and regulations are uniform, the alleged irregularities are the result of California's laws and regulations, which do not provide sufficient standards for the processing of ballots. State Br. at 29-32; County Br. at 25-26. Appellees mistakenly rely on *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008). State Br. at 33-34; County Br. at 25-26.

In *Lemons*, the plaintiffs challenged the Oregon Secretary of State's decision to disqualify Oregon Referendum 303 because the signatures turned into the office were insufficient. 538 F.3d at 1101. This Court found that the allegations in *Lemons* were distinguishable from *Bush* because "Oregon's standard for verifying referendum signatures [were] sufficiently uniform and specific to ensure equal

6

treatment of voters." *Id.* at 1106. Specifically, during the verification of Referendum 303, all counties subjected rejected signatures to a second level of review, and the counties refused to consider extrinsic evidence from rejected signatures. *Id.* There was no evidence on the record indicating that counties had applied different standards when determining whether to reject a signature. *Id.* at 106-07.

Here, Appellants allege that California does not provide consistent means of assessing signatures and the intent of a voter, leading to the counting of ineligible ballots. ER 63-72. Indeed, if this Court were to shoehorn this case into *Lemons*, it would be dismissing all of Appellants' alleged irregularities. Unlike *Lemons*, Appellants allege that California counties applied different standards when reviewing signatures. For instance, Solano County runs all signatures through a machine for an initial review. ER 63. Solano County and Placer County also review signatures using at least three points of comparison. *Id.* Unlike *Lemons*, where all counties subjected all rejected signatures to a second level of review, not all counties in California subjected signatures to a second review. ER 63-64. Appellants allege that Solano County reviews rejected signatures at least three times. ER 63. Notably, Appellants allege that "citizens in these counties did not report incidents of election workers approving ballots that did not match the signatures on file." *Id.*

Conversely, Appellants allege that Appellee County Registrars implemented inadequate procedures. *Id.* "As massive numbers of VBM ballots flooded vote

counting centers, their signatures were visually checked at the rate of one signature pair every one to four seconds." *Id.* Appellants allege that these "inadequate procedures resulted in election workers approving VBM ballots that did not match the signature samples on record. Some election workers even counted ballots with no signatures or signatures that did not match the identity of the voter." ER 64.

Appellants allege that the lack of uniform signature verification procedures are the result of California's laws and regulations. ER 63, 71. Neither California Elections Code section 3019, 2 CCR sections 20960-20962, nor sections 20980-20985 require election officials to run ballots through a machine, calibrate their signature verification rate to a specific error rate, or apply a specific number of points of comparison. ER 63-64, 71.

Unlike *Lemons*, Appellants also allege that California gives election workers wide discretion when determining the intent of a voter during the ballot remaking process. ER 64; *see also* 2 CCR §§ 20980-20985. California law does not require that all counties use a machine technology or the same manuel procedures. ER 64. Appellants also allege that "[s]ome counties, such as those listed in this lawsuit, have only one team verifying the intent of the voter whereas counties like Siskiyou County have multiple teams verifying the intent of the voter." *Id.* Multiple teams are "more accurate because it provides additional oversight and accountability." *Id.*

Appellants also allege that universal VBM and Appellees' inadequate maintenance of the voter rolls, together, disproportionately impacts in-person voters in certain counties. ER 72. Past elections have shown that counties like Los Angeles County and Orange County counted ineligible VBM ballots because they did not maintain accurate voter rolls. *Id.* Appellant EIPCa's research revealed that in 2020, 180 individuals voted in both Nevada and California, 72 deceased individuals voted in California, and 596 Nevadans voted in counties managed by Appellee County Registrars. ER 72. "Almost 124,000 more votes were counted in the 2020 election than registrants with voting histories for that election." *Id.* Appellee County Registrars in "Kern County, Riverside County, Orange County, and Los Angeles County recorded higher discrepancies by percentage between VBM votes counted and VBM registrants with voting histories than non-defendant counties like Butte County and Glenn County." *Id.*

At the very least, Appellants' claims impose a burden that is "neither strict nor wholly deferential," requiring the government to show that lesser burdensome alternatives were not available. *Soltysik v. Padilla*, 910 F.3d 438, 445 (9th Cir. 2018). And whether less burdensome alternatives are available is an issue of fact that is not amenable to resolution on a motion to dismiss.

The State claims that whether Appellants have alleged a burden on the right to vote is not an issue of fact, and the State relies on distinguishable cases to support

9

this proposition. State Br. at 24-25. In *Tedards v. Ducey*, this Court found that the delay of a vacancy election until the next election was reasonable. 951 F.3d 1041, 1066-67 (9th Cir. 2020). This Court also held that *Tedards* was distinguishable from *Soltysik* because "the burden in *Soltysik* fell higher on the Burdick sliding scale" and the circumstances of the case required "further development of the evidentiary record…." *Id.* at 67. Similarly, in *Clark v. Weber*, this Court dismissed the case without leave to amend because the challenged restrictions were neutral and only triggered rational basis review. 54 F.4th 590, 594 (9th Cir. 2022).

Here, Appellants' allegations do not trigger rational basis review because they have demonstrated that California's laws, regulations, and procedures increase the chance that voters in certain counties will have their votes diluted. Indeed, the parties have not engaged in discovery, yet Appellants have still demonstrated that in past elections, unlawful votes were counted in districts managed by Appellee County Registrars. ER 63-72.

Moreover, like *Soltysik*, the circumstances in this case merit further development of the evidentiary record. 910 F.3d at 447. Appellants are unable to uncover the extent of the voting irregularities and statistical anomalies without the benefit of discovery. At this stage, Appellants' allegations easily survive Rule 8 of the Federal Rules of Civil Procedure's minimal pleading standard, and the nature of Appellants' vote dilution claims warrant discovery.

10

**B.** **APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE EQUAL PROTECTION CLAUSE**

Appellees claim Appellants do not state a claim for relief under the Equal Protection Clause because in-person and VBM voters are not distinct groups of voters, and Appellants do not allege the unequal weighting of votes or unequal representation. State Br. at 40-41; County Br. at 19. Appellees, once again, misapprehend the nature of Appellants' claims, and attempt to limit the precedential effect of *Bush*, where the Supreme Court held an unequal and substandard system of counting votes across counties led to an equal protection violation. 531 U.S. at 106-07; State Br. at 51-53; County Br. at 21.

In *Bush*, the record revealed that Florida counties applied different standards in defining a legal vote during the recount of the 2000 presidential election. 531 U.S. at 106. Even though the dissent noted that the Supreme Court had not addressed the constitutionality of disparate vote counting procedures, the majority found that this distinction did not preclude a finding of an equal protection violation. *Id.* at 109, 125 (Stevens, J., dissenting) ("[W]e have never before called into question the substantive standard by which a State determines that a vote has been legally cast.") In reaching its decision, the Court relied on *Gray* and *Moore*, where the Court addressed the unequal weighting of votes. *Id.* at 106 (citing *Gray v. Sanders*, 372 U.S. 368, 379 (1963); *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969)). The Supreme

Court instructed lower courts that vote dilution can occur by way of unequal weighting of votes or vote cancellation/negation. *Bush*, 531 U.S. at 106-09, 125.

Appellees attempt to limit the precedential effect of *Bush* in this case by relying on *Short* and *Lemons*. County Br. at 22; State Br. at 51-53. In *Short*, there was no evidence that the counties implemented substandard or disparate vote counting procedures, which harmed voters in specific counties. 893 F.3d at 678.

In *Lemons*, this Court held that *Bush* did not apply because Oregon's standard for verifying signatures was uniform. 548 F.3d at 1106. Because *Lemons* also dealt with signature-verification requirements, the State claims California's requirements "would also pass muster under *Bush*…." State Br. at 51. However, in *Lemons*, there was no evidence that the counties were treating signatures differently, and all signatures were subjected to the same levels of review. 538 F.3d at 1106.

Unlike *Short* and *Lemons*, Appellants allege that California counties have applied different standards when processing ballots, leading to uneven results. ER 63-72. The irregularities were not the result of arbitrary mistakes but a state-authorized system. ER 70-72; *cf* County Br. at 30. Appellants do not allege a "handful of mistakes" either. *Id.* Since 2020, Appellant EIPCa has collected thousands of incident reports "demonstrating widespread irregularities and a lack of uniform and secure vote counting procedures, including signature verification and ballot remaking…." ER 70. "[T]he same issues that transpired in 2020 continued in

12

2021 and 2022 with roughly the same rate of incident reports." ER 71. Appellant EIPCa has received more incident reports since 2020 because California "gutted signature verification requirements and solidified VBM...." *Id.*

Appellee County Registrars have applied different procedures because California law gives counties this discretion. ER 63-64, 71. "Neither California Elections Code § 3019 nor 2 CCR § 20960 require counties to require election workers to verify a specific number of points of comparison." ER 53. California's laws and regulations do not require that counties apply the same levels of review or "use a machine to verify signatures." ER 63-64.

Appellants also allege that California gives election workers discretion when determining the intent of the voter during the ballot remaking process. ER 64; *see also* 2 CCR §§ 20980-20985. California law does not require that all counties use a machine technology or the same manual procedures. ER 64. Appellants also allege that some counties did not maintain accurate voter rolls, which led to the counting of ineligible VBM ballots. ER 72.

Contrary to Appellees arguing otherwise, the invalid VBM votes did not harm all California voters equally but rather the voters in specific counties, including counties where Appellants reside. State Br. at 40-41; County Br. at 19. Thus, like *Bush*, certain voters, including Appellants, have a greater likelihood of having their

13

votes diluted because they live in counties that implement precarious practices. ER 45, 63-64.

Indeed, this Court would be the outlier if it were to find that *Bush* does not apply here. A slew of courts have applied *Bush* to uneven and substandard election systems. *See, e.g., Stewart*, 444 F.3d at 869-71; *League of Women Voters of Kansas*, 525 P.3d at 828; *Black v. McGuffage*, 209 F. Supp. 2d 889, 898-99 (N.D. Ill. 2002) (holding that plaintiffs had stated an equal protection claim where they alleged that votes in some counties were statistically less likely to be counted than votes in other counties); *Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones*, 213 F. Supp. 2d 1106, 1108–10 (C.D. Cal. 2001) ("Common Cause") (holding plaintiffs stated an equal protection claim because some counties adopted more reliable voting procedures than others); *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (noting that courts have found *Bush* applicable in challenges to voting systems) (internal citations omitted)).

The County's attempt to distinguish *Common Cause* and *Black* because they involve statistically less reliable punch card voting machines is untenable. County Br. at 23-24. Nowhere did the Court limit *Bush* to the substandard use of punch cards machines. 531 U.S. at 106-07. Whether counties use uneven and substandard voting machines or manual procedures is a distinction without a difference. Appellants have alleged that Appellee County Registrars have implemented insufficient procedures

14

that increase the chance that certain voters will have their votes diluted. ER 63-71. The irregularities are reflected in thousands of incident reports and Appellant EIPCa's research conducted over the last three election cycles. ER 71-72.

In *League of Women Voters of Kansas*, the court held the plaintiffs stated an equal protection claim because Kansas did not require uniform signature matching requirements. 525 P.3d at 828. Appellants' case is even stronger because they not only allege that California's laws and regulations lack uniform standards, but they provide specific examples of counties applying varying practices. ER 63-71. Appellants also allege that certain counties did not maintain adequate voter rolls, diminishing the value of lawfully cast votes in those counties. ER 72. Appellees do not address this argument.

In sum, Appellants' equal protection claim satisfies Rule 8 of the Federal Rules of Civil Procedure's minimal pleading standard. The alleged irregularities are not isolated events but represent a pattern of practice that has "systematically den[ied] equality in voting." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980).

## C. APPELLANTS STATE A CLAIM FOR RELIEF UNDER THE DUE PROCESS CLAUSE

The Appellees erroneously assert Appellants' claims do not give rise to a due process violation by relying on cases where courts found the harm was the result of mistake or machine malfunctions. County Br. at 31-34; State Br. at 54-55. The

15

County also claims Appellants "plead nothing more than scattershot instances where observers were dissatisfied with the level of access allegedly provided to them and to the alleged election security deficiencies, without making *any* assertions that those irregularities rose to the level of a constitutional violation that impeded the right to vote." County Br. at 34. Appellees address these arguments in turn.

In *Soules v. Kauaians for Nukolii Campaign Comm.*, the appellants challenged a special election and Hawaii's absentee voting law, claiming the law failed to prohibit the delivery of absentee ballots to persons other than voters. 849 F.2d 1176, 1183 (9th Cir. 1988). This Court concluded that in light of the extensive regulations preventing the tampering of ballots, the delivery of 60 absentee ballots to persons other than the voter did not render the election unfair. *Id.* This Court, therefore, affirmed the summary judgment order rejecting the appellants' constitutional claims. *Id.* at 1184.

In *Gamza*, the Fifth Circuit emphasized that courts must "recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote." 619 F.2d at 454. The court concluded that because there was no evidence that Texas's electoral laws operated in a discriminatory manner, and the complaint alleged only an "inadvertent error", there was no constitutional deprivation. *Id.*; *see also Curry v. Baker*, 802 F.2d 1302, 1316

16

(11th Cir. 1986) (finding no constitutional violation because the alleged irregularities were the "incidental result of the Democratic Committee's attempt to determine the lawful primary winner in circumstances where plaintiffs had created the situation making absolute accuracy impossible"); *Bodine v. Elkhart County Elec. Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986) (finding that the malfunctioning of machines did not give rise to section 1983 claim because there was no evidence of willful conduct).

In *Northeast Ohio Coalition for the Homeless v. Husted*, Ohio made changes to its election laws, requiring the boards of elections to give voters notice of the additional information required for the absentee ballot to be counted. 837 F.3d 612, 619 (6th Cir. 2016). The Sixth Circuit emphasized that whether the elections board applied varying practices when determining whether to reject a ballot did "not address the central question in a lack-of-uniform standards claim: whether Ohio lacks 'adequate statewide standards for determining what is a legal vote.'" (*Id.* at 635-36 (quoting *Bush*, 531 U.S. at 110). The Sixth Circuit found that the discrepancies in how the local boards applied the statewide provisions impacted a small number of voters and did not give rise to a due process claim. 837 F.3d at 637.

Appellants do not allege that the state implemented strict vote-counting procedures or that the alleged irregularities are the result of random mistakes or machine malfunctions that transpired during one election. California does not

17

provide uniform standards regarding signature verification and ballot remaking technologies and manual procedures. ER 63-64. EIPCa has collected *thousands* of incident reports demonstrating that election workers do not adequately vet signatures and ballots, as allowed by state law, in the counties Appellee County Registrars oversee. ER 63-71. The irregularities are not isolated events but have occurred with the same frequency for the last three election cycles. *Id.*

The County improperly argues that "Appellants' allegations of deficient signature verification are often conclusory and speculate that invalid ballots may have been (or may one day be) counted." County Br. at 35. This argument conflicts with Appellants' allegations. Appellants specifically allege that some "election workers even *counted* ballots with no signatures or signatures that did not match the identity of the voter." ER 64 (emphasis added). At this stage, this Court must accept these allegations as true and construe all reasonable inferences in Appellants' favor. *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

Moreover, Appellants allege that Appellee County Registrars have failed to remove ineligible voters from the voter rolls for at least a decade and, in some cases, counted ineligible ballots. ER 50, 52, 57, 72. In 2020, Appellant EIPCa collected data revealing that 596 Nevadans voted in California, 180 individuals voted in both Nevada and California, and 72 individuals voted in California even though they were

deceased. ER 72. There is nothing "vague and unclear" about these allegations. County Br. at 36. EIPCa also recorded that almost 124,000 more votes were counted in the 2020 election than registrants with voting histories for that election. *Id.* These systemic "patterns and practices have continued through 2021 and 2022." *Id.*

Finally, the alleged irregularities across counties are not due to variations in population. County Br. at 28-29. Whether the counties apply different points of comparison or use a signature verification machine has no bearing on the size of the counties. ER 63. And Appellants did not allege that Placer County took more time reviewing signatures because its population is smaller. *Id.* This Court cannot rely on judicially noticed facts regarding the sizes of counties in California because they conflict with Appellants' allegations. *See United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) ("More specifically, we may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed.")

California's laws and regulations have enabled county officials to impose "significantly inaccurate systems of vote counting….upon some portions of the electorate and not others…." *Black*, 209 F. Supp. 2d at 901. Appellants' due process claim also satisfies Rule 8 of the Federal Rules of Civil Procedure's minimal pleading standard.

D.    THE LOWER COURT IMPROPERLY DISMISSED THE CASE WITHOUT LEAVE
      TO AMEND

Appellees claim this Court should not grant leave to amend because the case
has no legal merit. County Br. at 37-38; State Br. at 57-58. However, an amendment
is futile only when "no set of facts can be proved under the amendment to the
pleadings that would constitute a valid and sufficient claim or defense." *Miller v.
Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). This Court has "previously
reversed the denial of a motion for leave to amend where the district court did not
provide a contemporaneous specific finding of prejudice to the opposing party, bad
faith by the moving party, or futility of the amendment." *Bowles v. Reade*, 198 F.3d
752, 758 (9th Cir. 1999) (citing cases).

Neither the lower court nor the Appellees can cite to any facts that imply
Appellants have acted in bad faith or that an amendment would be futile. Indeed,
Appellees suggest that an amendment may be necessary by claiming Appellants'
allegations are not systemic or are the product of variations in county populations.
State Br. at 54-56; County Br. at 28-29, 33-34. Even if these arguments were proper,
an amendment could cure any pleading defect. This Court should therefore reverse
the lower court's dismissal because the lower court abused its discretion.

## III. CONCLUSION

This Court should reverse or vacate the lower court's dismissal and remand for further proceedings.

Date: November 20, 2023                    Respectfully submitted,

/s/ Mariah Gondeiro
Mariah Gondeiro

*Counsel for Appellants Election Integrity*
*Project California, Inc. et al.*

21

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by the Ninth Circuit Rule 32-1. The brief is 4,640 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Date: November 20, 2023

Respectfully submitted,

/s/ Mariah Gondeiro
Mariah Gondeiro

## CERTIFICATE OF SERVICE

I certify that on November 20, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Ninth Circuit. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


/s/ Mariah Gondeiro
Mariah Gondeiro